**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

**CONSERVATION LAW FOUNDATION,**

***Plaintiff,***

**v.**

**WILBUR ROSS, *et al.*,**

**Defendants.**

**Civ. No. 1:18-cv-01087-JEB**

**MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE AS DEFENDANT**

David E. Frulla
D.C. Bar No. 414170

Andrew Minkiewicz
D.C. Bar No. 981552

Elizabeth C. Johnson
D.C. Bar No. 987429

Anne E. Hawkins
D.C. Bar No. 1020996

KELLEY DRYE & WARREN LLP
3050 K Street, N.W. – Suite 400
Washington, D.C. 20007
Telephone: (202) 342-8400
Facsimile: (202) 342-8451
dfrulla@kelleydrye.com
aminkiewicz@kelleydrye.com
ejohnson@kelleydrye.com
ahawkins@kelleydrye.com

*Attorneys for Proposed Defendant-Intervenor*

## TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1
II. FACTUAL BACKGROUND ..... 2
  A. Proposed Intervenor ..... 2
  B. The Atlantic Scallop Fishery ..... 4
  C. The Omnibus Habitat Amendment 2 ..... 6
  D. FSF Involvement and Interest in OHA2 ..... 8
III. FSF SHOULD BE PERMITTED TO INTERVENE AS OF RIGHT ..... 9
  A. FSF's Application Is Timely ..... 10
  B. FSF Has a Sufficient Interest Relating to this Action to Warrant Intervention and Establish Standing ..... 11
  C. No Existing Party Adequately Represents FSF's Interests ..... 14
IV. IN THE ALTERNATIVE, FSF SHOULD BE GRANTED PERMISSIVE INTERVENTION ..... 15
V. CONCLUSION ..... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akiachak Native Cmty. v. U.S. Dept. of Interior*,
584 F. Supp. 2d 1 (D.D.C. 2008) ........................................................................10

* *Assoc. Dog Clubs of N.Y. v. Vilsack*,
44 F. Supp. 3d 1, 6 (D.D.C. 2014) ........................................................11, 13, 15

*CLF v. Mineta*,
131 F. Supp. 2d 19 (D.D.C. 2001) ........................................................................9

*CLF v. U.S. Dept. of Commerce*,
229 F. Supp. 2d 29 (D. Mass. 2002) ......................................................................9

* *Forest Cnty. Potawatomi Cmty. v. United States*,
317 F.R.D. 6 (D.D.C. 2016)................................................................... *passim*

*Military Toxics Project v. EPA*,
146 F. 3d 948 (1998)...................................................................................11, 14

*Mova Pharmaceutical Corp. v. Shalala*,
140 F.3d 1060 (D.C. Cir. 1998) ...........................................................11, 14

*Nat'l Coalition for Marine Conservation v. Evans*,
231 F. Supp. 2d 119 (D.D.C. 2002) ........................................................................9

*Navistar, Inc. v. Jackson*,
840 F. Supp. 2d 357 (D.D.C. 2012) ...................................................................10, 15

*Oceana v. Evans*,
384 F. Supp. 2d 203 (D.D.C. 2005) ....................................................................2, 9

*Oceana v. Evans*,
Civ. No. 03-10570-GAO, 2004 U.S. Dist. LEXIS 14895 (D. Mass. July 30, 2004) ..........................................................................................................9

*Oceana v. Gutierrez*,
Civ. No. 1:07-cv-00142-RBW (D.D.C. May 30, 2007) ..........................................9

*Oceana v. Prtizker*,
24 F. Supp. 3d 49 (D.D.C. 2014) ..........................................................................9

*Oceana v. Prtizker*,
75 F. Supp. 3d 469 (D.D.C. 2014) ......................................................................2, 9

*Wilderness Soc'y v. Babbitt*,
104 F. Supp. 2d 10 (D.D.C. 2000) .......... 9

**Other Authorities**

83 Fed. Reg. 15240 (Apr. 9, 2018) .......... 1, 6-7

Fed. R. Civ. P. 24 .......... 1, 9, 14-16

Local Rule 7(a), (j) .......... 1

Pursuant to Local Rule 7(a), proposed defendant-intervenor Fisheries Survival Fund ("FSF" or "Proposed Defendant-Intervenor"), by and through undersigned counsel, hereby submits this Memorandum in Support of its Motion for Leave to Intervene as of right pursuant to Fed. R. Civ. P. 24(a)(2), or, in the alternative, for permissive intervention under Fed. R. Civ. P. (b)(1)(B), and Local Rule 7(j).

## I. INTRODUCTION

Plaintiff Conservation Law Foundation ("Plaintiff" or "CLF") has brought this action to challenge Defendant, the National Marine Fisheries Service's ("NMFS") Final Rule, 83 Fed. Reg. 15240 (Apr. 9, 2018) ("Final Rule"), which implements the Omnibus Essential Fish Habitat Amendment 2 ("OHA2"). OHA2 implements broad sets of regulations designed to improve essential fish habitat ("EFH") protection and changes year-round and seasonal closure areas. In pertinent part, OHA2 and the Final Rule opened an expanded portion of fishing grounds in the Georges Bank and Southern New England management region off the coast of Massachusetts to mobile bottom-tending gear (*i.e.*, including scallop dredges). These areas contain high scallop concentrations and previously had been closed to scallop fishermen for over two decades. *See* Declaration of Marjorie J. Orman ("Orman Decl.") (attached hereto as Exhibit 1) ¶ 25. The areas were originally within closures implemented by the New England Fishery Management Council (the "Council") in 1994. *Id.* These areas were part of what is known as "Closed Area I" on Georges Bank and the "Nantucket Lightship Closed Area" ("NLSA") in the Southern New England region. *Id.* Later, in 2003, portions of Closed Area I and NLSA at issue in this action were also designated as closed areas as part of the original Omnibus Habitat Amendment; however, these closures were primarily designed to control fishing mortality, not to protect vulnerable habitat. *Id.* ¶ 26. Plaintiff's lawsuit, in effect, seeks to have these superseded habitat closures re-implemented.

FSF, an organization representing well over 200 scallop fishery permit holders all along the Eastern seaboard – from Maine to North Carolina – was an active participant in the regulatory process leading to the Final Rule adopting OHA2. *See* Orman Decl. ¶¶ 2, 20. FSF's participants actively fish off the coast of Massachusetts, and currently are fishing in the newly-opened areas under OHA2. *Id.* ¶ 30; *see also* Declaration of Eric Hansen ("Hansen Decl.") (attached hereto as Exhibit 2) ¶ 3. As set forth herein, FSF seeks to intervene in this action to protect its participants' demonstrated interests in OHA2 and the Final Rule, and specifically to protect their interest in the continued economic viability and ecological sustainability of scallop fishing operations, as well as their interests in the Full-Time scallop permits they have been issued by NMFS. FSF requests this intervention because Plaintiff's requested relief could cost the scallop fishery an estimated $140-160 million per year and would set back scallop and habitat conservation efforts promoted by OHA2. Orman Decl. ¶¶ 30-32. Moreover, the current Biological Opinion for the scallop fishery addresses protected species in a comprehensive way, and has been successfully defended through litigation. *See Oceana v. Pritzker,* 75 F. Supp. 3d 469 (D.D.C. 2014); *Oceana v. Evans,* 384 F. Supp. 2d 203 (D.D.C. 2005). Accordingly, FSF seeks to participate as a Defendant-Intervenor in this case with respect to those aspects of the case that impact the scallop fishery.

## II. FACTUAL BACKGROUND

### A. Proposed Intervenor

FSF was founded in March of 1998 by Atlantic scallop fishermen holding Full-Time Limited Access permits issued by the federal government. Orman Decl. ¶ 2. The Atlantic Limited Access scallop fishery is conducted from the Georges Bank, off Massachusetts, through Virginia. *Id.* ¶ 3. FSF's 200-plus participants are similarly homeported from Massachusetts to North Carolina. *Id.* ¶¶ 3-4. Each of FSF's participants primarily, if not entirely, fish for scallops

using scallop dredges. *Id*. ¶ 2. Scallop dredges are not anything like the hydraulic dredges Plaintiffs reference in their Complaint. About the only thing these two pieces of equipment have in common is that they are towed behind a boat. But more on that, if FSF is permitted to intervene.

FSF's goal is to enhance the information and techniques used by Defendants to provide sustainable yield from the Atlantic scallop fishery and to preserve FSF's participants' economic viability. *Id*. ¶ 5. The fishery has been rebuilt for nearly twenty years. Ecologically balanced and economically viable scallop conservation and management measures over the long term are critical to these goals. *Id*.

More specifically, since its inception, FSF consistently has advocated for interests of its participants and the Full-Time Limited Access scallop fleet. *Id*. ¶ 6. FSF works to address regulatory proposals that negatively affect the economic prospects and long-term viability of the scallop fishing industry; develop better scientific information about scallop resources; develop better approaches to scallop conservation and management; and develop fishing gear and techniques that better meets conservation needs while maintaining catch levels. *Id*. ¶ 2. FSF has also dedicated time and resources attending meetings and writing comments for the Council and the Mid-Atlantic Fishery Management Council ("Mid-Atlantic Council"), as well as NMFS, regarding matters of concern to the scallop fishery. *Id*. ¶ 7.

Over the past two decades, FSF has also combined the experience and knowledge of its participants with outside scientific and academic experts to generate much-improved strategies for the industry and the environment. *Id*. ¶ 8. In this regard, FSF collaborates with university and government scientists, as well as privately-retained scientists and consultants. *Id*. FSF has

participated actively in the development of OHA2 and the scientifically rigorous collection and analysis of information used in OHA2's development. *Id.* ¶¶ 20-21, 24.

**B. The Atlantic Scallop Fishery**

1. Bycatch and interaction with other species

FSF participants have teamed with gear technologists and university scientists to greatly reduce the unintended incidental catch ("bycatch") of fish species other than scallops. *Id.* ¶ 9. For example, FSF participants have helped develop and utilize a real-time online yellowtail flounder bycatch avoidance system administered by the School of Marine Sciences and Technology at the University of Massachusetts-Dartmouth. *Id.*

The scallop fishery operates with extremely low occurrences of protected species interactions. *Id.* ¶ 15. Of the interactions with species protected under the ESA and other laws that have historically occurred, the primary impacted species was threatened loggerhead sea turtles. *Id.* In 2006, FSF worked with NMFS, the Council and scientific partners to develop and implement a gear modification called turtle chains to minimize the impact of such interactions. *Id.* Additional modifications were made to the dredge frame in subsequent years to further minimize the potential for harm to the turtles. *Id.* Since then, general reductions in scallop fishing and increases scallop harvest rates (also called catch-per-unit-effort or "CPUE") resulting from the rotational management regime have further greatly reduced any potential for protected species interactions. *Id.* To FSF's knowledge, and as detailed in the Biological Opinion regarding the scallop fishery, no scallop vessel has ever had an interaction with a right whale, nor is there documentation of such an interaction. *Id.* ¶ 16.

2. Importance of rotational management to the scallop fishery

The Council's Atlantic Sea Scallop Fishery Management Plan and its implementing regulations govern the Atlantic sea scallop fishery. *Id.* ¶ 10. In 2003, Amendment 10 to the

Scallop FMP overhauled the regulatory structure governing the scallop fishery. *Id*. ¶ 11. Amendment 10 implemented a rotational model, with a combination of "open areas" and controlled "access areas" of high abundance. *Id.* Open areas are managed by restricting the number of days each permitted vessel can fish per year (known as "days-at-sea" ("DAS")). *Id.* ¶¶ 11-12. The access areas, on the other hand, are treated much like farmland, in that they are closed to fishing when abundant concentrations of juvenile scallops are discovered in resource surveys conducted by the federal government and teams of university scientists, and then opened to fishing when the scallops are mature. *Id.* ¶ 11. When the access areas are reopened, they are subject to controlled harvest by fixing the total number of trips and pounds of scallops per trip. *Id*.

FSF championed the practice of rotational management in the scallop fishery. *Id*. ¶ 13. By fishing in areas of high scallop concentrations, fishermen are able to reduce the amount of time they need to spend fishing to catch a given weight of scallops, *e.g.*, increase CPUE. *Id*. By this measure alone, the scallop dredge's impact on the ocean bottom habitat is reduced, scallop yield is increased, and the potential that dredges will inadvertently catch other fish species, such as yellowtail flounder, summer flounder, and monkfish, decreases. *Id*. Moreover, in the high-abundance access areas where scallops are larger due to having benefitted from periods of "grow-out," and where landings are capped by weight, there are additional environmental and economic benefits in that fewer individuals are harvested per unit of weight – and larger scallops generally achieve higher market prices. *Id*. ¶ 14.

Currently, scallop stocks are at or near historic high levels of abundance. *Id*. ¶ 17. The rotational management model developed through Amendment 10 has led the Atlantic scallop fishery to become one of the most highly valued in the nation, *id*., and the scallop fishery is

relying on its ability to utilize rotational management areas and open areas off the New England and Mid-Atlantic coasts for its continued sustainability. *Id.* ¶ 18. When areas are closed to the fishery, the overall catch limits for the fishery decrease due to complexities of the catch projection models. *Id.* ¶ 19. Displaced efforts in open areas, in particular, that result from a fishery closure also include: (1) increased localized fishing pressure in locations that may not readily support such pressure; (2) changed catch composition and therefore reversal of progress made on bycatch reduction efforts; and (3) increased gear bottom contact time when vessels are forced to fish in less efficient areas, thereby increasing the potential for habitat impacts and incidental catch across the fishery's range. *Id.*

### C. The Omnibus Habitat Amendment 2

The Council initiated OHA2 in 2004, and spent over a decade on its development in order to improve management of essential fish habitat and to enhance groundfish productivity. *See* Final Rule, 83 Fed. Reg. 15240 (Apr. 9, 2018). With regard to the first objective, OHA2 implemented a broad group of management measures, including new closures, to improve habitat protection. Orman Decl. ¶ 27. It performed a comprehensive review of the existing groundfish closures, which had been designed to control fishing mortality, not to protect vulnerable habitat. *Id.* ¶ 26. As a key component of this review, the Council developed the Swept Area Seabed Impact ("SASI") model, which combined fishing effort data and estimates of habitat vulnerability in a spatial context, in order to estimate adverse impacts to habitat from fishing. *Id.* ¶ 23. Through the OHA2 process, the Council determined – after years of comprehensive review – that its SASI model and other analyses were the best and most robust tools for consideration of alternatives that collectively minimized the adverse effects of fishing on essential fish habitats. *Id.* ¶ 24. The Council also relied on far more detailed substrate profiling information that was not available when the existing closures were implemented, such as scallop video survey work

conducted by the University of Massachusetts' School for Marine Science and Technology in collaboration with FSF participants. *Id*.

Analysis from the SASI model, which was peer-reviewed twice, concluded that the best way to minimize habitat impacts from scallop fishing gear is to maximize CPUE. *Id*. ¶ 23. This principle, in consideration with impacts to juvenile groundfish, essential fish habitat, and habitat areas of particular concern, helped guide the Council in selecting its OHA2 alternatives, particularly as it relates to the scallop fishery. *Id*. The Council also considered that maximizing CPUE would, in general, reduce the potential, if any, for protected species interactions or other impacts. *Id*.

Informed by its analyses, including use of the SASI model, the Council re-designed its system of fisheries closures throughout New England. *See* 83 Fed. Reg. 15240. This resulted in the closure of areas with vulnerable habitat that had been open to fishing prior to OHA2, as well as the opening of some areas that had previously been closed to fishing. *Id.* The areas were grouped by region and include Gulf of Maine, Georges Bank, and Southern New England. *See* 83 Fed. Reg. 15241-23. The new areas represented an overall improvement in protection of the most vulnerable habitat, based on improved scientific understanding since the time of the original designations. *See, e.g.,* 83 Fed. Reg. at 15244 ("the approved measures are expected to have positive habitat impacts compared to leaving the habitat and groundfish closures in the Nantucket Lightship area in place...").

In addition to improving habitat protections, OHA2 improved the scallop fishery's ability to achieve optimum yield by opening an expanded portion of Closed Area I (located on Georges Bank) and the western part of the Nantucket Lightship area (in the Southern New England region), which had been closed for over two decades. Both areas contain – and have historically

contained –substantial amounts of valuable large scallops. Orman Decl. ¶ 28; Hansen Decl. ¶ 4. The Council-selected alternatives represent a balanced approach to maximizing protection of vulnerable seabed habitat without causing unnecessary economic harm to the region's federal fisheries. Orman Decl. ¶ 22. These alternatives were selected with a full understanding of scallop fishery regulations and practices, and with consideration of a huge body of scientific literature. *Id*.

**D. FSF Involvement and Interest in OHA2**

FSF and its participants were actively engaged in the Council's development process for OHA2, which was fair, transparent, and based on a substantial scientific record. Orman Decl. ¶ 20. Over more than a decade during its development, FSF representatives attended all, or nearly all, of the Council's meeting regarding OHA2 – including meetings of its Habitat Committee, Advisory Panel, Plan Development Team, and Closed Area Technical Team. *Id*. ¶ 21. FSF also submitted hundreds of formal oral and written comments to the Council and NMFS regarding the analyses and alternatives contained in OHA2. *Id*.

FSF's interest in OHA2 stems primarily from OHA2's improvement of the fishery's ability both to achieve optimum yield and reduce habitat impacts by opening an expanded portion of Closed Area I and the western part of the NLSA, which had been closed for over two decades. *Id*. ¶ 28. Both areas contain substantial amounts of valuable large scallops. *Id*. At the time the Final Rule was published, the Council estimated that the new access into the Closed Area I and Nantucket Lightship areas would increase scallop revenue by $140-$160 million in the following year alone. *Id*. ¶ 30. Although only implemented a few months ago, FSF participants currently are fishing in the newly-opened areas, and are already seeing major increases in revenue, with unprecedented high levels of CPUE, due to the new management regime. *Id*.; Hansen Decl. ¶ 6.

## III. FSF SHOULD BE PERMITTED TO INTERVENE AS OF RIGHT

"[T]he D.C. Circuit has taken a liberal approach to intervention." *Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 18 (D.D.C. 2000) (citing *Natural Res. Def. Council v. Costle*, 561 F.2d 904, 910-11 (D.C. Cir. 1977)). Intervention may be "of right" or "permissive." Fed. R. Civ. P. 24. In this regard, courts in this Circuit have permitted industry groups to intervene as defendants in lawsuits filed by environmental groups against government agencies challenging regulatory decisions. *See, e.g., Nat'l Coalition for Marine Conservation v. Evans*, 231 F. Supp. 2d 119 (D.D.C. 2002). Indeed, FSF has been permitted to intervene as a defendant in numerous lawsuits challenging rulemakings involving the Atlantic scallop fishery, including several brought by Plaintiff CLF.[1]

Intervention as of right is governed by Federal Rule of Civil Procedure 24(a), which provides, in relevant part:

> On a timely motion, the court must permit anyone to intervene who: . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a). The D.C. Circuit "has identified four requirements for intervention as a matter of right: . . . (1) an application to intervene in a pending action must be timely . . . (2) the putative intervenor must have a 'legally protected' interest in the action . . . (3) the action must

---

[1] *See, e.g., CLF v. Mineta*, 131 F. Supp. 2d 19 (D.D.C. 2001) (challenging scallop Frameworks 12 & 13); *CLF v. U.S. Dept. of Commerce*, 229 F. Supp. 2d 29 (D. Mass. 2002) (scallop Framework 14); *Oceana v. Evans*, Civ. No. 03-10570-GAO, 2004 U.S. Dist. LEXIS 14895 (D. Mass. July 30, 2004) (challenging scallop Framework 15 on ESA and MSA grounds); *Oceana v. Evans*, 384 F. Supp. 2d 203 (D.D.C. 2005) (challenging scallop FMP Amendment 10 on ESA and MSA grounds); *Oceana v. Gutierrez*, Civ. No. 1:07-cv-00142-RBW (D.D.C. May 30, 2007) (challenging 2006 scallop Biological Opinion); *Oceana v. Prtizker*, 75 F. Supp. 3d 469 (D.D.C. 2014) (challenging 2008 scallop Biological Opinion); *Oceana v. Prtizker*, 24 F. Supp. 3d 49 (D.D.C. 2014) (challenging Omnibus Amendment to annual catch limits).

threaten to impair the putative intervenor's proffered interest in the action . . . [and] (4) no existing party to the action may adequately represent the putative intervenor's interests." *Forest Cnty. Potawatomi Cmty. v. United States*, 317 F.R.D. 6, 10-11 (D.D.C. 2016) (internal citations omitted). In addition to these requirements, a proposed intervenor must establish the elements of Article III standing. *Id.* at 11. As discussed below, FSF meets these requirements.

**A. FSF's Application Is Timely**

In considering the timeliness of a motion to intervene, "courts should take into account (a) the time elapsed since the inception of the action, (b) the probability of prejudice to those already party to the proceedings, (c) the purpose for which intervention is sought, and (d) the need for intervention as a means for preserving the putative intervenor's rights." *Forest Cnty.*, 317 F.R.D. at 10 (citing *Karsner v. Lothian*, 532 F.3d 876, 886 (D.C. Cir. 2008)). "The critical factor is whether any 'delay in moving for intervention will prejudice the existing parties to the case.'" *Akiachak Native Cmty. v. U.S. Dept. of Interior*, 584 F. Supp. 2d 1, 5-6 (D.D.C. 2008). So long as a motion for intervention is filed at the same time or shortly after the defendants' answer to the complaint, the motion generally is considered timely. *See, e.g.*, *Navistar, Inc. v. Jackson*, 840 F. Supp. 2d 357, 361 (D.D.C. 2012) (motion to intervene was timely when filed "less than two weeks after Defendants filed their responsive pleadings, [but] before any discovery or substantive progress had been made in the case").

Here, FSF has filed this Motion contemporaneously with Defendants' filing of their Answer to Plaintiffs' Complaint, and before Defendants filed any other responsive pleadings. FSF has also moved to intervene before any discovery or substantive progress has been made in the case, and before the Court has issued a scheduling order in the case. Indeed, the Court recently extended the deadline for Defendants to file the certified list of the contents of the administrative record until September 7, 2018. *See* July 10, 2018 Minute Order. Thus, FSF's intervention will

not delay the proceedings, and no party can reasonably claim it would be prejudiced by FSF's intervention at this stage in the case. FSF's Motion accordingly is timely.

**B. FSF Has a Sufficient Interest Relating to this Action to Warrant Intervention and Establish Standing**

The second and third intervention prongs require a putative intervenor to show that the action threatens to impair its "legally protectable" interest. *See Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1074 (D.C. Cir. 1998) (citing *Southern Christian Leadership Conf. v. Kelley*, 747 F.2d 777, 770 (D.C. Cir. 1984)). The test as to whether a proposed intervenor's interest is threatened "is not a rigid one," *Forest Cnty.*, 317 F.R.D. at 10, and merely evaluates "the 'practical consequences' that the applicant may suffer if intervention is denied." *Id*. (citations omitted). Courts have found this requirement met where an agency rule benefits the putative intervenors and "vacating that rule would remove that benefit." *Assoc. Dog Clubs of N.Y. v. Vilsack*, 44 F. Supp. 3d 1, 6 (D.D.C. 2014) (noting "[t]his potential harm is not obviated by the [proposed intervenor's] ability to 'reverse an unfavorable ruling by bringing a separate lawsuit,' given the cost and delay of doing so").

Moreover, for purposes of Article III standing, a party seeking to intervene as a defendant in order to uphold an agency action must establish: "(a) that it would suffer a concrete injury-in-fact if the action were to be set aside, (b) that the injury would be fairly traceable to the setting aside of the agency action, and (c) that the alleged injury would be prevented if the agency action were to be upheld." *Forest Cnty.*, 317 F.R.D. at 11. An association like FSF has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Military Toxics Project v. EPA*, 146 F. 3d 948, 953-54 (1998) (citations omitted).

In *Forest County*, the court held that the proposed intervenors, the Menominee Indian Tribe of Wisconsin and the Menominee Kenosha Gaming Authority ("Menominee"), had standing to intervene in an action challenging the Department of the Interior's decision to disapprove an amendment to a gaming compact between the plaintiff Potawatomi Community and the State of Wisconsin that would essentially create a "50-mile non-competition zone" around the plaintiff's gaming facility in Milwaukee. *Id*. at 9. The court found that where the Menominee putative intervenors had "attempted for years to develop a gaming facility on land in Kenosha [*i.e*., within the 50-mile radius around Milwaukee]," and would "continue their efforts in the future," they had standing to intervene in the Potawatomi Community's suit because the suit sought to "overturn[] a favorable administrative action sought by the Menominee and which benefitted the Menominee." *Id*. at 11-12. In other words, an adverse decision to the Menominee on the merits would "impede their efforts to develop a gaming facility in Kenosha" and would "put the Menominee at a 'competitive disadvantage when seeking state approval for off-reservation gaming.'" *Id*. at 12.

Just as in *Forest County*, Plaintiff here has challenged an administrative decision (*i.e*., OHA2 and Final Rule) which FSF worked for years to achieve, and which benefits FSF and its participants. FSF has a legally protectable interest in a safely prosecuted and sustainable Atlantic scallop fishery, which affects the long-term viability of its participants' livelihoods. *See* Orman Decl. ¶ 5. FSF's participants also have a legally protected economic interest in fishing the newly-opened areas under OHA2 and the Final Rule. *Id*. ¶ 30; Hansen Decl. ¶¶ 4-6.

Plaintiffs, however, seek to have the Court vacate OHA2 and Final Rule and re-close the newly-opened fishing areas. *See* Complaint (Dkt. 1) at 37 ("Prayer for Relief"). A decision adverse to FSF on the merits would threaten FSF's and its members' interests by causing FSF's participants significant economic harm. Specifically, returning the re-opened portions of Closed

Area I and the Nantucket Lightship areas, which contain extremely high densities of scallops, to their former closed status would result the loss of hundreds of millions of dollars to FSF's participants and set back scallop rotational management. Orman Decl. ¶ 31.

A closure of the newly-opened areas would also harm essential fish habitat. Since the previous area closures dating from 2003 were not designed using detailed habitat information that became available over the last 15 years, the scallop fishery gave up access to those resources with no valid justification. *Id.* ¶ 32. OHA2 moved the closures to areas with more vulnerable habitat, which would be left unprotected if OHA2 were vacated. *Id.* These re-closings would also end up decreasing scallop fishery CPUE and correspondingly increase any potential, if any, for protected species interactions or other impacts. *Id.*

Ultimately, Plaintiff's requested remedy would undermine FSF's extensive work to develop a thriving and sustainable scallop fishery through rotational management, which is germane to FSF's purpose. *See* Orman Decl. ¶¶ 5-13; *see also Assoc. Dog Clubs of N.Y. v. Vilsack*, 44 F. Supp. 3d 1, 5 (D.D.C. 2014) ("Harm caused to an organization's programs by the invalidation of a rule" is a "concrete" injury); *Forest Cnty.*, 317 F.R.D. at 14 ("the requested relief, if granted, would, as a practical matter, impede the Menominee's efforts to . . . develop a gaming facility in Kenosha. Accordingly, disposition of this action could seriously impair the ability of the Menominee to protect their interests") (internal citation omitted). FSF has thus demonstrated a concrete injury that is traceable to the setting aside of OHA2 and the Final Rule.

Because upholding OHA2 and the Final Rule would remedy FSF's potential harm, FSF has shown the third element of standing – redressability – and accordingly has established constitutional standing to intervene in this case. Because FSF's members would have standing in their own right to intervene in this case to protect their economic interests as well as their interest

in a safely prosecuted and ecologically sustainable Atlantic scallop fishery; because these interests are germane to FSF's purpose; and because neither Plaintiff's claims nor relief requested requires the participation of FSF's individual members, FSF has established associational standing. *Military Toxics Project*, 146 F. 3d at 953-54.

Courts in this Circuit have held "generally speaking, when a putative intervenor has a 'legally protected' interest under Rule 24(a), it will also meet constitutional standing requirements, and *vice versa*." *Forest Cnty.*, 317 F.R.D. at 11 n.4 (citing *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003) ("[A]ny person who satisfies Rule 24(a) will also meet Article III's standing requirement")); *Fund for Animals*, 322 F.3d at 735 ("Our conclusion that the [proposed intervenor] has constitutional standing is alone sufficient to establish that [it] has 'an interest relating to the property or transaction which is the subject of the action'"). Because FSF has established Article III standing in this case, it has also established its "legally protected interest" in this action for purposes of Rule 24. *See Forest Cnty.*, 317 F.R.D. at 13 (citing *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1076 (D.C. Cir. 1998) ("[The proposed intervenor] need not show anything more than that it has standing to sue in order to demonstrate the existence of a legally protected interest for purposes of Rule 24(a)."). Thus, FSF has met the second and third prongs of the test for intervention as of right.

**C. No Existing Party Adequately Represents FSF's Interests**

Finally, FSF meets the fourth prong of intervention because no existing party to this case will adequately represent FSF's interests in upholding OHA2 and the Final Rule. "[T]he putative intervenor's burden here is *de minimis*, and extends only to showing that there is a possibility that its interests *may* not be adequately represented absent intervention." *Forest Cnty.*, 317 F.R.D. at 11 (citing *Fund for Animals, Inc.*, 322 F.3d at 735). Moreover, "[w]here, as here, one of the existing parties is a governmental entity, courts in this Circuit 'have often concluded that

governmental entities do not adequately represent the interests of aspiring intervenors.'" *Id*. at 14 (citations omitted). *See also Assoc. Dog Clubs of N.Y.*, 44 F. Supp. at 6 ("[M]erely because parties share a general interest in the legality of a program or regulation does not mean their particular interests coincide so that representation by the agency alone is justified.").

In this case, the Government Defendants will not adequately represent FSF's interests in upholding OHA2 and the Final Rule. For instance, FSF has "'a more narrow and 'parochial' financial interest not shared' by the government." *Navistar, Inc.*, 840 F. Supp. 2d at 368 (quoting *Fund for Animals, Inc*., 322 F.3d at 737). Namely, FSF stands to directly and economically benefit from OHA2, which the Council has estimated would increase scallop revenue by $140-$160 million in the following year alone. Orman Decl. ¶ 30. FSF is "concerned with preserving [its] own rights and opportunities, including [its] specific economic development goals," whereas the Government Defendants "represent[] the public interest of its citizens as a whole, and would be 'shirking its duty were it to advance [a] narrower interest at the expense of its representation of the general public interest.'" *Forest Cnty.*, 317 F.R.D. at 14. Thus, no existing party would adequately represent FSF's interests in this case.

Because FSF meets all four prongs for intervention under Fed. R. Civ. P. 24(a)(2), FSF respectfully requests it be permitted to intervene as of right in this case.

## IV. IN THE ALTERNATIVE, FSF SHOULD BE GRANTED PERMISSIVE INTERVENTION

Although FSF believes it has a clear-cut case for intervention as of right, in the alternative, FSF should be granted permissive intervention under Fed. R. Civ. P. 24(b), which allows for intervention to a party who "has a claim or defense that shares with the main action a common question of law or fact." In that case, the Rules instruct the court to "consider whether the

intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b).

As discussed above, FSF seeks to protect its ecological interests in OHA2 and the Final Rule, and its members' interests in pursuing scallop fishing in the newly-opened areas. Because FSF filed its Motion to Intervene at this case's very initial stage, and before any substantive progress has been made in this case, no party will be prejudiced by FSF's intervention here. Accordingly, in the alternative, FSF should be granted permissive intervention in this case.

## V. CONCLUSION

For all the reasons set forth above, FSF respectfully requests the Court grant this Motion for the purposes of asserting and protecting the interests of the Full-Time Atlantic scallop fleet in maintaining the Federal Defendants' regulations implementing OHA2.

Dated: July 20, 2018

Respectfully submitted,

/s/ David E. Frulla
David E. Frulla (D.C. Bar 414170)
Andrew Minkiewicz (D.C. Bar 981552)
Elizabeth C. Johnson (D.C. Bar 987429)
Anne E. Hawkins (D.C. Bar No. 1020996)

KELLEY DRYE & WARREN LLP
3050 K Street, N.W. – Suite 400
Washington, D.C. 20007
Telephone: (202) 342-8400
Facsimile: (202) 342-8451
dfrulla@kelleydrye.com
aminkiewicz@kelleydrye.com
ejohnson@kelleydrye.com
ahawkins@kelleydrye.com

*Attorneys for Proposed Defendant-Intervenor*