**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CONSERVATION LAW FOUNDATION, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | Civ. No. 1:18-cv-1087-JEB |
| WILBUR ROSS, in his official capacity | ) | ORAL ARGUMENT REQUESTED |
| as Secretary of Commerce, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| _____ | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

ERICA A. FULLER
D.C. Bar No. MA0001
CONSERVATION LAW FOUNDATION
62 Summer St.
Boston, MA 02110
(617) 850-1727 Telephone
(617) 350-4030 Facsimile
efuller@clf.org

EMILY K. GREEN
D.C. Bar No ME0002
CONSERVATION LAW FOUNDATION
53 Exchange St., Suite 2000
Portland, ME 04101
(207) 210-6439 Telephone
(617) 350-4030 Facsimile
egreen@clf.org

*Counsel for Plaintiff*
*Conservation Law Foundation*

ROGER FLEMING
D.C. Bar No. ME0001
EARTHJUSTICE
1625 Massachusetts Avenue, N.W.
Suite 702
Washington, D.C. 20036
(202) 667-4500 Telephone
(202) 667-2356 Facsimile
rfleming@earthjustice.org

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... IV

INTRODUCTION ....................................................................................... 1

STATUTORY FRAMEWORK ..................................................................... 4

    I.    THE ENDANGERED SPECIES ACT .................................. 4

        A.    Section 7 Imposes Procedural And Substantive Obligations ..................... 4

        B.    The Habitat Amendment Is Subject To Section 7 Compliance ................. 6

        C.    Critical Habitat Contains Essential Biological Features ............................ 7

    II.    THE MAGNUSON-STEVENS ACT ................................... 7

    III.    THE ADMINISTRATIVE PROCEDURE ACT ................... 8

STATEMENT OF FACTS ............................................................................ 9

    I.    IMPERILED NORTH ATLANTIC RIGHT WHALES ........ 9

    II.    THE HABITAT AMENDMENT REVISES BOUNDARIES WHERE FISHERIES USING GEAR KNOWN TO INTERACT WITH NORTH ATLANTIC RIGHT WHALES ARE AUTHORIZED TO FISH ........................ 13

        A.    NMFS's Partial Approval Of The Habitat Amendment Revises Closures In Right Whale Critical Habitat ................................... 14

        B.    NMFS Continues To Allow Harmful Fishing In The Absence Of A Section 7 Consultation ................................................. 15

    III.    NORTH ATLANTIC RIGHT WHALE INTERACT WITH FISHERIES IN SOUTHERN NEW ENGLAND ............................ 16

        A.    Northeast Sink Gillnet Fisheries ............................................. 17

STANDING .............................................................................................. 17

STANDARD OF REVIEW ......................................................................... 18

ARGUMENT ............................................................................................ 19

    I.    THE HABITAT AMENDMENT IS A FEDERAL AGENCY ACTION THAT MAY AFFECT NORTH ATLANTIC RIGHT WHALES AND REQUIRES SECTION 7 CONSULTATION ...................................... 20

A.   The Habitat Amendment Is An Agency Action Within The Meaning Of ESA Section 7 ........................................................................ 20

B.   The FEIS Acknowledges The Habitat Amendment May Affect North Atlantic Right Whales ............................................................... 21

C.   NMFS Is Required To Consult On Agency Actions That May Affect North Atlantic Right Whales ............................................... 23

II.   NMFS FAILED TO SATISFY PROCEDURAL REQUIREMENTS OF SECTION 7 BEFORE APPROVING THE HABITAT AMENDMENT ............ 25

A.   The ESA Requires A Section 7 Consultation On The Entire Agency Action ......................................................................... 27

B.   NMFS Cannot Rely On Reinitiation Of Certain Consultations ................ 29

C.   NMFS Cannot Rely On Unlawful Biological Opinions To Satisfy Section Obligations .................................................................... 31

1.   Some Of The Referenced Biological Opinions Conclude That Their Fisheries May Affect North Atlantic Right Whales ......................................................................... 31

2.   The Biological Opinions And The Atlantic Large Whale Take Reduction Plan Assume Closures Eliminated By The Habitat Amendment ...................................................... 32

3.   The Biological Opinions Do Not Contain An Incidental Take Statement As Required ......................................... 33

4.   The Biological Opinions Predate Scientific Information Demonstrating That Re-Initiation Was Required ..................... 34

III.   NMFS VIOLATED SECTION 7(D) WHEN IT APPROVED THE HABITAT AMENDMENT .................................................................. 35

IV.   NMFS'S APPROVAL OF THE HABITAT AMENDMENT WITHOUT COMPLETING THE SECTION 7 CONSULTATION VIOLATES THE MAGNUSON-STEVENS ACT AND THE APA ................................... 37

V.   THE COURT SHOULD VACATE MEASURES IN SOUTHERN NEW ENGLAND/GREAT SOUTH CHANNEL AND ENJOIN NMFS TO RECLOSE SUCH AREAS UNTIL SECTION 7 CONSULTATION IS COMPLETED AND MEASURES NECESSARY TO AVOID JEOPARDY ARE IMPLEMENTED ................................................... 38

CONCLUSION ............................................................................... 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Rivers v. Army Corps of Eng'r,*
  271 F. 2d 230 (D.D.C. 2003) ...................................................................................27, 18

*American Oceans Campaign v. Daley,*
  183 F. Supp. 2d 1 (D.D.C. 2000) .......................................................................13

*Amoco Prod. Co. v. Vill. of Gambell, AK,*
  480 U.S. 531 (1987).............................................................................................39

*Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson,*
  685 F.2d 678 (D.C. Cir.1982) .............................................................................18

*Camp v. Pitts,*
  411 U.S. 138 (1973).............................................................................................19

*Center for Biological Diversity, et al. v. EPA,*
  861 F.3d 174 (D.C. Cir. 2017) .......................................................................26, 29

*Center for Biological Diversity v. Ross,*
  2018 WL 4828406 (D.D.C. 2018) ..................................................................19, 26

* *Conner v. Burford,*
  848 F.2d 1441 (9th Cir. 1988) .......................................................................27, 28

*Defs. of Wildlife v. Jackson,*
  791 F. Supp. 2d 96 (D.D.C. 2011)......................................................................26

*Flaherty v. Bryson,*
  850 F. Supp. 2d 38 (D.D.C. 2012) ......................................................................37

*Friends of the Earth v. Laidlaw Envtl. Servs.,*
  528 U.S. 167 (2000).............................................................................................18

*Friends of River v. Nat'l Marine Fisheries Serv.,*
  293 F. Supp. 3d 1151 (E.D. Cal. 2018)...............................................................27

* *Greenpeace v. Nat'l Marine Fisheries Serv.,*
  80 F. Supp. 2d 1137 (W.D. Wash. 2000).......................................................28, 29

*Hawaii Longline Ass'n. v. Nat'l Marine Fisheries Serv.*,
   281 F. Supp. 2d 1 (D.D.C. 2003) ........................................ 29

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ...............................................26, 39

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual Auto. Ins. Co.*,
   463 U.S. 29 (1983) ......................................................9

*Natural Res. Def. Council v. Houston*, 146 F.3d 1118 (9th Cir.
   1998)……………………………………………………………………36

*Nat. Resources Defense Council v. Rodgers*, 381 F.Supp.2d 1212, (E.D. Cal.
   2005)……………… ……………………………………………………27

*Nat'l Parks Conservation Ass'n v. Jewell*,
   62 F.Supp.3d 7 (D.D.C. 2014 ) ...........................................38

*Nat'l Wildlife Fed'n v. Brownlee*,
   402 F. Supp. 2d 1 (D.D.C. 2005) ...............................24, 26, 27

*Oceana v. Locke*,
   831 F. Supp. 2d 95 (D.D.C. 2011) ........................................8

*Oceana, Inc. v. Pritzker*,
   75 F. Supp. 3d 469 (D.D.C. 2014) .......................................38

*Pac. Rivers Council v. Thomas*,
   30 F.3d 1050 (9th Cir. 1994) ...........................................36

*Richards v. INS*,
   554 F.2d 1173, 1177 (D.C. Cir. 1977) ..................................19

*Sierra Club v. Marsh*,
   816 F.2d 1376 (9th Cir. 1987) .........................................36

*\* Tennessee Valley Auth. v. Hill*,
   437 U.S. 153 (1978)..............................19, 23, 39, 40, 41

*Thomas v. Peterson*,
   753 F.2d 754 (9th Cir. 1985) ..........................................23

## Statutes

Administrative Procedure Act

5 U.S.C. §§ 701-706 ....................................................1, 26, 29

5 U.S.C. § 702.................................................................8

5 U.S.C. § 706(2)(A)...........................................................................................................8, 18

5 U.S.C. § 706(2)(C)...............................................................................................................9

5 U.S.C. § 706(2)(D).............................................................................................................18

Endangered Species Act

16 U.S.C. §§ 1531-1544......................................................................................................1, 4

16 U.S.C. § 1532(5)(A)(i)........................................................................................................7

16 U.S.C. § 1536(a)(2)................................................................1, 2, 4, 5, 6, 20, 26, 29, 35, 36

16 U.S.C. § 1536(b)(3)(A).......................................................................................................6

16 U.S.C. § 1536(d)..............................................................................................6, 26, 35, 36

16 U.S.C. § 1536(h)..........................................................................................................4, 29

16 U.S.C. § 1540(g)……………………………………...................................................18

Magnuson-Stevens Act

16 U.S.C. § 1801 *et seq*.........................................................................................................1

16 U.S.C. § 1801(b)(1)............................................................................................................7

16 U.S.C. § 1852(h)(1)............................................................................................................8

16 U.S.C. § 1854(a)(1)(A).....................................................................................................37

16 U.S.C. § 1854(a), (b).................................................................................................3, 8, 14

16 U.S.C. § 1855(f)..........................................................................................................8, 15

Marine Mammal Protection Act of 1972

16 U.S.C. 1361...................................................................................................................... 33

16 U.S.C. § 1387...................................................................................................................33

Federal Rules of Civil Procedure

Fed. R. Civ. P. 56(a) ............................................................................................................19

**Regulations**

50 C.F.R. §217.12……………………………………...................................................10

50 C.F.R. § 222.32 ......................................................................................................10

50 C.F.R. § 224.105 ....................................................................................................10

50 C.F.R. § 226.203 ....................................................................................................11

50 C.F.R. § 229.2 ........................................................................................................11

50 C.F.R. § 229.32 ......................................................................................................10

50 C.F.R. § 402 .............................................................................................................5

50 C.F.R. § 402.02 ...............................................................................................5, 7, 20

50 C.F.R. § 402.09 .........................................................................................................6

50 C.F.R. § 402.13 ...............................................................................................4, 5, 26

50 C.F.R. § 402.14 .........................................................................................4, 5, 26, 33

50 C.F.R. § 402.14(a) ...........................................................................4, 5, 6, 24, 29

50 C.F.R. § 402.14(b) ..................................................................................................29

50 C.F.R. § 402.14(c) ............................................................................................24, 27

50 C.F.R. § 402.14(g) .................................................................................................5, 6

50 C.F.R. § 402.14(i) ...................................................................................................33

50 C.F.R. § 402.16 ..........................................................................................6, 32, 34

**Federal Register Notices**

51 Fed. Reg. 19,926 (June 3, 1986) .........................................................................5, 36

59 Fed. Reg. 28,805 (June 3, 1994) .............................................................................11

62 Fed. Reg. 39,157 (July 22, 1997) ............................................................................10

69 Fed. Reg. 30,857, (June 1, 2004) ..............................................................................9

69 Fed. Reg. 69,536 (Nov. 30, 2004) ..........................................................................10

73 Fed. Reg. 60,173 (Oct. 10, 2008) ...........................................................................10

81 Fed. Reg. 4837 (Jan. 27, 2016) ...............................................................................11

82 Fed. Reg. 51,496 (Nov. 6, 2017) .............................................................................15

83 Fed. Reg. 15,240 (April 9, 2018) ..................................................................................1, 15

**Legislative History**

H.R. Rep. No. 697, 96th Cong., 1st Sess. 12 (1979) ......................................................41

H.R. Rep. No. 1625, 96th Cong., 2d Sess. 20 (1978) ....................................................36

S. Rep. No. 874, 95th Cong., 2d Sess. 5 (1978) ............................................................36


**Other Authorities**

*Guidance for Carrying Out Endangered Species Act (ESA) Section 7*
    *Consultations with NMFS Greater Atlantic Regional Fisheries Office;*
    https://www.greateratlantic.fisheries.noaa.gov/protected/section7/guidance/co
    nsultation/garfo_esa_section_7_technical_guidance_050216.pdf...........................24

*Integration of Endangered Species Act Section 7 with Magnuson-Stevens Act*
    *Processes*; https://www.fisheries.noaa.gov/national/laws-and-
    policies/fisheries-management-policy-directives ..................................................24

*No Action Spatial Management Alternatives*;
    http://s3.amazonaws.com/nefmc.org/NEFMC-Habitat-Doc-Web-1.pdf...............................15

*\* Authorities upon which we chiefly rely are marked with an asterisk*

## INTRODUCTION

This case challenges defendants' partial approval of the Omnibus Essential Fish Habitat Amendment 2 ("Habitat Amendment"), its analysis in the incorporated final environmental impact statement ("FEIS") and record of decision ("ROD"), and its issuance of implementing regulations in the final rule for violations of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act"), 16 U.S.C. 1801 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701-706. Plaintiff Conservation Law Foundation ("CLF") seeks to remedy defendants' failure to comply with one of the most important requirements of the ESA—the obligation of all federal agencies "to insure that any action . . . by such agency . . . is not likely to jeopardize the continued existence" of a species protected by the ESA or harm its habitat. 16 U.S.C. § 1536(a)(2) ("Section 7"). Specifically, defendants failed to initiate and complete the Section 7 consultation process prior to implementing the Habitat Amendment, which defendants admit may affect critically endangered North Atlantic right whales. This Memorandum supports the accompanying motion for entry of summary judgment.

On April 9, 2018, defendants Secretary of Commerce and National Marine Fisheries Service (collectively "NMFS") published a final rule implementing the Habitat Amendment after 14 years of development. 83 Fed. Reg. 15,240 (Apr. 9, 2018); ESA 24627-24672.[1] The action is an "omnibus" amendment because it makes simultaneous regulatory changes to all seven of the fishery management plans ("FMPs") for species managed by the New England Fishery Management Council ("Council"). It also revises the boundaries of long standing year-round

---

[1] The record provided for plaintiff's challenge to The Omnibus Essential Fish Habitat Amendment 2 and its associated FEIS (December 8, 2016) consists of documents labelled as "ESA" and referred to in this memorandum as "ESA XXX."

1

groundfish closures—ultimately opening more than 3,000 square miles of previously closed waters to expanded fishing.  Most concerning here are the new fishing opportunities for sink gillnet fisheries in Southern New England and the Great South Channel—where right whales are abundant and much of the area is critical habitat—as these fisheries use heavy vertical ropes known to entangle right whales to connect their nets on the seafloor to buoys on the surface.

Approval of the Habitat Amendment came on the heels of an unprecedented number of North Atlantic right whale deaths in 2017, new scientific information demonstrating the population has been declining since 2010 and is at risk of functional extinction, NMFS's own declaration of an Unusual Mortality Event on June 7, 2017, and environmental analysis for the Habitat Amendment that concluded sink gillnet gear poses one of the greatest entanglement risks to right whales.

As the agency responsible for approving and implementing the Habitat Amendment (hereafter "action agency") and the delegated expert agency responsible for the recovery of North Atlantic right whales (hereafter "consulting agency"), NMFS has a statutory obligation under Section 7 of the ESA to insure through consultation that the Habitat Amendment is not likely to jeopardize the continued existence of any ESA-listed species or result in the destruction or adverse modification of its habitat. *See* 16 U.S.C. § 1536.  Although NMFS admits it "concluded that the action 'may affect' right whales as that term is used in the ESA," Answer ECF No. 14 at par. 6, it nevertheless approved and implemented the Habitat Amendment without initiating the legally-required consultation or completing a biological opinion, in apparent reliance on outdated and legally flawed biological opinions for certain fisheries operating in that action area.

Only through a completed biological opinion on the Habitat Amendment can NMFS satisfy its substantive duties under the ESA either: (1) because it concludes the action—that revises longstanding year-round closures—*is not likely* to jeopardize the survival and recovery of right whales, specifies the amount of permissible take, and requires reasonable measures to minimize the action's effects; or (2) because it concludes that the action *is likely* to jeopardize the survival and recovery of North Atlantic right whales and specifies reasonable and prudent alternatives that avoid jeopardy. In the absence of a completed Section 7 consultation, NMFS's arbitrary and capricious decision cannot meet substantive obligations under the ESA and plaintiff is entitled to summary judgment on Claim I of its Complaint for Declaratory and Injunctive Relief (ECF No. 1) for violations of the ESA and APA.

Further, because NMFS failed to ensure no jeopardy to right whales when it implemented the Habitat Amendment, NMFS acted arbitrarily and capriciously when it approved the Habitat Amendment. Under the Magnuson-Stevens Act, NMFS may only approve, disapprove, or partially approve a fishery management plan such as the Habitat Amendment after it ensures compliance with the requirements of the Magnuson-Stevens Act and all other applicable law. 16 U.S.C. § 1854(a), (b). Here, NMFS approved the Habitat Amendment without a Section 7 consultation, and plaintiff is entitled to summary judgment on Claim II of its Complaint for violations of the Magnuson-Stevens Act and APA.

In this suit for declaratory and injunctive relief, CLF seeks a declaration that NMFS violated the ESA when it failed to complete the legally required consultation on the Habitat Amendment, and thus the Magnuson-Stevens Act when it approved the amendment in violation of the ESA. CLF also seeks an order vacating and remanding those parts of the Habitat Amendment (and its final environmental impact statement) and the final rule implementing

revisions to the prior groundfish closures until NMFS completes a biological opinion that contains any required reasonable and prudent measures necessary to avoid jeopardy of adversely modify critical habitat, based on the best scientific and commercial data available on all fisheries that interact with North Atlantic right whales and operate in the action area.

## STATUTORY FRAMEWORK

### I.    The Endangered Species Act

Under the Endangered Species Act, 16 U.S.C. §§ 1531-44, imperiled species are protected by being listed as "threatened" or "endangered." *Id.* §§ 1532, 1533.  Once listed, Section 7(a)(2) mandates that each federal agency that authorizes, funds, or carries out an agency action consult with the Secretary of the Interior or the Secretary of Commerce to insure that the action is "not likely to jeopardize the continued existence of any endangered species or threatened species or  result in the destruction or adverse modification" of the species' critical habitat. 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.14(a).  The substantive duty imposed by Section 7(a)(2) is constant, relieved only by an exemption from the Endangered Species Committee. 16 U.S.C. § 1536(h).  Consultation may be formal or informal, but it is a clearly defined process that requires specific written exchanges. 50 C.F.R. § 402.13.  In fulfilling these requirements, both the action agency and the Secretary must use "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

### A.    Section 7 Imposes Procedural And Substantive Obligations

Federal agencies fulfill their substantive mandate to avoid jeopardizing endangered or threatened species and adversely affecting their habitat through the consultation process. 16 U.S.C. § 1536(a)(2).[2]  Under this process, the agency proposing an action must first determine

---

[2] If the action agency determines that its proposed action will not affect listed species or critical habitat, it is not obligated to consult. 50 C.F.R. § 402.14.

4

whether the action "may affect" an ESA-listed species and, if so, it must consult with NMFS (for most anadromous and marine species) or with the U.S. Fish and Wildlife Service (for most freshwater and terrestrial species) to evaluate the current status of the species and the environmental baseline, as well as the proposed action and its direct, indirect, and cumulative effects. 50 C.F.R. §§ 402.02, 402.14(a), (g). The consulting agencies (NMFS and U.S. Fish and Wildlife Service) have adopted joint regulations governing this Section 7(a)(2) consultation process. 50 C.F.R. § 402. The threshold is low for a "may affect" determination and the required ESA Section 7 consultation. *See* 51 Fed. Reg. 19,926, 19,949 (June 3, 1986); *see also* ESA Section 7 Consultation Handbook ("ESA Handbook") at 3-13, 4-26.

Once consultation is initiated, the action agency must also satisfy its substantive duties to ensure the action is not likely to cause jeopardy to the species or adverse modification to the critical habitat. *See e.g.,* ESA 27250 (flow chart describing process). Under this statutory framework, federal actions that "may affect" a listed species or critical habitat may not proceed unless and until the federal agency insures, through *completion* of the consultation process, that the action is not likely to cause jeopardy or adverse modification. 16 U.S.C. § 1536(a); 50 C.F.R. §§ 402.14, 402.13.

If the action agency determines that the proposed action "may affect" but is "not likely to adversely affect" any listed species or critical habitat, it may complete an informal consultation and obtain "written concurrence" from the expert agency "that the proposed action is not likely to adversely affect any listed species or critical habitat." 50 C.F.R. § 402.13. A finding that the action "may affect" but is "not likely to adversely affect" means all effects are expected to be beneficial, insignificant, or discountable. *See* ESA Handbook at 3-12 - 3-13.

If, however, the action agency determines that the action is "likely" to adversely affect listed species or critical habitat, it must engage in formal consultation. 50 C.F.R. § 402.14. The formal consultation process commences when a federal agency determines that a proposed federal action "may affect listed species or critical habitat," 50 C.F.R. § 402.14(a), and concludes when the expert agency issues a biological opinion determining whether the proposed action is likely to jeopardize a listed species or destroy or adversely modify its critical habitat and the action agency takes steps to comply with that opinion. 16 U.S.C. § 1536(b)(3)(A); *see also* 50 C.F.R. § 402.14(g) (responsibilities of consulting agency during formal consultation); *id.* § 402.14(h) (contents of biological opinion). By regulation, formal consultation must conclude within ninety days after its initiation unless the action agency and the consulting agency mutually agree to extend the consultation for a specific time period. *Id.* § 402.14(e).

Once consultation is initiated, Section 7(d) prohibits "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate [ESA Section 7(a)(2)]." 16 U.S.C. § 1536(d); 50 C.F.R. § 402.09.

Consultation must be reinitiated if, among other reasons, "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," or "[i]f a new species is listed or critical habitat designated that may be affected by the identified action." *Id.* § 402.16.

B.    **The Habitat Amendment Is Subject To Section 7 Compliance**

As discussed above, Section 7 of the ESA mandates that "[e]ach Federal agency shall . . . insure that *any action authorized, funded, or carried out by such agency*" is not likely to jeopardize the continued existence of any ESA-listed species or result in the destruction or adverse modification of its habitat. 16 U.S.C. § 1536(a)(2) (italics added). The joint regulations

6

broadly define the scope of agency actions subject to ESA Section 7(a)(2) mandates to encompass "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by [f]ederal agencies," including the promulgation of regulations and the granting of licenses. 50 C.F.R. § 402.02 (definition of "action").  Under the ESA, the "action area" is broadly defined as "all areas to be affected directly or indirectly by the federal action and not merely the immediate area involved in the action." *Id*.  The potential "effects" of an agency action that an agency must consider are similarly broad and include both the direct and indirect effects of the action and all activities "interrelated or interdependent" with that action. *Id.* (definition of "effects of the action").

      C.     **Critical Habitat Contains Essential Biological Features**

Under the ESA, critical habitat is defined as an area occupied by an endangered species and containing physical or biological features essential to the conservation of the species which may require "special management considerations or protection." 16 U.S.C. § 1532(5)(A)(i). Further, "destruction or adverse modification of critical habitat" means a direct or indirect alteration that appreciably diminishes the value of critical habitat for the conservation of a listed species. 50 C.F.R. § 402.02.  Such alterations may include, but are not limited to, those that alter the physical or biological features essential to the conservation of a species or preclude or significantly delay development of such features. *Id.*

**II.    <u>The Magnuson-Stevens Act</u>**

The Magnuson-Stevens Act is designed to conserve and manage fish populations in the territorial waters of the United States and in the exclusive economic zone, which extends from the boundaries of state waters (three miles from shore) to 200 miles offshore or to an international boundary with neighboring countries. 16 U.S.C. § 1801(b)(1).  The Act vests primary management responsibility with the Secretary of Commerce, who in turn has sub-

delegated this responsibility to NMFS. *See Oceana v. Locke*, 831 F. Supp. 2d 95, 101 (D.D.C. 2011).

The Magnuson-Stevens Act creates eight regional fishery management councils and mandates that each council shall prepare a fishery management plan "for each fishery under its authority that requires conservation and management." 16 U.S.C. § 1852(h)(1).  All fishery management plans and regulations implementing plans are subject to final review and approval by the Secretary of Commerce to ensure that they comply with the requirements of the Magnuson-Stevens Act, as well as all other applicable laws and requirements. *Id.* § 1854(a), (b).  NMFS's ability to modify plans or amendments recommended by the regional fishery management councils is restricted by the requirement to approve, disapprove, or partially approve a recommended plan or amendment based solely on whether it is consistent with the Magnuson-Stevens Act and any other applicable law, *id.* § 1854(a)(3), including the Endangered Species Act.  Thus, where an action taken under the Magnuson-Stevens Act is inconsistent with applicable law, NMFS must disapprove the action until it is consistent with all applicable law.

The Magnuson-Stevens Act also provides that actions taken by the Secretary of Commerce under regulations implementing a fishery management plan shall be subject to judicial review "if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable." *Id.* § 1855(f).

III.    **The Administrative Procedure Act**

The APA grants a right of judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . ." 5 U.S.C. § 702.  Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . ." *Id.* § 706(2)(A).

An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Under the APA, a court must also "hold unlawful and set aside" any agency action taken that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

## STATEMENT OF FACTS

### I.  Imperiled North Atlantic Right Whales

The North Atlantic right whale (one of several large whales in the Northwest Atlantic Ocean) has been listed as endangered since passage of the Endangered Species Act in 1973. ESA 23371.  The species is also protected by the Marine Mammal Protection Act of 1972, and the Canadian Species at Risk Act of 2002. ESA 24916.

This copepod-dependent species is particularly vulnerable to the impacts of human activity: it commonly migrates along the entire Atlantic seaboard from Florida to the Gulf of Saint Lawrence (Canada); it moves slowly when feeding on the surface making it likely to get entangled in nearby fishing gear or struck by passing ships; its prey availability has shifted due to climate change; and females only give birth to a single calf once every six to ten years. ESA 25075; 25352-25354; 25673-25680; 26833; 27241; 27771.  NMFS has acknowledged in past actions that the loss of a single right whale could jeopardize the continued existence of the species. *See* 69 Fed. Reg. 30,857, 30,858 (June 1, 2004).  Scientists have recently concurred. ESA 25080.

The Recovery Plan for the North Atlantic Right Whale (2005) identifies entanglements in commercial fishing gear and ship strikes as the two most significant threats to recovery. ESA 23366-23502 (Recovery Plan) at 23389.  If not immediately killed, new research shows that chronic entanglement in fishing gear causes extreme stress, pain, and suffering for right whales and can interfere with behaviors such as foraging and locomotion. ESA 06013-06024; 25058-25073; 25308-25324; 25352-25354; 25443-25447; 25448-25462; 25649-25660; 26210-26235. Almost all (83 percent) North Atlantic right whales display scars demonstrating they have been entangled at least once. ESA 25353.  Other threats include habitat degradation from dredging, oil spills, coastal development, undersea noise pollution, and contaminant loads. ESA 23390-23392; 23443; 23498; 24869-24870 (5-year Review).

NMFS has taken several actions to protect North Atlantic right whales from entanglement in commercial fishing gear and ship strikes.  These include: (1) the development of the Atlantic Large Whale Take Reduction Plan, 62 Fed. Reg. 39,157 (July 22, 1997); (2) Atlantic Large Whale Take Reduction Plan regulations and subsequent amendments at 50 C.F.R. § 229.32; (3) Regulations Governing the Approach to North Atlantic Right Whales, 69 Fed. Reg. 69,536 (Nov. 30, 2004); 50 C.F.R. §§ 222.32 and 217.12; (4) Speed Restrictions to Reduce the Threat of Ship Collisions with North Atlantic Right Whales, 73 Fed. Reg. 60,173 (Oct. 10, 2008); Final Rule to Implement Speed Restrictions to Reduce the Threat of Ship Collisions with North Atlantic Right Whales, 50 C.F.R. § 224.105.

In Southern New England, right whales regularly congregate and feed on dense populations of small crustaceans (primarily the copepod *Calanus finmarchicus*) to meet their significant energy demands before migrating north in the summer and south in the winter to Georgia and Florida coastal waters to calve. ESA 26832-26833; 27767.  Important foraging

grounds in the Northeast include the Massachusetts and Cape Cod Bay, Great South Channel

(April-June), Gulf of Maine (e.g. Jordan Basin; Wilkinson Basin; Cashes Ledge, Platts Bank)

(April-October), northern edge of Georges Bank (May-July), and the southeastern Scotian Shelf.

ESA 27767-27768; 27770-27771. Some portion of the population likely remains in the

Northeast even in the winter. ESA 27771.

To protect these important spring and summer foraging grounds, NMFS designated

critical habitat in Cape Cod Bay and the Great South Channel in 1994. *See* 59 Fed. Reg. 28,805

(June 3, 1994) (also designating nearshore waters off Georgia and Florida as critical habitat due

to their importance as winter calving and nursery grounds); ESA 24611-24626. In 2016, NMFS

expanded the right whale critical habitat designation to include approximately 29,763 square

nautical miles of marine habitat in the Gulf of Maine, Georges Bank, and along the Southeast

coast. *See* 81 Fed. Reg. 4837 (Jan. 27, 2016); 50 C.F.R. § 226.203; ESA 24709-24745.

New scientific studies demonstrate that the North Atlantic right whale population has

been on a steady decline since 2010, ESA 06018, and entanglement deaths now account for 83

percent of diagnosed mortalities, ESA 25352-25354. In addition to mortalities, the substantial

energy requirements associated with chronic entanglement have contributed to reduced

survivorship in the remaining females by at least 20 percent, longer calving intervals, and

declining health due to increased stress hormones. ESA 25448-25462; 24983-24991; 25308-

25324; 26210-26235; 25355-25368. These sub-lethal effects threaten the continued existence of

right whales. ESA 06018.

NMFS evaluates human impacts to large whales by assessing the number of human

caused deaths against what is likely sustainable ("potential biological removal"). 50 C.F.R. §

229.2; ESA 25019. For more than a decade, the maximum potential biological removal

allowable to sustain the North Atlantic right whale population has been one whale per year or fewer. ESA 25677; 25743-25759 at 25747; 26836.  The Habitat Amendment FEIS acknowledges that right whales are already killed by commercial fisheries in numbers that exceed this biological removal threshold, ESA 28601, and that in Southern New England and the Great South Channel, "gillnets and traps pose the greatest threat of serious injury and mortality to large whales" such as North Atlantic right whales. ESA 28644.

In 2017, a rash of unprecedented deaths—approximately four percent of the right whale population—pushed the species closer to extinction.  From April 2017 to the end of 2017, 17 deaths were documented, including 12 in Canadian waters and five in waters of the United States. ESA 23290; 27247.  These deaths led NMFS to announce an Unusual Mortality Event on June 7, 2017 that called special attention to the whales' likely extinction in the absence of immediate action. ESA 23293-23294.  In 2018, there have been at least three additional deaths due to entanglement in commercial fishing gear in Southern New England and surrounding waters. ESA 23290-23291 (showing 2 deaths as of October 2018 and 2017 and 2018 strandings); *see also* Ex. A, Hillgarth Dec. ¶ 12; Ex. B, Patek Dec. ¶ 11; Ex. C, Shelley Dec. ¶ 9.  No new calves were documented in 2018. *See, e.g.,* Ex. B, Patek Dec. ¶¶ 10, 11; Ex C, Shelley Dec. ¶ 9.

Today, almost 50 years after the listing, right whales remain critically endangered.  At the end of 2015, scientists estimated the population was only 458 individuals (with fewer than 100 reproductively viable females), ESA 06018, and new models presented at the most recent Right Whale Symposium (November 2018) suggest it is even lower. *See* Ex. A, Hillgarth Dec. ¶ 11; Ex. C, Shelley Dec. ¶ 9; Ex. D, Peach Dec. ¶ 12; Ex. E, Mahoney Dec. ¶ 11.

II.    **The Habitat Amendment Revises Boundaries Where Fisheries Using Gear Known To Interact With North Atlantic Right Whales Are Authorized To Fish**

The Council initiated the Habitat Amendment in 2004 to review and update the essential fish habitat designations for all New England Fishery Management Plans consistent with requirements of the Magnuson-Stevens Act and to comply with a court order in *American Oceans Campaign v. Daley*, 183 F. Supp. 2d 1 (D.D.C. 2000). ESA 00001-00002; 24703; 03278; 06309.  The action area includes all waters of the U.S. exclusive economic zone in the Northeast. ESA 29440.  The Council's fishery management plans ("FMP") amended by the Habitat Amendment include: (1) NE Multispecies FMP (Groundfish); (2) Atlantic Sea Scallop FMP; (3) Monkfish FMP; (4) Atlantic herring FMP; (5) Red Crab FMP; (6) Skate FMP; and (7) Atlantic Salmon FMP. ESA 27319.

In addition to the fisheries operating under the FMPs amended by the Habitat Amendment, other fisheries not managed by the New England Council, but authorized by NMFS to fish, also operate in the action area. ESA 27781 (*e.g.*, trap/pot fisheries, longline fisheries); 27785 (list of fisheries regulated under the Atlantic Large Whale Take Reduction Plan). Although the FMPs for these fisheries—including the surf clam and ocean quahog and American lobster fishery (provides permit for Jonah crab fishery as well)—were not amended, the revised boundaries of the Habitat Amendment could cause effort to shift in response to gear conflicts with fisheries now granted access to formerly closed areas and have indirect adverse effects on right whales. ESA 23689-23691 (noting southern flank of Nantucket Lightship is now a primary Jonah crab trap/pot fishing area).

In 2011, the Council voted to revise the system of closed areas that restrict some types of fishing gear as part of the Habitat Amendment. ESA 27400.  The alternatives developed revised

13

the spatial management system within the Gulf of Maine (Eastern, Central, and Western sub-regions), Georges Bank and Southern New England/Great South Channel Areas. ESA 5043.

In June 2015, the Council voted to submit the Habitat Amendment to NMFS for review and approval. ESA 05033.

A.    **NMFS's Partial Approval Of The Habitat Amendment Revises Closures In Right Whale Critical Habitat**

NMFS reviewed the Council's recommended Habitat Amendment pursuant to the Magnuson-Stevens Act, 16 U.S.C. § 1854(a), (b), and issued its Record of Decision on January 3, 2018. ESA 05032-05056.  NMFS did not approve all of the Council recommended measures. *Id.*  Prior to implementing the Habitat Amendment, approximately 6,711 nm2 (8,887 square miles) of ocean was closed year-round to mobile bottom-tending fishing gears through the previously existing groundfish mortality closures. ESA 27683-27684. After approval of the Habitat Amendment, only 4,107 nm2 of ocean was closed year-round, *id.*, roughly a 40-percent decrease in protected waters.

Specifically, in Southern New England/Great South Channel, NMFS approved measures that: (1) eliminated the large year round closure west of Georges Bank (former Closed Area 1 Groundfish Closure Area = 1,148nm2), ESA 05035; 27684; (2) eliminated two large year-round closures south of Martha's Vineyard and Nantucket - the Nantucket Lightship Habitat Closure Area (987nm2) and the Nantucket Lightship Groundfish Closed Area (1,822nm2), *id.*; and (3) established the relatively small Great South Channel habitat management area (748nm2), ESA 05032; 27684.  No Action and Approved measures are shown below.



The map on the left represents the "No Action Spatial Management Alternatives" as displayed in the Public Information Document available at: http://s3.amazonaws.com/nefmc.org/NEFMC-Habitat-Doc-Web-1.pdf.  The map on the right represents NMFS Approved Spatial Management Alternatives. ESA 29438.

NMFS published its proposed rule in the federal register on November 6, 2017. *See* 82 Fed. Reg. 51496 (Nov. 6, 2017). ESA 24673-24704.  NMFS made its Record of Decision describing final measures in the Habitat Amendment on January 3, 2018. ESA 5032-5056. NMFS published its final rule and implementing regulations in the federal register on April 9, 2018. 83 Fed. Reg. 15,240 (April 9, 2018); ESA 5057-5102.  NMFS's publication of the final rule implementing the Habitat Amendment in the federal register constitutes final agency action for purposes of the Magnuson-Stevens Act. 16 U.S.C. § 1855(f).

B.  **NMFS Continues To Allow Harmful Fishing In The Absence Of A Section 7 Consultation**

In the FEIS, NMFS acknowledged its ESA Section 7 obligations on an action expected to impact an ESA-listed species in the FEIS. ESA 29221 ("If necessary, NMFS will prepare a

Biological Opinion (formal ESA consultation) or Section 7 Consultation (informal ESA consultation) to analyze OHA2 action and the potential impacts on ESA-listed species.").  Nearly the entire action area is designated as right whale critical habitat. ESA 24732; 30985.



Nothing in the administrative record demonstrates that NMFS has initiated a consultation on the Habitat Amendment.  NMFS's January 3, 2018 Record of Decision describing final measures in the Habitat Amendment constitutes final agency action for purposes of the ESA citizen suit provision, reviewable under the APA. ESA 5032-5056.

## III.    North Atlantic Right Whale Interact With Fisheries In Southern New England

The Habitat Amendment amends fishery management plans that use bottom trawl, mid-water trawl, sink gillnets, scallop dredges, trap/pot, bottom longline, hydraulic clam dredges, purse seine, and hook and line gear in their fisheries. ESA 27780.  "Of these gear types, . . . gillnet and trap gear pose the greatest risk of serious injury and mortality to large whales." ESA

28601; 27782 ("[A]ny type or part of fixed gear is considered to create an entanglement risk to large whales and should be considered potentially dangerous.").

### A. Northeast Sink Gillnet Fisheries

The gillnet fisheries operating in the action area fish primarily for cod, haddock, flounders, monkfish, and skates. ESA 27740. The Northeast Sink Gillnet fishery is classified as a Category I fishery under the Marine Mammal Protection Act because this gear is known to seriously injure or kill several marine mammal species, including North Atlantic right whales. ESA 24861; 27785. The Atlantic Large Whale Take Reduction Plan includes gillnets because of the threat they pose to North Atlantic right whales. ESA 25507. A large body of science addresses the lethal and sub-lethal effects of gillnet gear. ESA 23303-23312; 25399; 25451; 25456; 25553; 25555; 25748; 25749; 25849; 25899; 26008; 26328; 27208-27209; 27782-27785; 77935. To decrease right whale deaths due to gillnet entanglements in the waters north and south of Cape Cod, NMFS has implemented seasonal closures of the Great South Channel and Massachusetts Restricted Area as amendments to the ALWTRP in this area of high concentration. ESA 27270-27271; 27273-27274.

### STANDING

The declarations of plaintiff CLF and its members (Viola P. Patek, Nigella M.K. Hillgarth, Peter Shelley, and Robbin E. Peach) are attached to this memorandum. *See* Ex. A, Hillgarth Dec.; Ex. B, Patek Dec.; Ex. C, Shelley Dec.; Ex. D, Peach Dec.; Ex. E, Mahoney Dec. These affidavits show that NMFS's action has harmed plaintiff and plaintiff's members by approving the Habitat Amendment without initiating or completing an ESA consultation process to insure the action is not likely to cause jeopardy or adverse modification of critical habitat. Plaintiff and plaintiff's members have personal, professional and recreational interests in the continued vitality of the North Atlantic right whale. *See* Ex. A ¶¶ 6, 8-12; Ex. B ¶¶ 3-10; Ex. C.

¶¶ 5-8; Ex. D ¶¶ 10-11; Ex. E ¶¶ 8-10.  NMFS's action will continue to adversely affect

plaintiff's and plaintiff's members' ability to use and enjoy North Atlantic right whales by

viewing and seeking to view them, sharing sighting information, working to protect the species,

and pursuing information about them, among other things. *See* Ex. A ¶¶ 10, 13-14; Ex. B ¶¶ 12-

13; Ex. C. ¶¶ 10-13; Ex. D ¶¶ 10, 11, 15-16; Ex. E ¶¶ 8-10, 14.  Because their continued use and

enjoyment of the North Atlantic right whale is threatened by defendants' action, plaintiff also

satisfies the "traceability" and "redressability" prongs of the standing analysis.  Finally, the

interests of CLF and its members in ensuring the continued existence of North Atlantic right

whales are related directly to the mission of the organization: protecting New England's

environment for the benefit of all people. *See* Mahoney Dec. ¶¶ 3, 5-9.  Therefore, plaintiff

enjoys standing to maintain this action. *See Friends of the Earth v. Laidlaw Envtl. Servs.*, 528

U.S. 167, 180-185 (2000).

     Consistent with the ESA citizen suit provision, 16 U.S.C. § 1540(g), CLF filed a 60-day

Notice of Intent to sue on January 26, 2018. ESA 24807-24825. Consistent with the Magnuson-

Stevens Act requirement to file a Complaint within 30 days of publication of the final rule,

plaintiff filed this suit on May 9, 2018. ECF No. 1.

## STANDARD OF REVIEW

     Agency action under the ESA is judged under the Administrative Procedure Act's

("APA") "arbitrary and capricious" standard of review. *Cabinet Mountains*

*Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 685–86 (D.C. Cir.1982).

Under this standard, governmental action must be set aside where the agency takes action

"without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Review of regulations

promulgated under the Magnuson-Stevens Act are guided by the Administrative Procedure Act.

*See* 5 U.S.C. § 706(2)(A) (requiring a reviewing court to "hold unlawful and set aside agency

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

Summary judgment is appropriate where "there is no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In judicial review cases, summary judgment generally can be granted based on the contents of the administrative record. *See, e.g.*, *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Richards v. INS*, 554 F.2d 1173, 1177 (D.C. Cir. 1977).

An injunction is the appropriate remedy for violations of the Endangered Species Act. *Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978).  The Supreme Court has explicitly held that the ESA requires federal courts "to strike a balance of equities on the side of" species facing potential extinction:

> Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as "institutionalized caution."

*TVA* at 194.

## ARGUMENT

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation" and "reveals a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Center for Bio. Diversity v. Ross,* 2018 WL 4828406 (D.D.C. 2018) quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978)).  A review by the Supreme Court of the Act's "language, history, and structure" convinced the Court "beyond doubt" that "Congress intended endangered species to be afforded the highest of priorities." *Id*. at 174.  "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Id*. at 184.  To

accomplish this purpose, the ESA includes both substantive and procedural provisions that, together, are designed to protect and recover threatened and endangered species.

## I.    The Habitat Amendment Is A Federal Agency Action That May Affect North Atlantic Right Whales And Requires Section 7 Consultation

The facts material to CLF's motion under ESA § 7(a)(2) are beyond dispute.  First, the Habitat Amendment is an agency action. ESA 05032; 05057.  Second, the Habitat Amendment— which authorizes changed fishing behavior in fisheries with confirmed interactions with North Atlantic right whales— "may affect" North Atlantic right whales. ESA 27763; 27765 (Table 61, fn 1); 27780-27785; 28598-28599.  Third, NMFS Sustainable Fisheries Division has not determined, in consultation with NMFS Protected Resources Division, whether the Habitat Amendment is likely to jeopardize the continued existence of right whales or harm their habitat.

### A.    The Habitat Amendment Is An Agency Action Within The Meaning Of ESA Section 7

NMFS does not dispute, nor could it, that the Habitat Amendment is an "agency action" under the ESA.  An agency action is defined in Section 7(a)(2) as "any action authorized, funded, or carried out by" a federal agency. 16 U.S.C. § 1536(a)(2).  Under the implementing regulations, agency actions are broadly defined as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States . . . ." including "actions directly or indirectly causing modifications to the land, water, or air," and examples such as "the granting of licenses, contracts, leases, easement, right-of-way, permits, or grants-in-aid." 50 C.F.R. § 402.02.  The Habitat Amendment is authorized, funded, and carried out by NMFS. ESA 5057-5102

In its FEIS for the Habitat Amendment, NMFS admits its Section 7 duties for actions expected to have an impact on ESA-listed species. ESA 29221.  NMFS's Record of Decision,

which approves or disapproves all measures proposed by the Council, does not even mention

North Atlantic right whales, and is final agency action for purposes of the ESA. ESA 5032-5056.

    B.    **The FEIS Acknowledges The Habitat Amendment May Affect North Atlantic Right Whales**

As an initial matter, "Defendants admit that they concluded that the action 'may affect'

right whales as the term is used in the ESA." Answer (ECF No. 14) at par. 6.  NMFS could not

escape this conclusion and NMFS's failure to consult on the Habitat Amendment is not

supported by the administrative record.

In its FEIS, NMFS notes that North Atlantic right whales are: (1) "present in the affected

environment of the Habitat Omnibus Amendment," ESA 27770; (2) have important foraging

grounds in the Cape Cod Bay, Great South Channel (April-June), Gulf of Maine, and northern

edge of Georges Bank, ESA 27771; and (3) increasing evidence of wintering areas in Cape Cod

Bay, Jeffreys and Cashes Ledges, Jordan Basin, and Stellwagen Bank, *id.*

NMFS provides an explanation for its "may affect" determination: "The determination

for whether a species may be affected by a Council fishery is based on whether there has been

confirmed interactions with gear types primarily used in that fishery [citing an exhaustive list]."

ESA 27763.  The documents NMFS cites for this explanation and elsewhere in the FEIS support

confirmed interactions with North Atlantic right whales. *See* ESA 26819-27188 (2014 stock

assessment) at 26837-26838; ESA 26307-26818 (2015 stock assessment) at 26327-26332; ESA

5317-5756 (Batched Fisheries BiOp) at 05524-05533; ESA 5111-5316 (American Lobster BiOp)

at 05229-05238; ESA 24845-24869 (List of Fisheries for 2015) at 24861-24862; and ESA

06053-06118 (Red Crab BiOp) at 06094-06096.

In contrast, NMFS knew how to make a "no effect" finding that would not warrant a

consultation when it determined several marine mammals, and/or their critical habitat, were "not

likely to be affected by the action." ESA 27766-27767 ("Council fisheries will not overlap with [blue whale, sperm whale, pygmy sperm whale, dwarf sperm whale, striped dolphin, Atlantic spotted dolphin, and beaked whale species] occurrence or habitat, and therefore, direct (e.g., interaction with gear) or indirect (e.g. prey removal, habitat modification) effects to [species] from the operation of any of the Council fisheries is not expected.").

Without any analysis of the effect dredging might have on copepods' ability to aggregate into the dense patches required by right whales or a whales ability to see such copepod aggregations during times of increased turbidity, NMFS lumped North Atlantic right whales into this no effect category stating: "Council fisheries will not affect the availability of copepods for foraging right whales because copepods are too small to be captured in fishing gear, nor will any of the Council fisheries affect any of the other physical or biological features that were identified as essential for conservation of right whales in these regions." ESA 27767-27768. This conclusory statement ignores the threat of dredging identified in the Recovery Plan and NMFS's most recent update. ESA 23390, 23443, 23498.

The FEIS acknowledges that opening certain areas may shift effort from an area where entanglement risk is low into an area where encounters are more frequent, ESA 28598-28599, and states that large whales are "at risk of becoming entangled in fishing gear because the whales feed, travel, and breed in many of the same ocean areas utilized for fishing." ESA 27781; *see also* ESA 28645-28646 (noting that distribution of gillnet effort in Southern New England was expected and posed a risk of interacting with marine mammals). Further, the FEIS explains, "any type or part of fixed gear is considered to create an entanglement risk to large whales and should be considered potentially dangerous to large whale species," ESA 27782; closure revisions have "the potential to change fishing behavior and patterns of gear use in the affected

waters, which may influence the magnitude of protected resources impacts in the affected

region;" and certain shifts are "likely to result in increased interaction risks," ESA 28598-28599.

None of these effects are beneficial, insignificant, or discountable.

The May 2014 DEIS describes the potential negative impact of shifting gillnet effort into

the prior closures in the Southern New England/Great South Channel area:

> Specifically, gillnet effort shifts into the currently closed Nantucket Lightship
> Closure Areas could result in placing gear in the path of traveling whales. . . .
> Acknowledging the many difficulties surrounding adequate documentation of
> large whale entanglements in fishing gear (e.g., nature of the interactions, where
> and how interactions occur and in what specific gear, etc.), if gillnet effort
> increases in this area, there could be an increase in right whale and humpback
> whale entanglement levels in fixed fishing gear. . . . Mitigating these negative
> impacts, the high level of gillnet interactions around the southwestern corner of
> Nantucket Lightship Closed Area may be a result of the prohibition on gillnets
> within the area.

ESA 30752.  In the FEIS, this uncertainty is overlooked in favor of simply assuming the risk

would not increase, ESA 28644, despite the fact that "many entanglements go unobserved . . .

and even "the information presented . . . likely underestimates the incidence of large whale

serious injury and mortality deaths due to entanglement," ESA 27783. *See also* ESA 27245

(NMFS slide stating "about 3%-15% of entanglements are reported").

C.    **NMFS Is Required To Consult On Agency Actions That May Affect North
       Atlantic Right Whales**

The heart of the ESA's procedural protection is the consultation process, which Congress

designed "to ensure compliance with the [ESA's] substantive provisions." *Thomas v. Peterson*,

753 F.2d 754, 764 (9th Cir. 1985).  "The ESA's procedural requirements call for a systematic

determination of the effects of a federal project on endangered species.  If a project is allowed to

proceed without substantial compliance with those procedural requirements, there can be no

assurance that a violation of the ESA's substantive provisions will not result." *Id.* (citing

*Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978)).  Compliance with the procedural

provisions of the ESA—making the systematic determination of the effects of the action through

the consultation process—is integral to compliance with the substantive requirements of the

ESA.

 Here, NMFS Sustainable Fisheries Division was not just required to consult on the

Habitat Amendment, it was required to consult with NMFS Protected Resources Division "at the

earliest time possible" on this "action" that "may affect" an endangered species. *See* 50 C.F.R. §

402.14(a); *see also Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1, 9 (D.D.C. 2005).

Moreover, ESA regulations are clear that even though the consultation required here might

encompass a number of different fisheries operating within the geographical area that interact

with North Atlantic right whales, NMFS is not relieved of the requirement to "consider the

effects of the action as a whole." 50 C.F.R. § 402.14(c); *see Nat'l Wildlife Fed'n*, 402 F. Supp.

2d at 10.

 NMFS has long recognized its obligation to comply with ESA Section 7 in the fishery

management plan approval process.  To enhance coordination on their respective duties under

the Magnuson-Stevens Act and ESA, NMFS recently published Policy Directive 01-117

(January 19, 2015), entitled *Integration of Endangered Species Act Section 7 with Magnuson-

Stevens Act Processes*.[3] ESA 27262.  The policy guidance states that "ESA section 7

consultations are conducted on fishery management activities that: (1) are governed by fishery

management plans developed by the Councils pursuant to the Magnuson-Stevens Act; and (2)

---

[3]  The Policy Directive is available at https://www.fisheries.noaa.gov/national/laws-and-
policies/fisheries-management-policy-directives (follow link to memo); *see also*
https://www.greateratlantic.fisheries.noaa.gov/protected/section7/guidance/consultation/garfo_es
a_section_7_technical_guidance_050216.pdf.

may affect endangered or threatened species or designated critical habitat under NMFS'

jurisdiction." Further, it describes three specific opportunities for collaboration with the Councils

when a consultation applies:

> The first occurs when a Council is in the process of developing a new or modified management measure and NMFS ***determines that the action may affect*** endangered or threatened species or designated critical habitat. The second opportunity is during formal or informal consultation between the unit of NMFS functioning as the action agency (Sustainable Fisheries (SF)), and the unit of NMFS functioning as the consulting agency (generally Protected Resources (PR)), ***once a proposed action has been identified***. Another opportunity occurs when a ***change external*** to the Council process triggers the need for initiation, or reinitiation, of consultation on the fishery action.

*Id*. at 2 (emphasis added). Here, numerous public requests for, and comments on the need for a

Section 7 consultation were ignored: after management measures were developed that NMFS

acknowledged may affect North Atlantic right whales, ESA 23730-23732, 30954-303958; as

soon as the proposed action was identified, ESA 24407-24408, 24528-24583, 24826-24844; and

after new information outside of the Council process triggered the need for consultation, ESA

24807-24825.  NMFS did not engage in a consultation on the Habitat Amendment.

NMFS Sustainable Fisheries has not provided any evidence of a formal or informal

consultation with NMFS Protected Resources on the Habitat Amendment and further it has not

completed reinitiated consultations on the fisheries authorized to operate in the newly reopened

groundfish closed areas and known to interact with North Atlantic right whales.  Under Section 7

of the ESA, NMFS must consult on the Habitat Amendment.

## II.    NMFS Failed To Satisfy Procedural Requirements Of Section 7 Before Approving The Habitat Amendment

As explained *supra* in par. I, NMFS's approval of the Habitat Amendment was an agency

action that "may affect" North Atlantic right whales.  Under the ESA framework, such actions

must not proceed until and unless the federal agency insures, through completion of the

consultation process, that the action is not likely to cause jeopardy or adverse modification of critical habitat. 16 U.S.C. § 1536(a); 50 C.F.R. §§ 402.14, 402.13; *see also Center for Bio. Diversity v. Ross*, No. CV 18-112 (JEB), 2018 WL 4828406, at *3 (D.D.C. Oct. 4. 2018).

The procedural consultation requirement is necessary to inform the substantive determination of whether the action is likely to cause jeopardy or adverse modification of critical habitat. *See, e.g. Defs. of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 100 (D.D.C. 2011) ("Consultation is 'designed as an integral check on federal agency action, ensuring that such action does not go forward without full consideration of its effects on listed species.'" (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 603 (1992) (Blackmun, J., dissenting))). As such, the law is clear that until consultation is both initiated and completed, the requirements of Section 7(a)(2) have not been met. *See, e.g. id.*; *see also* 16 U.S.C. § 1536(d). As the D.C. Circuit court recently emphasized: "In no uncertain terms, the ESA mandates that every federal agency 'shall' engage in consultation *before* taking 'any action' that could 'jeopardize the continued existence of any endangered species or threatened species.'' *Center for Bio. Diversity, et al. v. EPA*, 861 F.3d 174, 188 n.10 (D.C. Cir. 2017) (italics added) (quoting 16 U.S.C. § 1536 (a)(2)).

Here, although NMFS acknowledges the Habitat Amendment "may affect" right whales, it has not consulted on the action as required by the ESA. To the extent NMFS argues that its decision not to consult is rational because it reinitiated consultations on nine fixed gear fisheries known to interact with North Atlantic right whales on October 17, 2018, ESA 06048-06052 ("Reinitiation Memo"), this explanation is lawfully inadequate, rendering NMFS's approval of the Habitat Amendment in violation of the ESA, 16 U.S.C. § 1536(a)(2), as well as arbitrary, capricious, and not in accordance with law, contrary to the APA, 5 U.S.C. §§ 701-706.

26

A.    **The ESA Requires A Section 7 Consultation On The Entire Agency Action**

The ESA requires the consulting agency to consider the "*entire* agency action." *Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988); *see also Nat'l Wildlife Fed'n v. Brownlee,* 402 F.Supp.2d 1, 10 (D.D.C. 2005) (holding that the Army Corps of Engineers' consultation on individual, site-specific dredge and fill actions did not satisfy agency's obligation to consult on the nationwide dredge-and-fill permit, because "overall consultation [] is necessary to avoid piece-meal destruction of panther habitat through failure to make a cumulative analysis of the program as a whole"); *see also* 50 C.F.R. § 402.14(c) ("Any request for formal consultation may encompass . . . a number of similar individual actions within a given geographical area or a segment of a comprehensive plan.  This does not relieve the Federal agency of the requirements for considering the effects of the action as a whole.").  Courts prohibit agencies from consulting on components rather than the entirety of an "agency action" because a segmented approach is inconsistent with the terms of the ESA and potentially undermines its purposes. *See, e.g., Friends of River v. Nat'l Marine Fisheries Serv.*, 293 F. Supp. 3d 1151, 1170–71 (E.D. Cal. 2018) ("Segmented consultations of a single agency action are counter to the ESA's requirements because an 'agency action could ultimately be divided into multiple small actions, none of which, in and of . . . themselves would cause jeopardy.'") (quoting *Nat. Resources Defense Council v. Rodgers*, 381 F.Supp.2d 1212, 1237 n.43 (E.D. Cal. 2005)).

When it comes to the ESA's consultation process, courts tend to adhere to the adage that, the whole is greater than the sum of its parts.  Thus, even if an agency were to consult on each part of the agency action before taking such action—which NMFS has not done here—a comprehensive analysis is still necessary to determine whether, as a whole, the "agency action" jeopardizes listed species.  The D.C. district court explained the rationale for disallowing

segregated consultation in *American Rivers v. Army Corps of Engineers,* in which the court

rejected an attempt by the U.S. Fish and Wildlife Service to consider only the effects of a

discrete portion of an agency action (one summer season, rather than the "context . . . overall.").

*Am. Rivers v. Army Corps of Eng'r*, 271 F.Supp.2d 230, 254 (D.D.C. 2003).  The court

explained:

> Nor can there be any question that the ESA requires that all impacts of agency
> action—both present *and* future effects on species—be addressed in the
> consultation's jeopardy analysis. *See Conner v. Burford,* 848 F.2d 1441, 1457–58
> (9th Cir.1988), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184
> (1989) (the ESA "does not permit the incremental-step approach" of consultation
> because "biological opinions must be coextensive with the agency action").
>
> Moreover, there are significant reasons to reject the segmentation FWS has
> utilized in this case. If FWS were allowed to apply such a limited scope of
> consultation to all agency activities, any course of agency action could ultimately
> be divided into multiple small actions, none of which, in and of themselves,
> would cause jeopardy. Moreover, such impermissible segmentation would allow
> agencies to engage in a series of limited consultations without ever undertaking a
> comprehensive assessment of the impacts of their overall activity on protected
> species. The ESA requires more; it "requires that the consulting agency scrutinize
> the *total scope* of agency action." *North Slope Borough v. Andrus,* 486 F.Supp.
> 332, 353 (D.D.C.1980), *aff'd in part, rev'd in part on other grounds,* 642 F.2d
> 589 (D.C.Cir.1980) (emphasis added).

*Id.* at 255.

By extension, courts regularly conclude that biological opinions which result from formal

consultation processes must match the scope of the agency action. *See, e.g., Conner,* 848 F.2d at

1458 (requiring biological opinion to be "coextensive" with the agency action).  According to the

*Conner* court, the ESA provides a "clear mandate" that a "comprehensive" biological opinion

addressing "all phases of the agency action" must be completed before initiation of the agency

action. *Id.* at 1453–55.  Similarly, in *Greenpeace*, the district court held in an initial ruling that a

"biological opinion which is not coextensive in scope with the identified agency action

necessarily fails to consider important aspects of the problem and is, therefore, arbitrary and

capricious." *Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1150 (W.D.

Wash. 2000); *see also Hawaii Longline Ass'n. v. Nat'l Marine Fisheries Serv.,* 281 F. Supp. 2d

1, 37 (D.D.C. 2003), on reconsideration in part sub nom. *Hawaii Longline Ass' v. Nat'l Marine

Fisheries Serv.,* 288 F. Supp. 2d 7 (D.D.C. 2003).

The ESA requires a comprehensive consultation resulting in a biological opinion that

addresses the full scope of the agency action prior to initiation of the agency action.  In this case,

NMFS was required to consult on the Habitat Amendment in its entirety.  Failing to initiate or

complete that consultation but approving the Habitat Amendment and authorizing the use of

fishing gears known to interact with right whales in newly opened areas of critical habitat

nevertheless, NMFS violated the ESA, 16 U.S.C. § 1536(a)(2), and the APA, 5 U.S.C. §§ 701-

706.

B.    **NMFS Cannot Rely On Reinitiation Of Certain Consultations**

NMFS apparently seeks to rationalize its failure to discharge its legal duty to consult on

the comprehensive Habitat Amendment by relying instead on formal consultations previously

reinitiated on nine select fisheries operating within the area. *See* ESA 28602; 28608; 28623;

6048-6052.

By reinitiating formal consultations on October 17, 2018, NMFS inherently made a

finding that each of these fisheries "may affect and is likely to adversely affect" North Atlantic

right whales. 50 C.F.R. § 402.14(a), (b).  However, NMFS's reinitiation of formal consultations

on these gillnet and trap/pot fisheries (American Lobster; Red Crab; Groundfish (large mesh);

Groundfish (small mesh); Northeast Skate complex; Monkfish; Spiny Dogfish; Mackerel, Squid,

and Butterfish; and Atlantic bluefish fisheries) does not discharge or exempt NMFS from its

statutory obligation in any way. *See, e.g. Center for Bio. Diversity, et al.*, 861 F.3d at 188 n.10

("Absent a formal exemption under 16 U.S.C. § 1536(h), an agency may not duck its

29

consultation requirement, whether based on limited resources, agency priorities or otherwise."
(citations omitted)).

As discussed *supra* in Par. II (A), consultation on particular fisheries could never satisfy
NMFS's duty to consult on the Habitat Amendment as a whole.  But the true error in NMFS's
ostensible reliance on these consultations to evaluate the impacts of the Habitat Amendment on
North Atlantic right whales is even more grievous—the reinitiated consultations predate and do
not account for the Habitat Amendment at all.

NMFS reinitiated consultation on nine particular fisheries more than a year ago to
consider new scientific information related to declining right whale abundance and reproductive
health —*not* to consider the impacts of the Habitat Amendment. *See* ESA 06048-06049.  In fact,
NMFS has allowed the fisheries to continue operating during this process on the basis that doing
so would not increase the likelihood of interactions with North Atlantic right whales because it
"does not entail making any changes to any fishery during the reinitiation period that would
cause an increase in interactions with whales, sea turtles, sturgeon, or Atlantic salmon." ESA
06051.  This rationale clearly does not account for the Habitat Amendment, which opens
historically closed areas to fishing gear known to entangle North Atlantic right whales and which
NMFS admits "may affect" right whales. Answer ECF No. 14 at par. 6.  Reliance on
consultations that do not account for or analyze the potential impacts of the Habitat Amendment
to guard against the jeopardy caused by the Habitat Amendment is nonsensical and undermines
the letter and intent of the law.

NMFS's reliance on these fisheries' consultations is woefully inadequate, additionally,
because it is questionable whether they are actually happening—nothing to CLF's knowledge or
in the record demonstrates that these consultations are in progress, much less that they have been

completed.  Moreover, NMFS only reinitiated consultation on *some* of the affected fisheries.

The Atlantic sea scallop, surf clam and ocean quahog, and Atlantic herring fisheries, all of which

are amended by the Habitat Amendment, are omitted from NMFS's Reinitiation Memo. *See* ESA

06048-049, 06051.

C.    **NMFS Cannot Rely On Unlawful Biological Opinions To Satisfy Section Obligations**

To the extent NMFS relies on existing biological opinions and prior measures

implemented by the Atlantic Large Whale Take Reduction Plan to justify its failure to consult on

the Habitat Amendment, those assertions fail, first, because they violate the agency's duty under

the ESA to consult on an agency action in its entirety. *See supra*, Par. II (A)*.*  Further, the

referenced biological opinions are unlawful in their own right, rendering reliance upon them

additionally arbitrary and capricious.

1.    Some Of The Referenced Biological Opinions Conclude That Their Fisheries May Affect North Atlantic Right Whales

NMFS relies on biological opinions for the Red Crab Fishery (2002), Sea Scallop Fishery

(2012), Northeast Multispecies Fishery (2013) ("Batched" biological opinion), and the American

Lobster Fishery (2014) to justify not consulting on the Habitat Amendment. *See, e.g.,* ESA

28602, 28608, 28623.  These biological opinions, however, do not support NMFS's conclusion

not to consult on the Habitat Amendment. To begin with, three of them conclude that operation

of the fisheries "may affect" right whales because of confirmed interactions with the gear types

primarily used in those fisheries. *See* ESA 05139 (American Lobster Fishery), 05369 (Northeast

Multispecies Fishery), 06058 (Red Crab Fishery).

NMFS admits that ESA consultations are required for agency actions that are expected to

impact ESA-listed species. *See, e.g.,* ESA 29221.  Yet, NMFS states that because "there has been

no indication that these fisheries have changed in any significant manner such that levels of take

have gone above and beyond" what was previously considered, NMFS does not need to reinitiate biological opinions. *See e.g.,* ESA 28602, 28608.

      2.   The Biological Opinions And The Atlantic Large Whale Take Reduction Plan Assume Closures Eliminated By The Habitat Amendment

NMFS justifies its decision not to consult by relying on biological opinions that necessarily never contemplated or assessed the Habitat Amendment's changes in size and management of previously closed areas *because they predate it*.  It is illogical to rely upon ESA analyses that assume the existence of closures no longer in force to evaluate the impacts of opening more than 3,000 square miles of those previously closed waters to expanded fishing. Because such changes would "modif[y]" the management regime "in a manner that causes an effect to the listed species"—as admitted throughout the Habitat Amendment FEIS—the biological opinions are unlawful as substitutes for the required Habitat Amendment consultation. *See* 50 C.F.R. § 402.16.

The "Batched" biological opinion issued in December 2013 to evaluate the effects of several FMPs on ESA-listed whales expressly assumes that management closures then in place would remain in place and acknowledges that existing closures "may benefit ESA-listed species due to elimination of active gear in areas where . . . cetaceans are present." *See* ESA 05507.  The biological opinion further states that "if closures shift effort to areas with a comparable or higher density of ESA-listed marine mammals, sea turtles, or fish then risk of interaction could actually increase." *Id.*  Based on the existing closures and other management measures, NMFS concluded in 2013 that the FMPs under review then would not jeopardize right whales, humpbacks, or other ESA-listed species.  Further, the 2013 biological opinion explicitly requires NMFS to reinitiate consultation if "the agency action is subsequently modified in a manner that causes an effect to the listed species or critical habitat not considered in this Opinion." ESA 05631.  The Habitat

Amendment is such a subsequent modification and invalidates agency reliance on its earlier analysis.

NMFS also unreasonably relies on the Atlantic Large Whale Take Reduction Plan and its adjustments, ESA 27783-27786, which similarly do not address the revised closure boundaries set forth in the Habitat Amendment or the potential for increased takes of right whales from gillnet fishing in areas previously closed.  Right whales continue to sustain mortality and serious injuries at rates much higher than their potential biological removal level and at least five right whale entanglement cases were documented between 2009 and 2013 involving gear consistent with gillnets. ESA 27189-27239 at 27205-27213.

3.    The Biological Opinions Do Not Contain An Incidental Take Statement As Required

Under the ESA, the expert agency may authorize incidental takes of listed species where doing so does not violate Section 7(a)(2). *See* 50 C.F.R.§ 402.14.  In the case of marine mammals, incidental takes are permitted under the ESA only where the taking is authorized pursuant to section 101(a)(5) of the Marine Mammal Protection Act. *See* 16 U.S.C. § 1387.  An incidental take statement specifies the extent of such incidental taking on the species, the reasonable and prudent measures necessary or appropriate to minimize impacts, other terms and conditions, and, in the case of marine mammals, the measures necessary to comply with the Marine Mammal Protection Act and applicable regulations. *See* 50 C.F.R.§ 402.14(i).  Here, several of the biological opinions referenced by NMFS did not contain the legally-required incidental take statement with respect to right whales. *See, e.g.* ESA 06105, 05271, 05622.  Nor could they, because the incidental take of right whales has not been authorized under section 101(a)(5) of the Marine Mammal Protection Act. *See* 16 U.S.C. § 1387; *see also* ESA 06105 (Red Crab fishery) ("NMFS is not including an incidental take authorization for ESA-listed

whales at this time because the incidental take of endangered whales cannot be authorized . . ."); 05271 (American Lobster fishery) (same rationale); 05622 (Batched fishery) (same rationale).

> 4.    The Biological Opinions Predate Scientific Information Demonstrating That Re-Initiation Was Required

An agency's obligations under the ESA are not satisfied by mere completion of the consultation process.  Rather, in addition to certain ongoing substantive requirements, agencies bear continuing responsibility to ensure that biological opinions remain lawful.  Under the ESA, reinitiation of consultation "is required" if, among other reasons, "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," or "[i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion." 50 C.F.R. § 402.16.

The biological opinions relied upon do not account for critical new scientific information from 2016 and 2017 revealing the declining status of North Atlantic right whales and the impacts of entanglement on the species. *See supra* at p. 11.  NMFS's failure to account for the best and most recent scientific information leads the FEIS analysis to incorrectly conclude that "at this time, there is no further evidence to make the conclusion that fishing gear entanglement alone cause[s] a decline in large whale health." ESA 27783.  This conclusion is in direct contrast with the "growing body of literature [that] has developed analyzing the effect of chronic entanglement on right whale health and reproduction" referenced in the 5-Year Review. ESA 25679.

Nor do the biological opinions account for the unusual mortality event in 2017, when 17 North Atlantic right whale deaths were documented (four percent of the total population). ESA 23290.  Further, calving intervals have increased, *see e.g.,* ESA 27241, and there was not a single documented birth in 2018, *see* Ex. B, Patek Dec. ¶¶ 10, 11; Ex. C, Shelley Dec. ¶ 9; Ex. E,

Mahoney Dec. ¶ 11. None of this new information was evaluated in the context of the Habitat Amendment decision. New consultations are required on the basis of this new factual information and scientific studies.

III.    **NMFS Violated Section 7(d) When It Approved The Habitat Amendment**

To the extent NMFS's inclusion of its Reinitiation Memo, ESA 06048-06052, or its recently provided "Endangered Species Act Section 7(d) Determination for the Continued Implementation of the Batched Fisheries, American Lobster, and Atlantic Deep-Sea Red Crab Fishery Management Plans," ESA 30986-30991, is intended to imply that NMFS complied with Section 7(d) of the ESA and was therefore free to proceed with its action approving the Habitat Amendment, NMFS is mistaken. *See* 16 U.S.C. ¶ 1536(d). First, Section 7(d) does not amend Section 7(a) to read that consultation is not required prior to action so long as there is no irreversible or irretrievable commitment of resources. Second, the Reinitiation Memo and Section 7(d) finding do not even address the Habitat Amendment, thus it carries no weight toward NMFS's Section 7 compliance in the context of the Habitat Amendment. While CLF's requested relief is compelled by Section 7(a)(2), Section 7(d) also supports declaratory relief and the requested injunctive relief until completion of the required consultation.

Because the obligation to insure against jeopardy and adverse modification of habitat might be eroded by other actions taken during the consultation period, even though the action itself cannot proceed before completion of consultation, Congress imposed further restrictions on agency actions during the consultation period through ESA Section 7(d), which provides:

> **Limitation on commitment of resources.** After initiation of consultation required under subsection (a)(2) of this section, the Federal agency . . . shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section.

16 U.S.C. § 1536(d).

Congress made clear that Section 7(d) is an *additional* limitation on agency action during the consultation period that does not diminish the express requirements of Section 7(a)(2). *See, e.g.*, H.R. Rep. No. 1625, 96th Cong., 2d Sess. 20 (1978) (Section 7(d) "further strengthen[s] the consultation process"); S. Rep. No. 874, 95th Cong., 2d Sess. 5 (1978) ("[t]he basic premise . . . is that the integrity of the interagency consultation process designated under section 7 of the act be preserved"); *see* 51 Fed. Reg. at 19,940 ("section 7(d) is strictly prohibitory in nature"). Section 7(d) prohibits those activities that commit an agency to a proposed action before NMFS has passed judgment on that action under Section 7(a)(2).

Here, NMFS made a prohibited commitment of resources through approval of the Habitat Amendment opening the pre-existing closed areas to fishing, and NMFS has allowed those areas to remain open even though it has now initiated a broad consultation that may retrospectively consider the effects. *See Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1128 (9th Cir. 1998) (section 7(d) violated where BOR executed water service contracts prior to completion of formal consultation). Courts have found that the potential for harm to the protected resource itself is considered a violation of Section 7(d). *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1057 (9th Cir. 1994) ("timber sales constitute *per se* irreversible and irretrievable commitments of resources under § 7(d) and thus could not go forward during the consultation period"). Section 7(d), thus, does not and cannot permit activities that otherwise are in violation of the procedural or substantive requirements of Section 7(a)(2); it does not grant permission to proceed with potentially harmful activities in either the absence of consultation or while consultation is ongoing.

In addition, the Reinitiation Memo never mentions the Habitat Amendment and it acknowledges that its consideration of the new scientific information and the excessive take of right whales across the subject fisheries was for those fisheries as they were operating at the time. ESA 06051 ("The fisheries under consideration will continue to operate under their respective FMPs unless NMFS takes action under the [Magnuson-Stevens Act] to stop them or modify the operation in some manner.").

NMFS approved the Habitat Amendment despite its recognition that the fishery management changes contained in the action may affect right whales.  By opening the areas previously closed to fishing in the Habitat Amendment prior to completing the required consultation on the Habitat Amendment, NMFS violated Section 7(d).

## IV.   NMFS's Approval Of The Habitat Amendment Without Completing The Section 7 Consultation Violates The Magnuson-Stevens Act And The APA

In the absence of the legally required Section 7 consultation on the Habitat Amendment, NMFS's approval is also unlawful under the Magnuson-Stevens Act.  Under the Magnuson-Stevens Act, a fishery management plan must be consistent with the National Standards, other provisions of the Magnuson-Stevens Act, and any other applicable law, 16 U.S.C. § 1854(a)(1)(A), including the ESA.  Here, NMFS approved a fishery management plan that was inconsistent with the ESA.

By approving and implementing the Habitat Amendment, which it admits may affect North Atlantic right whales, NMFS violated the Magnuson-Stevens Act and APA. *See Flaherty v. Bryson*, 850 F. Supp. 2d 38, 54 (D.D.C. 2012) ("it is NMFS's role . . . to ensure that the Council has done its job properly under the [Magnuson-Stevens Act] and any other applicable law").

**V.**    **The Court Should Vacate Measures In Southern New England/Great South Channel And Enjoin NMFS To Reclose Such Areas Until Section 7 Consultation Is Completed And Measures Necessary To Avoid Jeopardy Are Implemented**

Unsupported agency action normally warrants vacatur.  "The appropriateness of vacating an agency action depends on whether (1) the agency's decision is so deficient as to raise serious doubts whether the agency can adequately justify its decision at all; and (2) vacatur would be seriously disruptive or costly." *See Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 499 (D.D.C. 2014) (citing *Northern Air Cargo v. U.S. Postal Serv.,* 674 F.3d 852, 860-61, 400 U.S. App. D.C. 69 (D.C. Cir. 2012)).  Vacatur, rather than remand, of NMFS's approval of the Southern New England/Great South Channel closure openings is appropriate in this case based on NMFS's unlawful promulgation of the Habitat Amendment final rule without the formal consultation necessary to ensure the rule would not likely jeopardize right whales or adversely modify their critical habitat, since NMFS's failure to initiate consultation was a serious substantive deficiency rather than a minor procedural defect under ESA. *See Nat'l Parks Conservation Ass'n v. Jewell,* 62 F.Supp.3d 7, 20-22 (D.D.C. 2014).  Without formal consultation, NMFS has no serious possibility of developing a reasoned explanation on remand and vacatur of the rule here would have limited disruptive consequences.

The very purpose of the consultation process is to gather, generate, and assess information concerning the effects of an action that may affect a listed species or its critical habitat.  Until consultation is completed, much of that information may be unknown or otherwise unavailable to the action agency; that is the core purpose of the consultation. Here, instead of initiating and completing the legally required Section 7 consultation, NMFS relied on outdated and unlawful biological opinions. *See supra* at Par. II(C).  The failure of NMFS to consult on its Habitat Amendment decision left it without the information necessary to ensure against jeopardy

or adverse modification of critical habitat, including information related to the impacts of the introduction of fishing gear known to take right whales into the previously closed areas where right whales are known to habituate. *See, e.g.,* ESA 24861, 25507, 27785, 30752.

Further, vacatur in this case would not be seriously disruptive or costly. Vacatur would reinstate the *status quo* area closures that were in existence for over 20 years and with which New England fishermen are familiar. Reclosing these areas to fishing would be a routine administrative action for NMFS, and fishermen would continue to fish under the same catch limits because the closures only affect where fishermen can fish, not how much fish they can catch. These would be minimal disruptions and costs in the context of the ESA, where the balance of hardships and the public interest always favor protection of the endangered species. *TVA v. Hill*, 437 U.S. at 187-88.

In addition, this Court should enjoin NMFS to complete the required consultation by a date certain and reclose the areas opened by the Habitat Amendment until the consultation process is complete and NMFS has implemented any permanent measures necessary to ensure against jeopardy or adverse modification of critical habitat. There is no question that the ESA limits a court's equitable discretion in determining whether injunctive relief is warranted, *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 543 n. 9 (1987) (explaining that the ESA "foreclose[s] the traditional discretion possessed by an equity court"). The heart of the ESA's procedural protection is the consultation process, which Congress designed to ensure compliance with the ESA's substantive provisions, and enforcement of ESA § 7(a)(2) is necessary to insure achievement of the substantive goals of the Act. *See* TVA, 437 U.S. at 188. The ESA's procedural requirements demand a systematic determination of the effects of a federal project on endangered species, and if a project is allowed to proceed without substantial compliance with

those procedural requirements there can be no assurance that a violation of the ESA's substantive provisions will not result.

Although *TVA* clarified that the "language, history, and structure" of the ESA, 437 U.S. at 174, removed several factors in the four-factor test for injunctive relief from a court's equitable jurisdiction. *TVA* may not have resolved whether plaintiffs must establish irreparable injury because there was uncontroverted scientific evidence that completion and operation of the disputed project would "either eradicate the known population of [the listed species] or destroy their critical habitat." *Id.* at 171. Regardless, in light of the stated purposes of the Endangered Species Act in conserving endangered and threatened species and the ecosystems that support them, establishing irreparable injury should not be an onerous task. 16 U.S.C. § 1531.

Thus, once a plaintiff shows, as CLF has here, that the circumstances triggering the consultation requirement exist and that the required procedures have not been followed, the court should issue an injunction for the procedural violations. Once a violation of the ESA is found the balance of hardships and the public interest always favor an injunction to protect the endangered species. *TVA*, 437 U.S. at 187-88. "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.'" *TVA*, 437 U.S. at 194. Until consultation on the proposed actions set forth in the Habitat Amendment is completed, critical information is neither known nor available to NMFS. Under such circumstances, NMFS cannot ensure against jeopardy or adverse modification of critical habitat and the action cannot go forward.

The fundamental scientific purpose of the consultation process also explains why when plaintiffs demonstrate a procedural violation of the ESA the court should enjoin activities under

§ 7(a)(2) pending completion of consultation.  Much of the information necessary to ensure against jeopardy or the adverse modification of critical habitat is generated by the consultation process itself.  Imposing a burden on plaintiffs to demonstrate a threat of harm before the science is gathered and assessed would fail to effectuate the purposes of the ESA—affording endangered species the "highest of priorities," and "halt[ing] and revers[ing] the trend towards species extinction, whatever the cost."  *TVA*, 437 U.S. at 174, 184; *see also* H. R. Conf. Rep. No. 697, 96th Cong., 1st Sess. 12 (1979), *reprinted in* 1979 U.S. Code Cong. & Admin. News 2572, 2576 (Section 7 places "the burden on the action agency" to demonstrate that its action likely will not jeopardize the species or adversely modify its critical habitat, and the agency must "give the benefit of the doubt to the species").  For these reasons, this Court should enjoin NMFS to close the areas opened to fishing pending completion of the Section 7 consultation process.

In this case, there is no question that CLF and its members have and will continue to suffer irreparable harm from NMFS's failure to initiate and complete the ESA Section 7 consultation necessary to insure the opening of the previously closed areas is not likely to cause jeopardy to right whales or adversely modify their critical habitat.  The declarations included with this memorandum show that CLF and its members have personal, professional and recreational interests in the continued vitality of the North Atlantic right whale. *See* Ex. A ¶¶ 6, 8-12; Ex. B ¶¶ 3-10; Ex. C. ¶¶ 5-8; Ex. D ¶¶ 10-11; Ex. E ¶¶ 8-10.  These declarations also show that until NMFS completes an ESA Section 7 consultation, CLF's members' ability to use and enjoy North Atlantic right whales by viewing and seeking to view them, sharing sighting information, working to protect the species, and pursuing information about them among other things, will be irreparably harmed. *See* Ex. A ¶¶ 10, 13-14; Ex. B ¶¶ 12-13; Ex. C. ¶¶ 10-13; Ex. D ¶¶ 10, 11, 15-16; Ex. E ¶¶ 8-10, 14.

## CONCLUSION

Based on the foregoing, the Court should grant summary judgment to plaintiff and grant plaintiff the relief requested in its Proposed Order.

Respectfully submitted this 21st day of December, 2018.

/s/ Erica A Fuller
ERICA A. FULLER
D.C. Bar No. MA0001
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
Tel: 508-400-9080
Fax: 617-350-4030
efuller@clf.org

EMILY K. GREEN
D.C. Bar No. ME0002
Conservation Law Foundation
53 Exchange St., Suite 200
Portland, Maine 04101
Tel: 207-210-6439
Fax: 617-350-4030
egreen@clf.org

ROGER M. FLEMING
D.C. Bar No. ME0001
Earthjustice
1625 Massachusetts Avenue, N.W. Suite 702
Washington, D.C. 20036
Telephone 202-667-4500
Facsimile 202-667-2356
rfleming@earthjustice.org

*Counsel for Plaintiff*

42

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2018, I caused the foregoing to be filed and served upon counsel of record via the Court's CM/ECF filing system, which will send notice of such to all counsel of record.

/s/ Erica A Fuller
Erica A Fuller