**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CONSERVATION LAW FOUNDATION, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civ. No. 1:18-cv-1087-JEB |
| WILBUR ROSS, in his official capacity | ) | ORAL ARGUMENT REQUESTED |
| as Secretary of Commerce, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| _____ | ) | |

<u>**PLAINTIFF'S COMBINED REPLY MEMORANDUM IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT AND IN OPPOSITION TO FEDERAL DEFENDANTS'
AND INTERVENOR DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT**</u>

ERICA A. FULLER
D.C. Bar No. MA0001
CONSERVATION LAW FOUNDATION
62 Summer St.
Boston, MA 02110
(617) 850-1727 Telephone
(617) 350-4030 Facsimile
efuller@clf.org

EMILY K. GREEN
D.C. Bar No ME0002
CONSERVATION LAW FOUNDATION
53 Exchange St., Suite 200
Portland, ME 04101
(207) 210-6439 Telephone
(617) 350-4030 Facsimile
egreen@clf.org

STEPHEN D. MASHUDA
D.C. Bar No. WA0005
EARTHJUSTICE
705 Second Ave., Suite 203
Seattle, WA 98104
(206) 343-7340 Telephone
(206) 343-1526 Facsimile
smashuda@earthjustice.org

TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT .......................................................................................................3

I.     NMFS'S APPROVAL OF THE HABITAT AMENDMENT WITHOUT
COMPLETING THE SECTION 7 CONSULTATION PROCESS
VIOLATES THE ENDANGERED SPECIES ACT .................................................3

    A.     The Habitat Amendment May Affect Listed Species and Triggers
NMFS's Duty to Consult .............................................................6

    B.     NMFS Must Consult on the Effects of the Entire Habitat
Amendment.................................................................................7

    C.     NMFS Erred in Assuming that the Habitat Amendment Would Not
Affect Right Whales in a Manner that Required a Consultation ..............11

        1.     NMFS Unreasonably Assumed the Habitat Amendment
Would Not Change the Operation of the Gillnet Fisheries............12

        2.     NMFS Failed to Consider the Interdependent Changes to
Fishery Operations from the Habitat Amendment........................14

    C.     NMFS's Reliance on Prior Biological Opinions is Arbitrary and
Capricious ................................................................................17

II.     NMFS VIOLATED THE MAGNUSON-STEVENS ACT WHEN IT
APPROVED THE HABITAT AMENDMENT IN VIOLATION OF THE
ENDANGERED SPECIES ACT........................................................................18

III.     CLF PROVIDED NOTICE OF ITS SECTION 7(D) VIOLATION....................19

IV.     CLF HAS STANDING....................................................................................25

    A.     NMFS's Failure to Consult on the Habitat Amendment Injures
CLF .........................................................................................26

    B.     The Harm to CLF is Caused by NMFS's Failure to Consult Before
it Approved the Habitat Amendment...........................................30

        1.     Courts Employ a Relaxed Legal Standard to Evaluate
Causation and Redressability for Procedural Injuries...................30

        2.     NMFS's Failure to Consult and Consider Effects to Right
Whales Will Harm CLF's Interests in Right Whales....................31

3.    The Harm to CLF is Not Dependant on the Decisions of
Third Party Fishermen ............................................................... 33

C.    CLF Has Standing to Bring These Claims on its Own Behalf ................. 35

V.    AN INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE
HARM TO RIGHT WHALES .......................................................... 36

A.    The Habitat Amendment is Likely to Cause Irreparable Harm to
Right Whales .................................................................................... 39

B.    NMFS's Request for Additional Remedy Briefing is Unwarranted .......... 42

CONCLUSION ....................................................................................................... 44

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach*,
    469 F.3d 129 (D.C. Cir. 2006) ................................................................35

*Agnew v. Gov't of the D.C.*,
    920 F.3d 49 (D.C. Cir. 2019) ..................................................................9

*Allied Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ................................................................43

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
    271 F.Supp.2d 230 (D.D.C. 2003) ..........................................................10

*Am. Rivers, Inc. v. NOAA Fisheries*,
    No. CV-04-0061-RE, 2006 WL 1455629 (D. Or. May 23, 2006).................9, 10

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*,
    659 F.3d 13 (D.C. Cir. 2011) .................................................................36

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) .................................................................34

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
    341 F.3d 961 (9th Cir. 2003) .................................................................33

*Citizens for Responsibility & Ethics in Wash. v. Fed. Election Comm'n*,
    316 F. Supp. 3d 349 (D.D.C. 2018) ..........................................................9

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ........................................................................42, 43

\* *Conner v. Burford*,
    848 F.2d 1441 (9th Cir. 1988) ..............................................................20, 22

*Conservation Force v. Salazar*,
    715 F. Supp. 2d (D.D.C. 2010) ..............................................................23, 24

*Cooling Water Intake Structure v. U.S. EPA*,
    905 F.3d 49 (2nd Cir. 2018)..................................................................10, 11

*Ctr. for Biol. Diversity v. U.S. EPA*,
    794 F. Supp. 2d 151 (D.D.C. 2011) .........................................................23, 24

\* *Ctr. for Biol. Diversity v. U.S. EPA*,
    861 F.3d 174 (D.C. Cir. 2017) ..............................................25, 28, 30, 31

*Ctr. for Biol. Diversity v. U.S. Dept. of Interior*,
 563 F.3d 466 (D.C. Cir. 2009) ...................................................................27

*Dania Beach v. Fed. Aviation Admin.*,
 485 F.3d 1181 (D.C. Cir. 2007) .................................................................31

*Defenders of Wildlife v. Babbitt*,
 958 F. Supp. 670 (D.D.C. 1997) ...............................................................17

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n*,
 878 F.3d 371 (D.C. Cir. 2017) ...................................................................35

*Equal Rights Ctr. v. Post Properties, Inc.*,
 633 F.3d 1136 (D.C. Cir. 2011) ...........................................................35, 36

*Estate of Boyland v. U.S. Dep't of Agric.*,
 913 F.3d 117, 123 (D.C. Cir. 2019) ..........................................................26

*Fed. Commc'n Comm'n v. Nextwave Pers. Commc'ns Inc.*,
 537 U.S. 293 (2003) ...................................................................................42

*Fisheries Survival Fund v. Jewell*,
 2018 WL 4705795 (D.D.C. 2018) .............................................................31

*Fla. Audubon Soc'y v. Bentsen*,
 94 F.3d 658 (D.C. Cir. 1996) .....................................................................27

*Greenpeace v. NMFS*,
 80 F. Supp. 2d 1137 (W.D. Wash. 2000) .....................................................6

*Hernandez v. Ashcroft*,
 345 F.3d 824 (9th Cir.2003) .........................................................................9

*Humane Soc'y v. Jewell*,
 76 F. Supp. 3d 69 (D.D.C. 2014) .................................................................9

*Idaho Conservation League v. Mumma*,
 956 F.2d 1508 (9th Cir. 1994) ..............................................................33, 34

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
 681 F.3d 1006 (9th Cir. 2012) .................................................................5, 7

*Loggerhead Turtle v. Council of Volusia Cty.*,
 148 F.3d 1231 (11th Cir. 1998) ..................................................................34

* *Mayo v. Jarvis*,
 177 F. Supp. 3d 91 (D.D.C. 2016) .............................................................28

*N.Y. Reg'l Interconnect, Inc. v. FERC*,
   634 F.3d 587 (D.C. Cir. 2011) ...................................................................34

*Nat. Res. Def. Council v. Jewell*,
   749 F.3d 776 (9th Cir. 2014) .....................................................................25

*Nat. Res. Def. Council v. Houston*,
   146 F.3d 1118 (9th Cir. 1998) ...................................................................20

* *Nat'l Parks Conservation Ass'n v. Jewell*,
   62 F. Supp. 3d 7 (D.D.C. 2014) ...................................................4, 5, 7, 18

* *Nat'l Wildlife Fed'n v. Brownlee*,
   402 F. Supp. 2d 1 (D.D.C. 2005) ....................................................5, 6, 22

*Nat'l Wildlife Fed'n v. Nat'l Park Serv.*
   669 F. Supp. 384, 386-87 (D. Wyo. 1987) ................................................22

*Nat'l Wilderness Inst. v. U.S. Army Corps of Eng'rs*,
   No. Civ. No. 010273 (TFH), 2005 WL 691775 (D.D.C. Mar. 23, 2005)................................23

*Nat'l Women's Law Ctr. v. Office of Mgmt. and Budget*,
   358 F. Supp. 3d 66 (D.D.C. 2019) .............................................................36

* *N. Slope Borough v. Andrus*,
   486 F. Supp. 332 (D.D.C. 1980), *aff'd in part, rev'd in part on other grounds*,
   642 F.2d 589 (D.C. Cir. 1980) .............................................7, 8, 21, 22

*Oceana v. Bureau of Ocean Energy Mgmt.*,
   37 F. Supp. 3d 147 (D.D.C. 2014) ............................................................22

*Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS*,
   482 F.Supp.2d 1248 (W.D. Wash. 2007)....................................................15

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*,
   606 F. Supp. 2d 1122 (E.D. Cal. 2008).......................................................23

*Pac. Rivers Council v. Thomas*,
   30 F.3d 1050 (9th Cir. 1994) .....................................................................20

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
   797 F.3d 1087 (D.C. Cir. 2015) .................................................................35

* *Sierra Club v. FERC*,
   827 F.3d 59 (D.C. Cir. 2016) ..........................................25, 26, 27, 33

*Sierra Club v. Marsh*,
   816 F.2d 1376 (9th Cir. 1987) ...................................................................41

*Sierra Forest Legacy v. Sherman*,
  646 F.3d 1161 (9th Cir. 2011) ...................................................................38, 39

*Singh v. Clinton*,
  618 F.3d 1085 (9th Cir. 2010) ..............................................................................9

*Strahan v. Coxe*,
  939 F. Supp. 963 (D. Mass. 1996) .......................................................................34

*Sw. Ctr. for Biol. Diversity v. U.S. Bureau of Reclamation*,
  143 F.3d 515 (9th Cir. 1998) ..............................................................................23

* *WildEarth Guardians v. Jewell*,
  738 F.3d 298 (D.C. Cir. 2013) ......................................................................25, 31

*WildEarth Guardians v. Salazar*,
  859 F. Supp. 2d 83 (D.D.C. 2012) ......................................................................26

**Statutes**

Endangered Species Act

  16 U.S.C. § 1536(a)(2)........................................................................1, 5, 6, 25

  16 U.S.C. § 1536(d) ............................................................................................19

Magnuson-Stevens Act

  16 U.S.C. § 1854(a)(1)(A) ..........................................................................15, 18

**Regulations**

50 C.F.R. § 402.09........................................................................................................19

50 C.F.R. § 402.13..........................................................................................................6

50 C.F.R. § 402.14........................................................................................................10

50 C.F.R. § 402.14(a)......................................................................................................4

50 C.F.R. § 402.14(c)......................................................................................................8

50 C.F.R. § 402.14(c)(6)..........................................................................................7, 8, 9

50 C.F.R. § 402.14(g).................................................................................................5, 19

50 C.F.R. § 402.16(c)......................................................................................................4

50 C.F.R. § 648.80........................................................................................................33

**Federal Register Notices**

51 Fed. Reg. 19,926 (June 3, 1986) ................................................................5, 7

69 Fed. Reg. 30,857 (June 1, 2004) ......................................................................2

84 Fed. Reg. 22,051 (May 16, 2019) ....................................................................2

**Other Authorities**

Final ESA Section 7 Consultation Handbook (March 1998) available at:
    https://www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf ........................5

https://www.fisheries.noaa.gov/leadership-message/immediate-action-needed-
    save-north-atlantic-right-whales ....................................................................20, 39

https://www.westcoast.fisheries.noaa.gov/protected_species/marine_mammals/fis
    heries_interactions_assess_risk.html ...................................................................13

*\* Authorities upon which we chiefly rely are marked with an asterisk*

## INTRODUCTION

In just the past month, six more North Atlantic right whales have been killed by human activities.  This alarming series of deaths accounts for 1.5 percent of the existing population and includes four reproductive-age females—the most critical component for the survival and recovery of this species.  Plaintiff Conservation Law Foundation ("CLF") has challenged the National Marine Fisheries Service's ("NMFS") violations of the Endangered Species Act ("ESA") in this case because these deaths, and the twenty that preceded them in the last two years, underscore that paperwork exercises and business-as-usual management cannot protect the North Atlantic right whale from extinction.

Against the backdrop of this steep population decline, NMFS promulgated final regulations authorizing the Omnibus Essential Fish Habitat Amendment 2 ("Habitat Amendment") without ensuring through the ESA section 7 consultation process that opening thousands of square miles of right whale habitat to commercial fishing would avoid jeopardy to this declining species.  This violates the express purpose of the ESA's consultation requirement—to ensure "that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species . . . ."  16  U.S.C. § 1536(a)(2).  NMFS's failure to consult on the effects of the Habitat Amendment has substantially increased the risk that endangered North Atlantic right whales will die or be seriously injured by sink gillnets, known to entangle right whales, in the former Nantucket Lightship Area Closure and Closed Area 1 ("Closures") where this gear had been prohibited for more than 20 years.

NMFS does not dispute that it did not consult on the Habitat Amendment itself.  Instead, it invokes a handful of other documents (many of which predate the Habitat Amendment) and cursory checklists for fisheries in New England and asks this Court to assume that the required analysis is somewhere in the penumbra of this paperwork.  But none of the scattershot material—

1

by itself or in combination—cited in NMFS's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and Support of Defendants' Cross-Motion for Summary Judgment (ECF No. 40-1) substitutes for the comprehensive scientific inquiry that NMFS must undertake to satisfy its ESA responsibilities for the North Atlantic right whale.

NMFS provides a range of unconvincing excuses for its failure to consult. Its main thrust is that NMFS Fisheries Division had no duty to consult with its Protected Resources Division over the Habitat Amendment because the Fisheries Division improperly claimed: (1) the unfettered discretion to examine the effects to right whales on a limited fishery-by-fishery basis rather than the effect of the action as a whole; (2) the technical expertise to determine that eliminating the Closures would not change the operation of certain fisheries in a way that would affect right whales; and (3) it was reasonable to rely on outdated biological opinions and the piecemeal reinitiation of consultations on certain fisheries instead of initiating a comprehensive consultation on the Habitat Amendment that would examine the effects of all the fisheries, and interactions between fisheries, permitted in the Closures after approval.

This is a complete dereliction of duty. Right whales are on the brink of extinction and NMFS has previously concluded that the loss of even a single member of this population could jeopardize its continued existence. *See* 69 Fed. Reg. 30,857, 30,858 (June 1, 2004). NMFS has admitted that the Habitat Amendment "may affect" right whales, that the Northeast sink gillnet fishery poses a significant entanglement risk to the species,[1] and that the elimination of the Closures will change patterns of fishing activity and the distribution of gillnets. NMFS's failure to consult with the biological experts at the Protected Resources Division before it implemented

---

[1] NMFS classifies the Northeast sink gillnet fishery as a Category I fishery under the Marine Mammal Protection Act because it causes "frequent" serious injury and mortality to North Atlantic right whales. 84 Fed. Reg. 22,051, 22,067 (May 16, 2019).

the Habitat Amendment in April 2018 was unlawful and represents a missed opportunity to protect this fragile population from the risk of gillnet entanglements in New England waters that cannot remain unaddressed and unmitigated.

To address the likelihood of irreparable harm caused by NMFS's decision to open thousands of square miles of right whale habitat to commercial fishing gear known to entangle right whales, CLF has also requested that the Court enjoin commercial fishing with sink gillnet gear in the Closures until and unless NMFS complies with its obligation to consult on the Habitat Amendment. Defendants' arguments opposing this request suffer from a similar mix of unwarranted requests for deference and wishful thinking. NMFS fails to rebut the credible expert testimony establishing a likelihood of irreparable harm and fails to offer any valid reason why CLF's requested relief must await yet more briefing after the Court's decision on the merits.

NMFS also urges the Court to dismiss the action on jurisdictional grounds by challenging CLF's standing. This argument falls flat. CLF's members' declarations make clear that they are injured by NMFS's failure to consult and that this failure is traceable to an increased risk of gillnet entanglements. Evaluating and mitigating this risk to right whales is precisely what the ESA consultation process is designed to accomplish.

The Court should reject Defendants' arguments and grant CLF's summary judgment motion and request for an injunction to protect right whales until NMFS complies with the ESA.

## ARGUMENT

**I.** **NMFS's Approval of the Habitat Amendment Without Completing the Section 7 Consultation Process Violates the Endangered Species Act**

As CLF explained in its opening brief (ECF No. 38-1), NMFS was required to conduct a section 7 consultation on the Habitat Amendment because it is an agency action that "may affect" right whales and other listed species. ECF No. 38-1 at 21-23. NMFS does not contest

that the Habitat Amendment is an agency action that may affect right whales. *See id.* at 22. Instead, NMFS works hard to divert the Court's attention from the legal violation that flows from these facts by shifting away from the question of whether it was required to consult on the effects of the Habitat Amendment to a different query with a different, and manufactured, *new* standard: whether it was required to "conduct *additional* consultation," ECF No. 40-1 at 29, or "conduct a *new* consultation." *Id.* at 27 (emphasis added). NMFS argues that it need not consider "whether the Habitat Amendment will have *any* effect on right whales and their critical habitat, but whether it 'causes an effect to the listed species or critical habitat *that was not considered in the biological opinion*.' 50 C.F.R. § 402.16(c) (emphasis added)." *Id.* at 30. But NMFS has never before considered—together or separately—the effects of the Habitat Amendment. The Court should reject the agency's attempts to invent a new standard for triggering consultation and to reframe the core legal question in this case.

NMFS's argument rests largely on the premise that it has discretion to divide up the agency action and separately consider its effects on listed species. Based on this premise, NMFS argues that it did not have to consult on the Habitat Amendment because it already or elsewhere determined that the changes made to closed areas would not harm right whales. But these arguments ignore the basic process and responsibilities that the ESA assigns. A brief review of those requirements is therefore in order.

Under the ESA, the agency taking the action—referred to as the "action agency," in this case NMFS Fisheries Division—makes an initial determination as to whether the action "may affect" a listed species. *See* 50 C.F.R. § 402.14(a). "The 'may affect' threshold for triggering the consultation duty under section 7(a)(2) is low . . . 'Any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement.'"

*Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 12-13 (D.D.C. 2014), quoting

Interagency Cooperation—Endangered Species Act of 1973, 51 Fed.Reg. 19,926, 19,949-50

(June 3, 1986); *see also Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir.

2012) (same).  The ESA Section 7 Handbook makes clear that an action "may affect" a species

when it "may pose *any* effects" on them.  *See* Final ESA Section 7 Consultation Handbook

(March 1998) available at: https://www.fws.gov/endangered/esa-

library/pdf/esa_section7_handbook.pdf, at xvi (emphasis in original); *see also Karuk Tribe of*

*Cal.,* 681 F.3d at 1027 ("actions that have *any* chance of affecting listed species or critical habitat

– even if it is later determined that the actions are 'not likely' to do so – require at least some

consultation under the ESA.") (emphasis added).[2]

    Thus, as here, once a "may effect" determination is made, consultation is required to

determine the nature and extent of the effects of the proposed agency action.  The ESA entrusts

responsibility for the analyses necessary for consultation to NMFS Protected Resources, *not* the

Fisheries Division.  *See* 50 C.F.R. § 402.14(g).  Even in the situation where, after an initial "may

affect" finding, NMFS Fisheries Division believes that its action is "not likely to adversely

affect" a listed species, the consultation process can terminate only *if* NMFS Protected Resources

provides a written concurrence with the Fisheries Division's finding.  *Id.* § 402.14(b)(1); *see also*

*Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1, 10-11 (D.D.C. 2005); *see also* ESA Section

7 Handbook (1998) at xvi.  Through this "informal consulation process," the regulations ensure

that the subject-matter experts in the Protected Resources Division are involved in any review of

activities that "may affect" the listed species even if a formal consultation turns out not to be

---

[2] "An agency may avoid the consultation requirement only if it determines that its action will
have 'no effect' on a listed species or critical habitat." *Karuk Tribe of Cal.,* 681 F.3d at 1027.
NMFS made no such finding in this case.

necessary.  *See* 50 C.F.R. § 402.13.  NMFS Fisheries Division has no expertise in protecting

right whales and is afforded no deference for its decisions as to the effects of its actions on right

whales.  *See, e.g., Brownlee*, 402 F. Supp. 2d at 10-11 ("Congress has entrusted administration of

the ESA to FWS [the expert agency], not to the Corps [the action agency], so, while FWS's

interpretation of the ESA and its regulations may be entitled to deference, the Corps'

interpretations are not." (internal quotations and citations removed)).

A.    **The Habitat Amendment May Affect Listed Species and Triggers NMFS's Duty to Consult**

The legal question in this case is straightforward—whether NMFS was required to

consult on the effects of the Habitat Amendment before approving the elimination of two large

closures in New England waters.  The answer is a resounding yes.  NMFS's conclusory

statements that the "closures did not increase overall fishing effort or otherwise change the way

the fisheries interact with listed species" and "any new effects from the changes to closed areas

did not rise to a level requiring NMFS to engage in additional consultation for those fisheries,"

ECF No. 40-1 at 27, miss the point.  NMFS Fisheries Division did not have the authority or the

expertise to make those determinations, and a consultation on the entire action was triggered.

NMFS does not dispute, nor could it, that the Habitat Amendment is an "agency action"

under the ESA.  It is an "action authorized, funded, or carried out by" a federal agency.  16

U.S.C. § 1536(a)(2); ESA 5057-5102; *see also Greenpeace v. NMFS*, 80 F. Supp. 2d 1137, 1145

(W.D. Wash. 2000) (implementation of fishery management plans "constitute[s] on-going

agency action under the ESA").  And NMFS admits the Habitat Amendment "may affect" listed

species.  ECF No. 38-1 at 22.  Beside NMFS's admissions, documents it cites throughout its

environmental analysis for this action confirm multiple instances of North Atlantic right whales

becoming entangled by the same gear the Habitat Amendment introduced into areas right whales

6

are known to frequent.  *See* ECF No. 38-1 at 22-23.  These effects meet the low threshold for a

"may effect" determination.  *See Nat'l Parks Conservation Ass'n*, 62 F. Supp. 3d at 12–13;

*Karuk Tribe of Cal.*, 681 F.3d at 1027; 51 Fed. Reg. 19926, 19949-50 (June 3, 1986).

Further, as discussed *supra,* the Fisheries Division's determination that a formal

consultation and biological opinion is not warranted does not end the inquiry; the expert agency

must confirm via written concurrence that the action is not likely to adversely affect the listed

species.  There has been no such finding and no concurrence on the effects of the Habitat

Amendment as a whole.  And although the supplemental record reflects that NMFS Protected

Resources provided concurrence letters for several fisheries affected by the Amendment, there

has been *no such concurrence* for the Northeast Multispecies FMP (which includes the gillnet

fisheries) or the Deep-Sea Red Crab FMP (a trap/pot fishery).  *See* ECF No. 38-1 at 28-29.  The

Fisheries Division's inexpert opinions that the Habitat Amendment's effects are not significant

or not likely to cause jeopardy to right whales are not entitled to any deference.  *Supra* at 4-6.

The agency's admission that the Habitat Amendment may affect right whales, and the

absence of a concurrence that NMFS need not consult, ends the inquiry.  NMFS's litany of

excuses, addressed below, are all inconsistent with the ESA and APA and should be rejected.

B.    **NMFS Must Consult on the Effects of the Entire Habitat Amendment**

NMFS's attempt to parcel out its analysis of the effects of the Habitat Amendment to

multiple, smaller-scale consultations violates its duty to consult on the entire agency action.  The

ESA is clear that a comprehensive consideration of the effects of the action as a whole is

required.  *See* 50 C.F.R. § 402.14(c)(6); *see also* ECF No. 38-1 at 35; *see also N. Slope Borough

v. Andrus*, 486 F. Supp. 332, 353 (D.D.C. 1980), *aff'd in part, rev'd in part on other grounds*,

642 F.2d 589 (D.C. Cir. 1980).  Avoiding a Habitat Amendment-wide analysis in favor of

fishery-by-fishery evaluations necessarily misses overarching and cumulative impacts.  *See* ECF

No. 38-1 at 35-37.  Seeking to reframe the legal issue, NMFS asserts that it has discretion to define the scope of the action on which it will consult.  *See* ECF No. 40-1 at 27.  The statute, regulations, and well-established caselaw afford NMFS no such discretion.

The ESA's implementing regulations expressly allow a federal agency proposing an action to collectively consider "a number of similar individual actions within a given geographical area . . ." while cautioning that this does not "relieve the Federal agency of the requirements for considering the effects of the action as a whole."  50 C.F.R. § 402.14(c).  In contrast, the regulations provide no authority for an agency to make the opposite choice: dividing a single, broad agency action into pieces and considering them separately.  The Habitat Amendment is undoubtedly a single agency action—"action" is expressly defined to include "the promulgation of regulations."  *Id.* § 402.02.  Consistent with the plain language of the statute and the regulations, courts regularly require complete and comprehensive ESA consultations equivalent in scope to the agency action.  *See, e.g., N. Slope Borough*, 486 F. Supp. at 353 (ESA "requires that the consulting agency scrutinize the total scope of agency action."); *see also* ECF No. 38-1 at 34-37.  NMFS's failure to analyze the effects of the Habitat Amendment in its totality plainly violates these requirements.

NMFS wrongly invokes 50 C.F.R. § 402.14(c) to support its assertion that it may break apart the Habitat Amendment.  But that regulation simply provides that "[a]ny request for formal consultation may encompass . . . a number of similar individual actions within a given geographical area or a segment of a comprehensive plan" and explicitly states that "[t]his does not relieve the Federal agency of the requirements for considering the effects of the action as a whole." 50 C.F.R. § 402.14(c)(6); *see also, e.g., N. Slope Borough*, 486 F. Supp. at 353.  Thus, the regulation plainly requires something *more* than consideration of separate pieces of the

action.  NMFS's interpretation of 50 C.F.R. § 402.14(c)(6) as requiring only consideration of

effects on a fishery-by-fishery basis, *see* ECF No. 40-1 at 29, impermissibly renders the

requirement that NMFS consider "the effects of the action as a whole" in the final sentence of

that regulation superfluous.  Applying "one of the most basic interpretive canons—that a statute

should be construed so that effect is given to all its provisions, so that no part will be inoperative

or superfluous, void or insignificant," *Citizens for Responsibility & Ethics in Wash. v. Fed.*

*Election Comm'n,* 316 F. Supp. 3d 349, 391 (D.D.C. 2018) (internal quotations and citations

omitted), the court should effectuate the last sentence of the regulation and require NMFS to

consider the effects of the Habitat Amendment as a whole.  *See Agnew v. Gov't of the D.C.*, 920

F.3d 49, 57 (D.C. Cir. 2019) (A "statute [must] not be interpreted in a way that renders any part

of it superfluous.").  NMFS's interpretation reads that requirement out of the regulation and is

not entitled to any deference.  NMFS "has no discretion to make a decision that is contrary to

law." *Singh v. Clinton*, 618 F.3d 1085, 1091 (9th Cir. 2010) (quoting *Hernandez v. Ashcroft*, 345

F.3d 824, 846 (9th Cir. 2003)); *Humane Soc'y v. Jewell*, 76 F. Supp. 3d 69, 113 (D.D.C.

2014) ("The [agency's] interpretation of the ESA. . . directly conflicts with the structure of the

ESA and, consequently, this interpretation is entitled no deference").  NMFS is in violation of

the ESA for failing to consider the effects of the Habitat Amendment as a whole.

The two cases upon which NMFS relies to claim discretion to consider the Habitat

Amendment in smaller pieces do not support its argument.  First, in *Am. Rivers, Inc. v. NOAA*

*Fisheries*, No. CV-04-0061-RE, 2006 WL 1455629 (D. Or. May 23, 2006), the "discretion" the

court acknowledged was that of the agency to consider similar agency actions in a single

biological opinion—not to break one agency action apart.  In that case, the court first considered,

and rejected, the argument that the Bureau of Reclamation's separate operations of multiple

dams on different rivers were actually a single agency action. *Id*. at *6. It then turned to the question of whether the agency properly exercised its discretion when it declined to consider these projects together in a single biological opinion. *Id*. at *9 ("Plainly, [federal defendants] could exercise that discretion by choosing to combine similar actions in one consultation."). Whether NMFS Fisheries Division properly exercised its discretion to consider separate actions collectively, *see* 50 C.F.R. § 402.14, is not the situation before this Court. Rather, this case presents the opposite question: whether the ESA allows NMFS to divide the Habitat Amendment—undoubtedly a single agency action—into smaller pieces for consultation.

Importantly, the *Am. Rivers* court emphasized that no matter how the agency considered these actions—in one biological opinion or two—it must demonstrate that it considered all of the combined effects of the actions comprehensively, something that is lacking in NMFS's approach here. The court affirmed that "an agency may not 'engage in a series of limited consultations without ever taking a comprehensive assessment of the impacts of their overall activity on protected species.'" *Id.* at *6 (citing *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F.Supp.2d 230, 255 (D.D.C. 2003)). Yet this is exactly what NMFS did by refusing to undertake a comprehensive assessment of the Habitat Amendment's effects on the right whale and instead fragmenting its consideration into a series of cursory, fishery-specific assessments. *See* ECF No. 38-1 at 35-37 (demonstrating that a fragmented analysis of the individual fisheries necessarily avoids consideration of overarching impacts of the Habitat Amendment on how fisheries operating in the area may be collectively affected).

*Cooling Water Intake Structure v. U.S. EPA*, 905 F.3d 49 (2nd Cir. 2018), is similarly unhelpful to NMFS. There, the court considered challenges to an EPA rule establishing requirements for cooling water intake structures and the adequacy of the accompanying ESA

biological opinion.  Petitioners argued that the expert agency (in that case both NMFS and the Fish and Wildlife Service) failed to "consider all phases" of the agency action in its biological opinion.  *Id.* at 73.  The court noted that "[n]othing in the ESA requires that the Services assess *every future "phase"* of an agency action on a site-specific or species-specific basis," and concluded the properly delineated agency action was the "promulgation of CWA section 316(b) standards"—that is, the promulgation of a rule.  *Id.* (emphasis added).  In other words, *Cooling Water Intake Structure* supports CLF's argument that the proper scope of consultation here is the promulgation of the Habitat Amendment.

Indeed, NMFS's insistence on treating the Habitat Amendment as a series of separate actions for purposes of the ESA is contrary to its definition and treatment of the Habitat Amendment as a single action for all other purposes.  For example, NMFS analyzed the effects of the Habitat Amendment as a whole in a single Environmental Impact Statement, authorized the Habitat Amendment as a single, unified proposal, and issued a single regulatory package to implement it.  NMFS fails to explain why it used its alleged discretion to treat the Habitat Amendment as a whole as the agency action for purposes of compliance with the Magnuson-Stevens Act and the National Environmental Policy Act ("NEPA"), but then chose to divide it up when it came to analyzing effects under the ESA.

In sum, the ESA requires NMFS to conduct a formal consultation on the Habitat Amendment as a whole.  The ESA flatly prohibits NMFS from diminishing the effects of its entire action by dicing it up into smaller pieces and making unauthorized and unsubstantiated findings that the effects of those smaller pieces are insignificant.  NMFS's actions are arbitrary, capricious, and not in accordance with the bedrock requirements of ESA Section 7.

C.    **NMFS Erred in Assuming that the Habitat Amendment Would Not Affect Right Whales in a Manner that Required a Consultation**

As CLF described in its opening brief, NMFS erred in assuming that eliminating the Closures through the Habitat Amendment would not change the operation of the gillnet fisheries in a manner that would affect right whales. ECF No. 38-1 at 30. Further, the agency's attempt to consider the Habitat Amendment in a piecemeal fashion, through reinitiated consultation on a select fishery-by-fishery basis, cannot capture all of the changes implemented by the Habitat Amendment. *Id.* at 35-37. Now, in its opposition, NMFS complains that it "is not required to reevaluate and update its prior biological opinions every time it approves an FMP amendment," and that the Fisheries Division has the discretion to decide whether the new measures trigger its duty to consult. ECF No. 40-1 at 29. However, the Habitat Amendment was not just "any new action," *id.*; it was the first time in decades that NMFS provided new fishing opportunities for New England fisheries. Given that prior biological opinions did not even contemplate the various shifts in the several fisheries effectuated by the Habitat Amendment, it was *the* ultimate action that triggered consultation.

    1.    NMFS Unreasonably Assumed the Habitat Amendment Would Not
          Change the Operation of the Gillnet Fisheries

NMFS Fisheries Division identified three metrics relevant to its conclusion that it "did not expect the opening of closed areas to result in significant changes in overall fishing effort or behavior (e.g., gear type, gear quantity, area fished." ECF No. 40-1 at 11; ESA 28598. And for its conclusion that right whale interactions with gillnet fisheries did not rise to the level requiring consultation, it identified three related factors: "amount of gear in the water, soak or tow time, and co-occurrence with protected species." ECF No. 40-1 at 11; ESA 28598. As a threshold matter, the expert biologists in NMFS Protected Resources did not develop or concur in these criteria or this finding, and NMFS Fisheries Division does not have the expertise or authority to

unilaterally undertake these assessments. *See supra* at 5-6. Regardless, while the agency lists the criteria, it otherwise ignores and fails to analyze them.

NMFS used an analysis of two of these metrics—the *area fished* and the *co-occurrence* of a specific gear with an endangered species—to determine the risk of interactions between the gillnet gear and right whales across the entire Northwest Atlantic as the basis of its finding that North Atlantic right whales are "potentially affected by the action." ESA 27763-65 (identifying species based on "the best available information on protected species occurrence and distribution in the areas utilized by Council fisheries" and analyzing confirmed interactions with specific gear types; Table 61, n. 1). However, instead of conducting such an analysis to look at the risk of gear interactions (entanglements) specifically in the areas that would be reopened, NMFS offers up this conclusory statement: "*Regardless of the area opened or modified*, the number of vessels and amount of gear in the water are not expected to be substantially different from current conditions." ECF No. 40-1 at 11 (emphasis added). By failing to analyze *the area opened or modified*, NMFS deflects attention from the central issue—right whales extensively use the former Closures and pursuant to its ostensible methodology,[3] NMFS should have considered the effects of introducing gillnets into the Closures. In place of that analysis, NMFS makes conclusory and often conflicting statements that permitting fishing in these areas "may not lead to increased interactions with protected species," but alternatively, "if effort were to

_____

[3] NMFS regularly uses co-occurrence models to assess risk to whales based on the spatial and temporal distributions of fisheries. *See* https://www.westcoast.fisheries.noaa.gov/protected_species/marine_mammals/fisheries_interacti ons_assess_risk.html. The Asaro Declaration describes such a model to predict risk to right whales from the lobster fishery. ECF No. 40-4 at 4 ("team was presented with a Decision Support Tool modeling framework from which it could calculate entanglement mortality risk associated with management measures *in specific areas* based on whale distribution, gear distribution, and relative gear severity") (emphasis added).

shift into the region from areas of lower marine mammal interactions, then interactions could

increase," ECF No. 40-1 at 12-13; ESA 28645, while noting "uncertainty" of the various

scenarios.  ECF No. 40-1 at 33; ESA 28598-99.  Analyzing and understanding the co-occurrence

of right whales in the Closures and the increased entanglement risk that results is precisely why

NMFS Fisheries Division must consult with the experts in its Protected Resources Division.

2.      NMFS Failed to Consider the Interdependent Changes to Fishery
         Operations from the Habitat Amendment

In addition to failing to consider the effects of shifting gillnet fisheries, there are several

other flaws in NMFS's rationale.  First, while the Habitat Amendment did not alter the amount of

fish that gillnet fisheries are allowed to catch, ECF No. 40-1 at 11, 30, that does not justify the

assumption that the *number of vessels* or the *amount of gear* in the water will remain unchanged.

*Id.*  One of the very purposes of the Habitat Amendment was to provide "optimum yield in the

groundfish fishery."  ESA 27398-99.  Several other factors that NMFS itself identified (gear

type, gear quantity, area fished) are also likely to affect the operation of the gillnet fishery in the

newly opened areas, including: the number of fishermen permitted in the sink gillnet fishery, the

number of vessels currently fishing with sink gillnet gear, the number of actual gillnets fished by

the average permit holder, the soak time of those gillnets, the distances those vessels currently

transit to fish as compared to distances required to reach the reopened Closures, and whether

potential but currently unused permits or gillnets (a measure of latent effort in the fishery) might

become active again if access to abundant fish populations improved or fishing grounds were

closer to port.  But NMFS failed to include any of these factors in its purported assessment of the

Habitat Amendment's effects on gillnet fishing and completely ignored that it was equally

plausible and in fact likely that gillnet fishing in the Closures would substantially increase due to

the Habitat Amendment.

Second, NMFS fails to recognize that the gillnet fishery will not operate in a bubble once this new access is granted. NMFS's assumption that, "opening closed Area I was not expected to result in increased interactions with trap gear, because traps were already permitted in the closed area," ESA 28636; ECF No. 40-1 at 12, is irrelevant to the core violations CLF alleges here—namely, NMFS's unlawful decision to introduce *gillnet* gear into areas where it had been prohibited. Moreover, NMFS ignored the reality that adding new types of fishing gear to this area is likely to result in changes in where, when, and how existing fisheries using other gear types operate. In addition to the trap/pot fisheries already operating in the Closures, other fisheries with newly authorized access use gear such as bottom trawl, midwater trawl, and dredges that were previously prohibited to protect habitat. The use of different gear types within the same area can lead to conflicts among the different fisheries.[4] Although informal and formal agreements exist in other areas to avoid such conflicts, ESA 29134; 29181, fishermen will often simply shift fishing operations to prevent conflicts. In other words, opening previously closed areas can cause a domino effect in terms of shifting fishing gear throughout not just the Closures, but the entire region. Yet NMFS failed to consider or analyze the risk to right whales from all of this interdependent and shifting fishing effort resulting from the Habitat Amendment as a whole. *See Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS*, 482 F.Supp.2d 1248, 1267 (W.D. Wash. 2007); ECF No. 38-1 at 36.

---

[4] Examples include: a bottom trawler trawling over a line of lobster traps on the bottom causing them to be destroyed or dislocated and irretrievable; a gillnetter dropping her gear on top of a line of lobster traps causing a tangled mess of lines making it impossible to haul either gear into the boat; a midwater trawler trawling through an area where gillnet or trap pot fisheries use surface buoys severing the lines and making the gear irretrievable. Some of the fisheries using these gear types had their FMPs amended by the Habitat Amendment, but several others gained access merely because the Closures were eliminated by the Habitat Amendment.

NMFS's claim that evaluation on a fishery-by-fishery basis is functionally equivalent to consultation on the Habitat Amendment is unreasonable: an anlaysis of these component parts does not capture the effects of the action as a whole.  There is no dispute that the Habitat Amendment *did* amend individual FMPs to update essential fish habitat designations for its managed species to meet Magnuson-Stevens Act requirements, but that is irrelevant to the issue here: NMFS's approval and implementation of a single regulatory package that eliminated long standing groundfish closures.  Limiting the effects analysis to individual fisheries with FMPs amended by the Habitat Amendment ignores the effects of other fisheries known to entangle right whales operating in the newly opened Closures and ignores the interdependent interactions between all of these fisheries operating in the same areas and how this affects the whales. NMFS's claim that it need not assess these possible interactions between fisheries because it already concluded that opening the Closures would not result in significant changes in the level of fishing effort, ECF No. 40-1 at 33, demonstrates the circular nature of NMFS's reasoning; if the agency has not assessed the overall Habitat Amendment, how can it make conclusions about overall fishing effort?

Third, NMFS argues that because gillnet gear had been prohibited within the Nantucket Lightship Groundfish Closed Area, it had "concentrated along the boundary of the area creating an elevated risk of entanglement."  ECF No. 40-1 at 12.  It offers this conclusion, without any analysis or evidentiary support, to bolster its claim that effort would "disperse" after the Closures were eliminated.  *Id.*  Recognizing the uncertainty of such a statement it also states alternatively: "if effort were to shift into the region from areas of lower marine mammal interactions, then interactions could increase."  *Id.* at 13.  Given that NMFS acknowledges that the "greatest risk of entanglement" to right whales "is from fixed fishing gear with lines rising into the water column,

such as sink gillnet and trap/pot gear," ECF No. 40-1 at 11, if NMFS Fisheries Division actually believed there were so many gillnets on the boundaries as to create an "elevated risk" of entanglement, then it long ago should have been acting, through a consultation or otherwise, to protect right whales from this purported "fence" of gear.  Tellingly, however, it offers no record evidence that there was any such "fence" prior to the Habitat Amendment.  *See infra* at 37.

In failing to consult with Protected Resources, the Fisheries Division failed to consider relevant expert analysis from NMFS biologists on the impact of allowing gillnet fishing in the Closures on right whales and lacks any rational basis for its belief that the Habitat Amendment will not harm right whales.  The agency's failure to consult is arbitrary and capricious and in violation of its obligations under the ESA.  *See Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 685 (D.D.C. 1997) ("Although the Court must defer to an agency's expertise, it must do so only to the extent that the agency utilizes, rather than ignores, the analysis of its experts.").

### C.  NMFS's Reliance on Prior Biological Opinions is Arbitrary and Capricious

In a last effort to justify its failure to consult, NMFS maintains that it could rely on the no-jeopardy conclusions in its 2013 "Batched" biological opinion because the Habitat Amendment would not "change the basis for the conclusions . . . ." ECF No. 40-1 at 34-36; *see* ESA 31027.  As CLF has demonstrated, however, that biological opinion wrongly assumed not only that the North Atlantic right whale population was *increasing* but also that the closures now opened by the Habitat Amendment remained in place.  ECF No. 38-1 at 30-32.  NMFS's rationale that it could nevertheless rely on the conclusions in this document defies logic.

First, whether or not NMFS asserted at the time that the closures were significant for safe-guarding the population, the closed areas were inarguably one of the circumstances considered by the agency in the biological opinion, which expressly acknowledged that the

closures "may benefit" the species.  ESA 05507.  Now NMFS has done away with those

closures, thereby "*chang*[ing] one of the grounds on which the [2013] Biological Opinion's 'no

jeopardy' conclusion is based."  *Nat'l Parks Conservation Assn.*, 62 F. Supp. 3d at 19.

Uncertainty at the time of the 2013 Biological Opinion does not change the fact that

circumstances have since changed due to the Habitat Amendment, rendering the prior

determination obsolete.

     Second, NMFS's convoluted argument that it has considered new scientific information

from 2016 and 2017 only proves CLF's point that it is unreasonable to rely on the 2013

Biological Opinion.  NMFS apparently seeks to simultaneously rely on the 2013 Biological

Opinion while acknowledging that it is so outdated, and the population in such crisis, as to

necessitate reinitiation of consultation, while *already* having "reaffirmed the no-jeopardy finding

in the biological opinion."  ECF No. 40-1 at 35.  This muddling of the ESA's requisite processes

obscures key points: the 2013 Biological Opinion is outdated and NMFS cannot rely on it;

NMFS has not conducted an ESA consultation that accounts for recent science demonstrating the

current dire situation of the North Atlantic right whale; and therefore NMFS—particularly the

unauthorized Fisheries Division—certainly cannot make (or reaffirm) a no-jeopardy finding

outside of the consultation process.  The Court should reject the agency's attempt to draw any

conslusions from the 2013 Biological Opinion.

## II.    NMFS Violated the Magnuson-Stevens Act when it Approved the Habitat Amendment in Violation of the Endangered Species Act

     CLF explained in its opening brief that because NMFS's approval of the Habitat

Amendment violates the ESA, it is also unlawful under the Magnuson-Stevens Act.  *See* ECF

No. 38-1 at 37.  Under the Magnuson-Stevens Act, a fishery management plan must be

consistent with any other applicable law, 16 U.S.C. § 1854(a)(1)(A), including the ESA.  NMFS

does not dispute that CLF prevails on its Magnuson-Stevens Act claim if it prevails on its ESA claim. ECF No. 40-1 at 39. The Court should find that by approving and implementing the Habitat Amendment without completing the ESA consulation process, NMFS violated the Magnuson-Stevens Act and APA.

## III.    CLF Provided Notice of its Section 7(d) Violation

ESA section 7(d) prohibits NMFS Fisheries Division from making any irreversible or irretrievable commitment of resources after the initiation of consultation if doing so would foreclose the development or implementation of reasonable and prudent alternatives that may be necessary to comply with section 7(a)(2)'s substantive requirements to avoid jeopardy and adverse modification of critical habitat. 16 U.S.C. § 1536(d); 50 C.F.R. § 402.09. As CLF explained in its opening brief, section 7(a)(2) strictly prohibits an activity from proceeding unless and until NMFS determines, through the consultation process, that it will avoid jeopardy or adverse modification of critical habitat. ECF No. 38-1 at 33. Section 7(d) is an additional prohibition on agency action during the consultation process, not a license to undertake parts of the action while consultation proceeds. *Id.*

NMFS's argument that section 7(d) allows gillnet and other fisheries to expand into formerly closed areas based on the Fisheries Division's inexpert opinion that these actions are "non-jeopardizing" turns the statute on its head. Section 7(d) is not a license to proceed with an activity until the expert agency determines through the consultation process whether it will cause jeopardy. As a threshold matter, NMFS Fisheries Division is not even empowered under the ESA to determine whether fishery operations under the Habitat Amendment will jeopardize the North Atlantic right whale. 50 C.F.R. § 402.14(g). That determination is entrusted to Protected Resources, which has not completed consultation on the Habitat Amendment's effects nor even concurred in the Fisheries Division's purported interim findings that fishing operations would

19

not pose jeopardy.  ECF No. 38-1 at 28-29, 34.  NMFS fails to respond to this point, and instead

attempts to rely on its "no jeopardy" finding in the 2017 reinitiated consultation on the Batched

fisheries.  ECF No. 40-1 at 37.  Yet, as CLF has explained, that reinitiation suggested only that

*pre*-Habitat Amendment fishing activities could continue.  It did not even mention, much less

consider, the substantial changes to those operations that the Habitat Amendment would make.

NMFS's attempt to transform this prohibition into an exception suffers from three

additional, and fatal, flaws.  First, contrary to NMFS's arguments, the purpose of this

requirement is not to facilitate taking actions that may harm endangered species in the absence of

completed consultation, but rather to "ensur[e] that the status quo will be maintained during the

consultation process."  *Conner v. Burford*, 848 F.2d 1441, 1455 (9th Cir. 1988) (internal citations

removed); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1056 n. 14 (9th Cir. 1994).  In this

case, the action that NMFS Fisheries Division has authorized without completing consultation is

the Habitat Amendment, including opening vast areas of right whale habitat to gear known to

harm right whales.  Maintaining the status quo in this case would entail allowing fishing

operations to proceed as they did *before* the Habitat Amendment was approved and

implemented.  Far from maintaining the status quo operations of the fisheries subject to the

Habitat Amendment, NMFS Fisheries Division is attempting to use a 7(d) determination to

fundamentally change those operations by allowing gillnet fisheries to operate in previously

protected areas—the very action that NMFS must address in the consultation process.

Second, the resources that NMFS Fisheries Division is prohibited from irreversibly and

irretrievably committing encompass not just government funds but the very species that ESA

7(a) and 7(d) are meant to protect.  *See Pac. Rivers Council*, 30 F.3d at 1057; *Nat. Res. Def.

Council v. Houston*, 146 F.3d 1118, 1128 (9th Cir. 1998).  The North Atlantic right whale is a

critically endangered species, pushed even closer to the brink by the recent deaths of six

individuals, including four reproductive females. *See* https://www.fisheries.noaa.gov/leadership-

message/immediate-action-needed-save-north-atlantic-right-whales. The injury or death of even

just one of these whales jeopardizes the survival and recovery of this species. *See supra* at 2.

Pushing this already precarious population further toward jeopardy would certainly narrow the

available range of reasonable and prudent alternatives that could be implemented to avoid

jeopardy once consultation is completed.

NMFS Fisheries Division attempts to skirt this inconvenient reality by asserting that it

"reasonably concluded that continued operation of the fisheries would not violate ESA Section

7(d)" in part because "continued operation of the fisheries would not violate Section 7(a)(2)."

ECF No. 40-1 at 37. As noted above, the action at issue here is not actually the simple

"continued operation" of these fisheries, but the *substantially altered and expanded* operation of

those fisheries. This alone renders NMFS's argument invalid.

Federal Defendants lean heavily on *N. Slope Borough* for the notion that section 7(d) is

simply meant to prevent large investments of money on a project that might violate section

7(a)(2). ECF No. 40-1 at 37-38. This reading misses both the context of *N. Slope Borough* and

the broader meaning of section 7(d) itself. *N. Slope Borough* addressed the relationship between

the "the segmented approach of" the Outer Continental Shelf Lands Act ("OCSLA"), which

establishes a staged process for planning, leasing, exploration, and development of offshore oil

and gas resources, and the ESA. *N. Slope Borough*, 642 F.2d at 609. The question in that case

involved the scope of the "agency action" for the purposes of consultation. *Id*. at 609. The court

emphasized that under OCSLA's staged permitting approach, further ESA review would take

place at each stage, making it possible to more concretely define the scope of foreseeable effects

from the leasing stage itself. *Id.* Applying that logic, the court found that the "preliminary activities permitted by this lease sale" at the center of the dispute did not entail any irreversible or irretrievable commitment of resources—because there were several additional, built-in steps before the government could authorize on-the-ground activity that would affect species. *Id*. at 611. This is a far cry from NMFS's 7(d) determination here, where the agency opened immediately—in a single step, and without any further ESA consultation—fishing in thousands of square miles of right whale habitat. *See also Brownlee*, 402 F. Supp. 1 at 10 n.15 (holding that nationwide permits issued under the Clean Water Act required ESA consultation and agreeing with analysis of scope of agency action "in *Conner v. Burford,* 848 F.2d 1441, 1455–57 (9th Cir.1988) . . . limiting *North Slope Borough* to circumstances involving the intricate tension between the Outer Continental Shelf Lands Act and the ESA—circumstances not present in our case."); *Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F. Supp. 3d 147, 176 (D.D.C. 2014) (applying OCSLA case law to find that lease sales do not constitute irreversible and irretrievable commitments of resources).

The other cases NMFS relies on to avoid its section 7(d) obligations similarly fail to support its argument. For example, *Nat'l Wildlife Fed'n v. Nat'l Park Serv.* involved a decision by the National Park Service to continue operating a campground pending an analysis of its effects on grizzly bears, thus maintaining rather than changing the status quo, and a specific conclusion by the U.S. Fish and Wildlife Service that continued operation of the campground under the interim management plan challenged in the case would jeopardize the grizzly bear. 669 F. Supp. 384, 386-87 (D. Wyo. 1987). In contrast here, NMFS Fisheries Division has substantially altered the status quo without any concurrence or conclusion by Protected Resources that those alterations would not jeopardize the North Atlantic right whale. The other

two cases NMFS cites focused on whether discharges of pollutants and water allocations were reversible in and of themselves, rather than whether they affected the species itself in a way that precluded formulation and implementation of reasonable and prudent alternatives. *Nat'l Wilderness Inst. v. U.S. Army Corps of Eng'rs*, No. Civ. No. 010273 (TFH), 2005 WL 691775, at *16 (D.D.C. Mar. 23, 2005); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1122, 1193 (E.D. Cal. 2008).

Lastly, NMFS attempts to duck the issue entirely by arguing that CLF failed to provide adequate notice of NMFS's section 7(d) violation. ECF No. 40-1 at 36. That argument fails. The purpose of the ESA's 60-day notice requirement is to notify the agency of its perceived violation of the statute and afford "an opportunity to review their actions and take corrective measures if warranted. The provision therefore provides an opportunity for settlement or other resolution of a dispute without litigation." *Conservation Force v. Salazar*, 715 F. Supp. 2d, 99, 104 (D.D.C. 2010) (quoting *Sw. Ctr. for Biol. Diversity v. U.S. Bureau of Reclamation,* 143 F.3d 515, 520 (9th Cir. 1998)) (internal quotation marks omitted). So long as that basic purpose is served, courts will not require that a notice letter exhaustively detail all specific violations in order to be effective. For example, in *Ctr. for Biological Diversity v. U.S. EPA*, the court found a notice letter regarding EPA's failure to respond to a petition to make endangerment findings under the Clean Air Act regarding marine vessel and aircraft emissions effectively gave notice of the plaintiff's intent to sue over the failure to make the required endangerment findings, even though the letter only detailed those requirements in its background section. 794 F. Supp. 2d 151, 155 (D.D.C. 2011). The court found that "[a] reasonable reader of this letter could not understand plaintiffs to challenge only EPA's failure to make *some* response to their petitions; such a conclusion is inconsistent with the letter's emphasis on EPA's alleged statutory

obligations to make endangerment findings and its description of the dangers posed by climate

change." *Id.*  It also distinguished the case NMFS relies on here, *Conservation Force*, pointing

out that in that case the plaintiffs relied on a notice letter alleging that FWS had failed to make a

90-day finding in response to an ESA petition as the basis for their suit over the agency's failure

to make a 12-month finding.  Because the violation had not even occurred at the time the

plaintiffs filed their notice letter, the *Conservation Force* court held the notice was not effective.

In contrast, where the notice letter apprised the agency of "its putative obligations under the Act

and accorded it ample opportunity to take whatever steps it saw as appropriate . . . [it] cannot

claim to have been ambushed by plaintiffs' claims in this action" and "the purpose of the pre-suit

notice requirement has been served."  *Ctr. for Biological Diversity*, 794 F. Supp. 2d at 155-56.

CLF's two notice letters easily meet this standard.  ESA 24308; 24310; 24811; 24813.

As NMFS admits, CLF outlined the section 7(d) prohibition in detail in its Notice of Intent to

Sue.  ECF No. 40-1 at 36.  The issue in this case is not that NMFS did not have adequate notice

of its obligations under section 7(d).  Indeed, NMFS does not contend that it was unaware of

them, nor could it, given CLF's notice letter and NMFS's own purported experience

administering the ESA.  NMFS's preference for greater up-front specificity about its 7(d)

violations is particularly absurd given that the agency did not even produce those findings until

after CLF filed its initial motion for summary judgment.  *See* ECF No. 38-1 at 24-25; ESA

31023-31027.  It strains credulity to require CLF to anticipate what actions the agency might

subsequently undertake to excuse its violation of ESA section 7(a)(2) or to speculate on the

precise manner in which those *post hoc* findings would violate the ESA.  Nonetheless, CLF

provided NMFS with more than enough background in its notice letter for the agency to discern

how its findings on remand would or would not comply with the ESA.  ECF No. 40-3 at 5.

## IV.    CLF Has Standing

NMFS asserts that CLF's declarants lack standing to challenge NMFS's failure to comply

with its ESA section 7 duties because they "rely on speculation as to the future effects of the

amendment on right whales and do not establish injury-in-fact or causation."  ECF No. 38-1 at 1,

22-25.  This argument is meritless.  CLF's standing declarations provide specific facts showing

that NMFS's unlawful failure to consult harms their personal, professional, aesthetic, and

recreational interests in right whales and protecting the whales from entanglements in gillnet

gear.[5]  *See* Declaration of Nigella M. K. Hillgarth, ECF No. 38-2 ("Hillgarth Decl.");

Supplement to Declaration of Nigella M. K. Hillgarth attached as Exhibit A; Declaration of

Viola P. Patek, ECF No. 38-3 ("Patek Decl."); Declaration of Peter Shelley, ECF No. 38-4

("Shelley Decl."); Declaration of Robbin E. Peach, ECF No. 38-5 ("Peach Decl."); Declaration

of Sean Mahoney, ECF No. 38-6 ("Mahoney Decl.").  CLF has standing to bring its claims.

NMFS's failure to meet its statutory consultation obligation—that is, NMFS's failure to

"insure" that its actions were "not likely to jeopardize the continued existence of any endangered

species or threatened species" through the consulation process, 16 U.S.C. § 1536(a)(2)—

describes an "archetypal procedural injury."  *Ctr. for Biol. Diversity v. U.S. EPA,* 861 F.3d 174,

182-183 (citing *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)); *see also*

*Nat. Res. Def. Council, Inc. v. Jewell,* 749 F.3d 776, 783 (9th Cir. 2014) (failure to perform

legally required ESA section 7 consultation is "a procedural injury for standing purposes.").  To

establish standing for a procedural violation in the D.C. Circuit, a plaintiff must only

demonstrate a "substantial probability" that each element of standing is satisfied.  *Sierra Club v.*

---

[5] Only one member of an organization needs standing to satisfy Article III's case or controversy
requirement. *See Ctr. for Biological Diversity v. EPA,* 861 F.3d 174, 182-83 (D.C. Cir. 2017)
(an agency's failure to engage in ESA consultation that creates risk to one member's interest in a
threatened or endangered species is sufficient).

*FERC,* 827 F.3d 59, 65 (D.C. Cir. 2016) ("an additional quantum of [] harm" to the surrounding environment, despite an agency's maintained position that there would be no such increase, is sufficient). This Circuit has consistently recognized that "procedural rights are special" and "procedures are meaningful." *WildEarth Guardians v. Salazar,* 859 F. Supp. 2d 83, 91-92 (D.D.C. 2012).

NMFS's argument that CLF must prove that opening the Closures "will in fact" cause entanglements conflicts with this well-established case law. ECF No. 40-1 at 24. In essence, NMFS argues that CLF has not proven the merits of its claim that the Habitat Amendment "may affect" right whales. Indeed, NMFS's proffered standard erects a higher bar than that necessary to demonstrate a likelihood of irreparable harm to support an injunction request. *See infra* at 36-42. To the contrary, and central to this jurisdictional dispute, CLF is not required to prove the merits of its claim to establish standing. *See, e.g., Estate of Boyland v. U.S. Dep't of Agric.*, 913 F.3d 117, 123 (D.C. Cir. 2019) ("when considering whether a plaintiff has Article III standing, a federal court must assume, *arguendo*, the merits of his or her legal claim").

In any case, the premise on which NMFS relies (that gillnet fishing effort will not shift into the Closures and cause entanglements), *see* ECF No. 40-1 at 25, contradicts the agency's own admissions, is not supported in the record, and directly conflict with other NMFS policies that create closures expressly to protect right whales from gillnet and trap/pot gear in areas where they aggregate seasonally. The Court should reject NMFS's arguments and hold that CLF has established standing to challenge NMFS's failure to comply with the ESA.

## A. NMFS's Failure to Consult on the Habitat Amendment Injures CLF

NMFS first contends that CLF's member declarants do not have standing in their own right because they cannot establish injury in fact. ECF No. 40-1 at 23. Specifically, NMFS

contests their ability to show "that the challenged closures pose a threat to right whales and that their members are 'directly affected apart from their 'special interest' in the species," for two reasons: (1) the Hillgarth Declaration allegedly does not satisfy the requirement of imminent injury; and (2) the Patek, Peach, and Shelley Declarations allegedly rely on speculation about the risk of future injury arising from the actions of third parties.  ECF No. 40-1 at 23-25.  These arguments contradict the law and overlook the facts.

To establish a procedural injury in the D.C. Circuit, Plaintiffs must show: (1) "the defendant's acts omitted some procedural requirement" and (2) "it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest."  *Ctr. for Biol. Diversity v. U.S. Dept. of Interior,* 563 F.3d 466, 479 (D.C. Cir. 2009) (citing *Fla. Audubon Soc'y v. Bentsen,* 94 F.3d 658, 664-65 (D.C. Cir. 1996)); *Sierra Club,* 827 F.3d at 65 ("It must be substantially probable that the substantive agency action that disregarded a procedural requirement created a demonstrable risk, or caused a demonstrable increase in an existing risk, of injury") (internal citation omitted).  Here, NMFS admits it did not consult on the Habitat Amendment as a whole, *see* ECF No. 40-1 at 22, 27, 29, 34 ("Habitat Amendment did not trigger a duty for NMFS to consult"), and the declarations clearly demonstrate that NMFS's failure to consult injured CLF's declarants' concrete interests in a healthy and abundant right whale species through a reduction in the risk of entanglement in gillnet gear.  Hillgarth Decl. at ¶¶ 6, 8-12; Peach Decl. at ¶¶ 4-12; Patek Decl. at ¶¶ 4-10; Shelley Decl. at ¶¶ 5-12.

NMFS's assertion that declarants must "plan to view right whales in the action area," ECF No. 40-1 at 23, finds no support in the case law.  Courts are clear that standing does not demand such geographic precision.  To the contrary, the death or serious injury of a right whale anywhere directly affects CLF's members' ability to observe, study, photograph, and document

the species in the areas they visit and plan to visit to enjoy right whales. The injury to right whales in this case is similar to the injury alleged in both *EPA,* 861 F.3d 174, and *Mayo v. Jarvis,* 177 F. Supp. 3d 91, 131 (D.D.C. 2016). In *Mayo*, defendants similarly claimed plaintiffs failed to show likelihood of imminent harm to the grizzly bear as a result of an elk reduction program and suggested grizzly bears would not be taken "from an area where the Plaintiffs visit." 177 F. Supp. 3d at 129. The court rejected this argument, emphasizing "courts have consistently held in ESA cases that an alleged injury to a population segment of animals the plaintiffs have directly visited, observed, or studied is sufficient to support standing." *Mayo,* 177 F. Supp. 3d at 131. *See also EPA*, 861 F.3d at 184-85 (holding that plaintiffs were not required to identify particularized areas of overlap between pesticide use and specific species to establish a "substantial probability" of environmental risk). Simply stated, the injury here is harm to the entire species of North Atlantic right whales due to an increased risk of gillnet entanglement in the Closures and it is at least "substantially probable" that, in failing to consult and adequately analyze the effects of the Habitat Amendment, NMFS has unlawfully increased the risk of entanglement for right whales from gillnets there.

Defendants ignore express declarations of this injury. Ms. Hillgarth, the former CEO and President of the New England Aquarium, does not merely assert a "special interest in the species," ECF No. 40-1 at 23; she describes her particularized interests in preventing slow, painful injuries and deaths due to entanglements, and decreasing the risk of gillnet entanglements by forcing NMFS to comply with the ESA. *See* Hillgarth Decl. at ¶¶ 12-13 ("these revisions will open up some areas to fishing that were previously closed . . . some of these fisheries use gillnets, which pose a risk of entanglement to North Atlantic right whales"). She also describes her special interest in avoiding the extinction of North Atlantic right whales. Hillgarth Decl. at ¶

10 ("Every human-caused death of a North Atlantic right whale reduces my chances of seeing one. Were the species to go extinct, my enjoyment of whale watching would permanently be reduced, as the likelihood of seeing one of these creatures would drop to zero.").  While Ms. Hillgarth's initial declaration was sufficient, CLF offers a supplemental declaration to provide details on her plans to visit Massachusetts next spring to view right whales that were inadvertently left out of her original declaration.  *See* Exhibit A.

CLF's other declarants collectively enumerate the imminent injury NMFS denies.  Ms. Patek, who is the president of a non-profit that advocates for the conservation of right whales (among other issues),  Patek Decl. at ¶¶ 4-6, describes her "strong recreational interest in the survival of North Atlantic right whales," and the "rare privilege of seeing a North Atlantic right whale in person" close to shore near her home.  *Id.* at ¶ 8.  Her experiences viewing right whales were "highly emotional and personal," as is her hope to share this species with her children and grandchildren.  *Id.*  She expresses her concern about the painful entanglement of right whales in fishing gear and describes her interest in preventing drowning and starvation from rope and gillnets.  *Id.* at ¶ 11.  She clearly asserts that her aesthetic and recreational interests are injured by the changes made where "fisheries are allowed to operate in the waters off the coast of New England . . . in areas that had previously been closed."  *Id.* at ¶ 12.

Ms. Peach and Mr. Shelley similarly establish imminent injury.  Ms. Peach does not simply detail her acute interest in the species; she declares her knowledge that entanglement in commercial fishing gear is "one of the leading causes of deaths of North Atlantic right whales" and that opening fisheries to gillnets will lead to increased interactions between whales and gear.  Peach Decl. at ¶¶ 14, 16.  Additionally, Mr. Shelley details his long-standing  and deep personal, professional, emotional, and recreational interests in right whales.  Shelley Decl. at ¶¶ 5-7, 12.

As someone who has worked to protect right whales and their habitat for more than 40 years, he is "deeply concerned about the entanglement of North Atlantic right whales in commercial fishing gear including trap/pot and gillnets" and NMFS's decision to "approve[] opening more than 3,000 additional square miles to fisheries using gear that is known to entangle North Atlantic right whales." Shelley Decl. at ¶¶ 8, 10.

### B. The Harm to CLF is Caused by NMFS's Failure to Consult Before it Approved the Habitat Amendment

NMFS's failure to consult before it approved the Habitat Amendment makes it substantially probable that gillnet fishermen will fish in the Closures and—because the agency has not evaluated or addressed the effects of that fishing through the consulation process—increase the risk of entanglement. Under NMFS's syllogism, CLF's harm is speculative because it has not shown that: (1) effort would shift into the Closures; (2) the shift would result in increased entanglements; and (3) increased entanglements would harm right whales and thus affect declarants' ability to observe right whales. ECF No. 40-1 at 25. The Court should reject NMFS's argument based on this chain of causation. NMFS has admitted that opening the Closures would cause gillnet effort to shift there (*see infra* at 31) and, in fact, these fishing opportunities were part of the very rationale for opening them; whether the shift will result in increased entanglements goes to the merits of this case (the "may affect" finding and irreparable harm), not standing; and whether increased entanglements would equate with harm to right whales (and thus diminished ability to observe the species) barely merits a response.

### 1. Courts Employ a Relaxed Legal Standard to Evaluate Causation and Redressability for Procedural Injuries

It is well-established that in cases involving procedural injuries, the causation and redressability requirements of the standing test are relaxed. *See EPA,* 861 F.3d at 185. In a case alleging a procedural deficiency, this Circuit requires causation in the form of two links: (1) one

connecting the agency omission to some "substantive government decision that may have been

wrongly decided" and (2) "one connecting that substantive decision to the plaintiff's

particularized injury." *Jewell,* 738 F.3d at 306 (citation omitted).  To satisfy the second prong of

this test, a plaintiff must only show that the alleged procedural deficiencies are "connected to a

risk of harm to [p]laintiffs' identified interests."  *Fisheries Survival Fund v. Jewell,* 2018 WL

4705795, at *5 (D.D.C. 2018); *see Dania Beach v. Fed. Aviation Admin.,* 485 F.3d 1181, 1185

(D.C. Cir. 2007) (plaintiffs successfully showed a "distinct risk" to their particularized interest

when an airport authorized secondary runways without engaging in the NEPA review process).[6]

### 2.    NMFS's Failure to Consult and Consider Effects to Right Whales Will Harm CLF's Interests in Right Whales

Between NMFS's admissions and CLF's declarants' reasonable beliefs based on that

information, NMFS's failure to consult and consider those effects will harm CLF's interests in

right whales.  It is clear from the record that NMFS itself thought opening the Closures would

change fishing effort and move gillnet fishing into the Closures.  ESA 29134; 2918; *see also*

ESA 12884; 23689-23691 (revised boundaries could shift effort in response to gear conflicts);

ESA 28598-28599 (noting certain shifts in effort are "likely to result in increased interaction

risks"); ESA 28645-28646 (noting distribution of gillnets in Southern New England was

expected to change and risk interacting with marine mammals); ESA 30752 (DEIS specifically

acknowledging risks of shifting gillnet effort into prior closures in Southern New England/Great

South Channel areas); ESA 31026 (noting Habitat Amendment changes where vessels are able to

fish and set gear; stating "if shifts in effort result in more gear being present for a longer period

---

[6] In cases alleging a procedural violation, the redressability requirement (which NMFS has not challenged) is satisfied if any "serious possibility" exists that court-ordered compliance with the procedure would alter the final agency decision.  Plaintiffs must only show that NMFS *could* reach a different conclusion after required consultation.  *See, e.g., EPA,* 861 F.3d at 185 (procedural deficiency need only be connected to the substantive result).

of time and in areas of high protected species occurrence, this is likely to result in increased interaction [entanglement] risk.").

Defendants also expressly argue in their brief that opening the Closures will shift effort: "In fact, it is likely that eliminating the two closed areas has reduced the entanglement risk by dispersing lines that were formerly concentrated just outside their boundaries in areas of high right whale density."  ECF No. 40-1 at 41.  NMFS cannot simultaneously contend that its regulation has both no effect on fishing effort for standing purposes (arguing that any shift of gillnet fishing into the former closures is speculative), *and* that it is sufficiently certain to shift fishing effort for merits purposes (arguing that the Habitat Amendment will reduce risk to whales by dispersing gillnets throughout the former closure areas).  NMFS's action made it substantially probable that gillnet fishing would expand into the Closures.

As discussed above, each of CLF's declarants straightforwardly allege that they reasonably believed eliminating the Closures would result in gillnet fishing that increased the risk of entanglements from the fisheries authorized by NMFS.  As Mr. Shelley asserts, opening these Closures "will impact fishing effort off the coast of southern New England, an area where North Atlantic right whales are increasingly detected."  Shelley Decl. at ¶ 10.  Mr. Shelley, based on an informed review of literature and discussion with researchers, states "that fishing gear entanglement is the leading cause of death to these whales."  *Id.* at ¶ 8.  He is keenly aware of the entanglements that "continue to threaten the survival" of these whales.  *Id.* at ¶ 9*; see also* Hillgarth Decl. at ¶ 13 ("I understand that some of these fisheries use gillnets, which pose a risk of entanglement to North Atlantic right whales"); Patek Decl. at ¶ 12 ("increased fishing with gear known to entangle right whales in areas that are frequented by right whales will lead to more entanglements"); Peach Decl. at ¶ 16 ("If areas are opened to fisheries using ropes and

gillnets where North Atlantic right whales are found, there will be increased interactions with the gear and more entanglements"); Mahoney Decl. at ¶ 14 ("These revisions will increase fishing efforts off the coast of southern New England with gear types known to cause entanglements, in areas where North Atlantic right whales are increasingly detected").

     3.     <u>The Harm to CLF is Not Dependant on the Decisions of Third Party Fishermen</u>

NMFS's final argument is that CLF lacks standing because any harm to right whales is based on speculation about the actions of third party fishermen. *See* ECF No. 40-1 at 24. This not only defies common sense but ignores the near-determinative effects of NMFS's management of fisheries. As detailed in the declarations and CLF's opening brief, NMFS authorizes and sets the specific contours of the sink gillnet fisheries that authorize the "third parties" to fish. *See* Hillgarth Decl. at ¶ 13; Peach Decl. at ¶¶ 16-17; Patek Decl. at ¶¶ 12-13; Shelley Decl. at ¶¶ 10, 11, 13; ECF No. 38-1 at 12; *see also* 50 C.F.R. § 648.80 Northeast Multispecies regulations. By the agency's own admission, its decision to open the Closures to these fisheries will result in gillnet fishing in the Closures where right whales are present, ECF No. 40-1 at 30-31, 33; and NMFS admits that the Northeast sink gillnet fishery can seriously injure and kill right whales. ECF No. 40-1 at 11; ESA 27783; *see also* footnote 1. This is more than sufficient to demonstrate a substantial probability that the procedural failure to consult created a risk of injury. *See Sierra Club,* 827 F.3d at 65.

When assessing procedural standing, the "[causation] requirement is only implicated where the concern is that an injury caused by a third party is too tenuously connected to the acts of the defendant." *Citizens for Better Forestry v. U.S. Dep't of Agric.,* 341 F.3d 961, 975 (9th Cir. 2003); *see also Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1518 (9th Cir. 1994) ("[t]he causation question . . . concern[s] only whether the plaintiffs' injury . . . is dependent

upon [the agency's] policy, or is instead the result of independent incentives governing [the third

parties'] decisionmaking process") (citation omitted).  However, if a third party's actions legally

depend on permission from the defendant, there is a causal connection between the injury and

actions of the defendant.  *See Strahan v. Coxe,* 939 F. Supp. 963, 978-79 (D. Mass. 1996)

(agency's commercial fishing regulatory scheme likely exacted a taking in violation of the ESA);

*see also Loggerhead Turtle v. Council of Volusia Cty.,* 148 F.3d 1231, 1249, 1253 (11th Cir.

1998) (plaintiff showed "sufficient causal connection" to hold a county liable for inadequate

regulation of artificial beachfront lighting in non-party municipalities because of the alleged

harm to sea turtle nesting).  In this case, the use of gillnets in the previously closed areas—and

thus the increased risk of entanglement that gear brings with it—could not happen but for the

changes to fishery management caused by NMFS's authorization of the Habitat Amendment

opening these areas to fishing.

The cases NMFS relies on to bolster its causation argument are inapposite.  In *N.Y. Reg'l*

*Interconnect, Inc. v. FERC*, 634 F.3d 587 (D.C. Cir. 2011), a transmission line development

corporation relied on a long hypothetical chain of events to prove injury—none of which were

certain to occur, and the corporation did not even have an active application for a transmission

project.  *Id.* at 587.  Similarly, the plaintiff in *Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015),

provided no factual allegations and relied on illogical speculations that "contradict[ed]

acknowledged realities."  *Id.* at 15-22; *see also id.* at 14-15 (dismissing sheriff's challenge to

Department of Homeland Security's decision to defer removing non-dangerous individuals from

the U.S. because it was highly speculative the decision would turn county into a crime "magnet"

that increased county's policing burden and jail population).  Here, the realities that NMFS itself

acknowledges fully support the injuries that CLF's declarants allege.  *See* Hillgarth Decl. at ¶ 13;

Patek Decl. at ¶ 13; Shelley Decl. at ¶ 10; Peach Decl. at ¶ 17; Mahoney Decl. at ¶ 15.  There is

no similarly attenuated chain of causation in this case and a finding of causation is not precluded,

as NMFS suggests.  CLF's declarants have established injury.

### C.  CLF Has Standing to Bring These Claims on its Own Behalf

CLF asserts and has established standing premised on its representation of members who

themselves have standing.  NMFS challenges CLF's organizational standing as well, though the

Court need not reach this issue to find that it has jurisdiction.  Regardless, CLF satisfies two

prongs necessary to establish organizational standing: (1) the increased threat of right whale

entanglements harms CLF's organizational interest; and (2) NMFS's violation of the ESA has

required increased CLF expenditures to ensure the survival of North Atlantic right whales.  *See*

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n*, 878 F.3d 371, 378 (D.C. Cir. 2017)

(Organizations must demonstrate "that the defendant's 'action or omission to act injured the

organization's interest,'" and that it "used its resources to counteract the harm.") (quoting *People*

*for the Ethical Treatment of Animals v. U.S. Dep't of Agric*., 797 F.3d 1087, 1094 (D.C. Cir.

2015).

CLF's organizational purpose and interests are inarguably germane to the survival of

North Atlantic right whales and protection of the species from entanglement in commercial

fishing gear.  *See* Mahoney Decl. at ¶¶ 5-11.  NMFS's action increasing the risk of right whale

entanglements in gillnets injures this purpose.  *Abigail All. for Better Access to Developmental*

*Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) (finding organizational standing

because there was a direct conflict between the defendant's conduct and the organization's

mission).  Moreover, CLF's activities to protect and recover a sustainable right whale population

have been "perceptibly impaired" by NMFS's failure to ensure that the Habitat Amendment will

not jeopardize the right whale. *Equal Rights Ctr. v. Post Properties, Inc*., 633 F.3d 1136, 1139 (D.C. Cir. 2011) (internal citation omitted).

Following its mission, CLF has expended and will continue to expend resources to protect right whales in a variety of forums, including resources to counteract increased risk of entanglement in commercial fishing gear. *See* Mahoney Decl. at ¶ 10 ("CLF will continue to fight to protect these creatures for as long as they are imperiled.); *see also id.* at ¶¶ 5-10 (describing CLF's various expenditures of time and effort to protect right whales); see also ESA 24407-24408 (2017 Comment Letter urging NMFS to conduct a consultation on the Habitat Amendment to insure that right whales are not jeopardized). NMFS's action impedes and undermines "CLF's past, current, and future efforts to protect right whales and to ensure the survival of this species . . . ." Mahoney Decl. at ¶ 10; *see Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 27 (D.C. Cir. 2011) ("many of our cases finding Havens standing involved activities that could just as easily be characterized as advocacy—and, indeed, sometimes are"); *see also Nat'l Women's Law Ctr. v. Office of Mgmt. and Budget*, 358 F. Supp. 3d 66, 80 (D.D.C. 2019) ("Expending funding and staff time" that would otherwise be unnecessary is a sufficient showing that an organization has used their resources to "counteract [the] harm"). The agency's failure to comply with the ESA and prevent further harm to the species makes each of these efforts more difficult, time-consuming, and resource intensive.

## V.    <u>An Injunction is Necessary to Prevent Irreparable Harm to Right Whales</u>

NMFS violated the ESA by failing to consider the effects of the Habitat Amendment before it decided to open thousands of square miles of right whale habitat to fishing gear that can entangle right whales. To protect right whales from irreparable harm, CLF has moved for a carefully tailored injunction under the ESA while NMFS complies with the requirement to ensure that the Habitat Amendment does not jeopardize the continued existence of this critically

imperiled species.  As CLF demonstrated in its opening brief, this relief would effectively reduce

irreparable harm and is narrowly tailored to address fishing gear known to entangle and harm

right whales.  Under the ESA and the facts of this case, the likelihood of harm to right whales

outweighs any other equitable considerations, and CLF's requested relief is in the public interest.

ECF No. 38-1 at 38-44.

In its response, NMFS argues only that CLF has failed to satisfy the irreparable harm

prong of the test for injunctive relief—and only in cursory fashion.  ECF No. 40-1 at 41-42.

NMFS does not dispute  the imperiled current status of right whales and the need to protect each

member of this declining species, nor that fishing gear entanglements are the greatest source or

mortality, nor that right whales congregate in the formerly closed Nantucket Lightship

Groundfish Closure Area and Closed Area 1, nor that the harm or death of even a single whales

is necessarily irreparable.  *Id*.  NMFS instead asserts in a single paragraph that there is no likely

harm from reopening three thousand square miles of habitat to commercial fishing with sink

gillnet gear known to entangle right whales.  The agency's assertions rest in large part on its

declarant's speculation about the effects of the Habitat Amendment (effects the agency's

biologists did not evaluate through the ESA consultation process) and fail to address the

evidence of harm presented in the record and Dr. Moore's expert testimony.  *See* Declaration of

Dr. Michael Moore, Vet MB, PhD, in Support of Plaintiff's Request for Permanent Injunction

(ECF 38-7) ("Moore Decl.").  The central fact remains that the Habitat Amendment allows sink

gillnet gear to be dispersed throughout areas of high right whale density and will likely lead to

entanglement of one or more right whales.  Especially in the context of the continuing and

alarming decline of this species, there can be no question that such harm is irreparable.  The

Court should grant CLF's tailored request for an injunction under the ESA.

As a threshold matter, it is telling that NMFS responds to Dr. Moore's testimony with a declaration from a manager; not with testimony from one of the agency's numerous marine mammal biologists or other scientists.  Dr. Asaro's post-graduate degrees and responsibilities within the agency are in policy and environmental management, not in biology. *See* Declaration of Michael Asaro (ECF No. 40-4) at 7-8 (Asaro Decl.").  Dr. Asaro, however, offers opinions not about NMFS's policies or management approach, but about scientific matters such as the causes, likelihood, or effects of right whale entanglements in fishing gear.  *See, e.g.,* Asaro Decl. at ¶ 14 (offering "opinion [that] dispersing the gillnet gear throughout the former Closure Areas is likely to either" reduce or maintain current entanglement risk).  Dr. Moore, on the other hand, has 20 years of experience as a biologist and veterinary doctor working specifically on whale entanglements.  Moore Decl. at ¶ 4.  In addition to his first-hand field experience assisting whale disentanglements and investigating right whales deaths caused by entanglements and other human activities, he has authored or contributed to numerous publications about this precise topic.  *Id.* at ¶¶ 5-6.  Based on that experience, Dr. Moore offers detailed expert testimony about the rates and effects of entanglements, including his expert opinion that reopening the closed areas will likely lead to entanglement and irreparable harm to one or more right whales.  *Id.* at ¶¶ 6, 32.  The Court should not assign equivalent weigh to these two declarations.  Indeed, courts do not defer to agency opinions—even those from scientists with expertise in the relevant topic— when considering the equities, especially when these conclusions are offered precisely because the agency has not yet considered the issues though the required process.  *Sierra Forest Legacy v. Sherman,* 646 F.3d 1161, 1185-86 (9th Cir. 2011) (holding that district court erred by deferring to agency in denying injunctive relief and finding, among other things, that "deference

to agency experts is particularly inappropriate when their conclusions rest on a foundation tainted by procedural error").

A.      **The Habitat Amendment is Likely to Cause Irreparable Harm to Right Whales**

The errors and misunderstandings in the Asaro Declaration permeate the agency's attempts to dismiss the likelihood of irreparable harm in its brief.  The agency first attempts to minimize the risk of gillnet entanglements by comparing the amount of vertical line from gillnets to the amount of vertical line from lobster trap/pot gear.  ECF No. 40-1 at 41, Asaro Decl. at ¶¶ 7-8.  This relative comparison is inapt for three reasons.  First, it is based on the incorrect premise that only the vertical lines from gillnets (but not the nets themselves) pose a risk of entanglement because whales are not found at depth.  *See* Asaro Decl. at ¶ 8 (asserting that "whales are unlikely to occupy the depths" where the nets themselves are deployed).  But as Dr. Moore details in his Supplemental Declaration (attached as Exhibit B, "Supp. Moore Decl."), a peer-reviewed study highlights that North Atlantic right whales dive and feed on the sea floor— exactly where sink gillnets are deployed.  Supp. Moore Decl. at ¶¶ 8-9 (describing studies of right whale feeding behavior in all parts of the water column); *see also* Moore Decl. at ¶¶ 18, 26-29 (detailing sink gillnet fishery).  This increases both the likelihood that whales will encounter this gear and the severity of the consequences.  Supp. Moore Decl. at ¶ 9 (explaining that the strength and tension of gillnets themselves are especially damaging to right whales and pose significantly higher risk of serious injury).  Second, and more fundamentally, merely comparing the relative abundance of pot/trap vertical lines to gillnet vertical lines ignores the disproportionate number of entanglements in gillnet gear.  As Dr. Moore explained, while gillnets comprise far less than three percent of the vertical lines in these waters, they nevertheless account for more than *ten percent* of the documented right whale entanglements.  Moore Decl. at

¶ 18; Supp. Moore Decl. at ¶¶ 7-8, 18.  NMFS's attempt to equate the number of vertical lines to the likelihood of entanglement does not account for this critical and relevant difference.  Finally, NMFS's relativistic comparison ignores that the additional risk of entanglements occurs against the backdrop of the continuing perilous decline of the species.  In addition to over 20 deaths since 2017, six more right whales (including four reproductive age females) have been killed in June 2019 alone.  Supp. Moore Decl. at ¶ 7; *see also* https://www.fisheries.noaa.gov/leadership-message/immediate-action-needed-save-north-atlantic-right-whales (NMFS describing this "urgent conservation crisis").  In this context, where whales are being killed at an alarming rate, the relevant question is not whether one factor may pose more frequent risk than another.  Rather, the fact that other types of fishing gear pose an additional risk to the species argues for greater protection from all sources of entanglements, not less.  Supp. Moore Decl. at ¶ 7.  The Court should reject Defendants' efforts to change the subject.

The agency next speculates, without any citation to evidence, that the Habitat Amendment might result in a reduction in entanglement risk depending on the current and future distribution of gillnet fishing gear.  ECF No. 40-1 at 42; Asaro Decl. at ¶ 14.  The Court should not be distracted by this unsupported assertion.  As Dr. Moore explains, to ground this statement in science, the agency would need to know the number of vessels engaged in this fishery, the total number of nets deployed, and the locations of those nets and the whales prior to the Habitat Amendment.  Supp. Moore Decl. at ¶ 18.  Neither the agency nor its declarant presents any of this information or analysis.  Indeed, this analysis is precisely what the agency should have undertaken through a comprehensive consultation on the effects of the Habitat Amendment.  Moreover, betting on the most favorable outcome does not comply with the ESA's precautionary

mandate and fails to "give the benefit of the doubt" to the species. *Sierra Club v. Marsh*, 816 F.2d 1376, 1386 (9th Cir. 1987) (citations omitted).

The Court should similarly not credit the agency's dismissal of area closures as somehow ineffective for preventing harm to right whales. ECF No. 40-1 at 41-42; Asaro Decl. at ¶¶ 10-12. As Dr. Moore details, area/gear closures and other geographically based protections have a long, proven track record of success and play a paramount role in the conservation of this species. For example, the Massachusetts Restricted Area Closure (including Cape Cod Bay) has been so successful that NMFS recently gave the Commonwealth of Massachusetts a 24 percent credit towards their risk reduction goal. Supp. Moore Decl. ¶¶ 14, 17*; see also id*. at ¶ 15 (discussing use of gear/area closure to protect harbor porpoise); *id.* at ¶ 16 (detailing use of dynamic closure areas to protect whales from ship strikes). And NMFS itself relies on area closures and vessel speed restrictions to reduce the risk of ship strikes in several areas along the Atlantic seaboard. *Id.* at ¶ 13. The agency's dismissal of this strategy is both puzzling and contrary to this record. The Court should not be distracted by the agency's sudden shift in position.

Finally, the agency's extended exposition on recent workgroup discussions and measures adopted by the Atlantic Large Whale Take Reduction Team is completely beside the point. *See* Asaro Decl. at ¶¶ 2-6, 12. The purpose of the Atlantic Large Whale Take Reduction Team meeting and the "weak rope" and trap reduction measures recommended by that team apply only to trap/pot gear used in the American lobster fishery, not to other trap/pot fisheries or any of the several fisheries that use sink gillnets. Supp. Moore Decl. at ¶¶ 3-4*; see also id.* at ¶¶ 5-6 (detailing concerns with analytical tools and lack of evidence to evaluate effectiveness of weak rope even in lobster fishery). In other words, none of the measures described by Dr. Asaro and

applicable to trap/pot gear will do anything to prevent or mitigate the likelihood that right whales will become entangled in gillnets.

None of the agency's dismissals or its eleventh-hour speculation about the effects of the Habitat Amendment address Dr. Moore's detailed evidence and expert testimony—informed by over 20 years of working with the species and studying this exact issue—that dispersing gillnet gear in the former closed areas is likely to entangle one or more right whales and irreparably harm the species. Supp. Moore Decl. at ¶ 19; Moore Decl. at ¶ 32. CLF has carried its burden to demonstrate that a narrowly tailored injunction is necessary to prevent irreparable harm to North Atlantic right whales until NMFS complies with the ESA. To prevent this harm, CLF respectfully requests that this Court issue a narrowly tailored injunction to reinstate the boundaries of the former Nantucket Lightship Groundfish Closure and Closed Area 1 and to prohibit gillnet fishing in those areas until NMFS complies with the requirements of the ESA to complete a comprehensive on the effects of the Habitat Amendment.

### B.    NMFS's Request for Additional Remedy Briefing is Unwarranted

The agency's alternative request for additional briefing regarding vacatur is misplaced for two reasons. First, the test for whether to remand without vacatur does not apply here, where Plaintiff has sought injunctive relief and made the requisite showing of irreparable harm. But even if the vacatur test applied, CLF has more than satisfied the requirements for partial vacatur of the Habitat Amendment's provisions that open the former Closures to gillnet fishing.

The U.S. Supreme Court has repeatedly described vacatur as a mandatory remedy for violations under the Administrative Procedure Act. *Fed. Commc'n Comm'n v. Nextwave Pers. Commc'ns Inc*., 537 U.S. 293, 300 (2003) ("The Administrative Procedure Act requires federal courts to set aside federal agency action that is 'not in accordance with law.'"); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971) ("In all cases agency action

must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law'…."). *Allied Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146 (D.C. Cir. 1993), cited by NMFS in its brief, *see* ECF No. 40-1 at 42, presents a narrow, rarely applied exception to the presumptive remedy of vacatur.  In that case, the D.C. Circuit declined to vacate the challenged rule because there was a "at least a serious possibility" that the agency could substantiate its reasoning on remand with additional explanation and because the vacatur would be highly disruptive, as the agency would have to refund all fees collected that year.  *Id.* at 151.

Neither of these factors apply to a partial vacatur of the Habitat Amendment's provisions opening these formerly closed areas to gillnet fishing.  In this case, NMFS has already been given the opportunity to explain its reasoning through a limited remand.  ECF No. 35.  NMFS cannot seriously contend that this Court should refrain from vacating NMFS's patently illegal action in order to give it yet another opportunity to explain itself.  Furthermore, NMFS cannot contend that vacatur would be highly disruptive.  In this case, NMFS itself has proclaimed that it retains full discretion to alter fishery management measures it promulgated under the Habitat Amendment at any time.  ECF No. 40-1 at 36-39.  Moreover, these areas were closed to gillnet fishing for more than 20 years prior to April 2018.  Reinstating the status quo that existed for decades before enactment of the Habitat Amendment would neither affect the catch limits of fishermen using gillnet gear, nor would reversion to the former regulatory regime be confusing or disruptive to fishermen already familiar with their prior fishing grounds.  Defendant-Intervenor's claims of economic disruption to the scallop fishery are predicated on a mistaken interpretation of CLF's requested relief.  ECF No. 42-1 at 12-13.  Throughout its opening brief and the declaration of Dr. Michael Moore, CLF emphasized the harm to right whales from *gillnet* gear and its request to prohibit the use of gillnet gear within these formerly closed areas.  *See e.g.,* ECF No. 38-1 at 38 (explaining request to "restore the former Nantucket Lightship Groundfish Closure and Closed Area 1 boundaries . . . and restore

the prior prohibition on gillnet fishing in those areas."); Moore Decl. at ¶ 32.  *See also* ECF No.
42-1 at 7-8 (acknowledging that CLF did not contest the effects of the Habitat Amendment as it
pertains to the scallop fishery).  To the extent that clarification is necessary, CLF reiterates that it
seeks narrowly tailored relief to reinstate the *boundaries* of these former closed areas and to
prohibit gillnet fishing within those boundaries.

Nor is there any reason for additional briefing to address remedy.  If NMFS wishes to
contest CLF's requested relief, the time to do so is now.  The assertion that application of the
*Allied Signal* factors may change based on the timing of this Court's ruling or the facts "on the
ground" at that time is pure speculation.  ECF No. 40-1 at 42.  CLF has presented the
straightforward legal and factual arguments relevant to remedy in its opening brief.  The
agency's legal violation—its failure to consult—is plain and can be remedied only by completing
the section 7 consultation process for the Habitat Amendment.  There is no mystery about this
relief and what it requires of the agency, nor will the outline or scope of this relief fundamentally
change.  Further factual development is equally unnecessary.  If anything, the longer gillnet
fishing continues in the areas opened by the Habitat Amendment, the more urgent the need for
relief.  The alarming deaths of six more right whales in just the past month underscores the
urgent need to act to protect these species.  The agency's failure to complete a scientifically
based, lawful consultation process has caused,and continues to cause, harm to the right whales
and to CLF's members whose use and enjoyment of right whales and their ocean ecosystem
depends on a healthy right whale population.  The time to address those arguments is now—there
is no need for additional briefing.

## CONCLUSION

In the absence of a completed section 7 consultation, there is no rational basis for NMFS
to conclude that shifting gillnet effort into an area that has been closed for more than 20 years is

not likely to adversely affect—let alone not likely to jeopardize—right whales. NMFS's refusal to consult on the Habitat Amendment in the face of a right whale crisis treats the ESA's mandates as a bureaucratic paper-shuffling exercise necessary to provide increased fishing opportunities, rather than the precautionary, science-driven process meant to protect endangered species that Congress intended. Its authorization of major changes in fishing operations that will increase the risk of harm to this critically endangered species violates the ESA's basic section 7 requirements. For the foregoing reasons, CLF requests that the Court grant its motion for summary judgment, deny NMFS's motion, and grant CLF's request for an injunction to protect right whales until NMFS comes into full compliance with the ESA.

Respectfully submitted this 12th day of July, 2019.

/s/ *Erica A Fuller*
ERICA A. FULLER
D.C. Bar No. MA0001
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
Tel: 508-400-9080
Fax: 617-350-4030
efuller@clf.org

EMILY K. GREEN
D.C. Bar No. ME0002
Conservation Law Foundation
53 Exchange St., Suite 200
Portland, Maine 04101
Tel: 207-210-6439
Fax: 617-350-4030
egreen@clf.org

STEPHEN D. MASHUDA
D.C. Bar No. WA0005
EARTHJUSTICE
705 Second Ave.
Suite 203

Seattle, WA 98104
Tel: (206) 343-7340
Fax: (206) 343-1526
smashuda@earthjustice.org

*Attorneys for Plaintiff*
*Conservation Law Foundation*

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2019, I caused the foregoing to be filed and served upon counsel of record via the Court's CM/ECF filing system, which will send notice of such to all counsel of record.


//s/ *Erica A Fuller*
ERICA A. FULLER