CONSERVATION LAW FOUNDATION,

Plaintiff,

v.

WILBUR ROSS, in his official capacity as
Secretary of Commerce, *et al.*,

Defendants,

and

FISHERIES SURVIVAL FUND,

Defendant-Intervenor.

Civil Action No. 18-1087 (JEB)

## MEMORANDUM OPINION

Demonstrating that "there is no folly of the beasts of the earth which is not infinitely

outdone by the madness of men," Herman Melville, Moby Dick 262 (W.W. Norton & Co. 1967)

(1851), humans have brought the North Atlantic right whale to the brink of extinction. As of the

release of this Opinion, only about 400 of these leviathans remain. In April 2018, the National

Marine Fisheries Service promulgated a comprehensive Habitat Amendment, which altered rules

governing New England's fisheries. Among other measures, the Amendment opened two large

swaths of the whales' feeding grounds to one of their most dangerous predators: gillnet fishing

gear. Plaintiff Conservation Law Foundation challenged this final rule, contending that NMFS

implemented it in dereliction of its Congressional mandate to "insure that any action authorized,

funded, or carried out by [any federal] agency . . . is not likely to jeopardize the continued

existence of any endangered species." 16 U.S.C. § 1536(a)(2). In what is ultimately not a close

call, the Court concludes that NMFS has violated not only the Endangered Species Act but also the Magnuson-Stevens Act. The Court further finds that the appropriate remedy for this violation is an injunction restoring prohibitions on gillnet gear in the two formerly closed areas.

## I.     Background

Because a violation of Section 7(a)(2) of the Endangered Species Act would give rise to causes of action under not only the ESA but also the Magnuson-Stevens Act — indeed, CLF alleges both, see ECF No. 38 (Plaintiff Renewed Motion for Summary Judgment) at 1; ECF No. 1 (Complaint), ¶ 1 — the Court begins by laying out the statutory framework before proceeding to the factual background. While Plaintiff also brings a claim under the Administrative Procedure Act, "the APA permits courts to review 'final agency action for which there is no other adequate remedy in a court,'" and "[h]ere, the ESA's citizen-suit provision provides an adequate remedy." Conservation Force v. Salazar, 715 F. Supp. 2d 99, 104 n.6 (D.D.C. 2010) (quoting 5 U.S.C. § 704); accord Bennett v. Spear, 520 U.S. 154, 161–62 (1997) ("Although petitioners contend that their claims lie both under the ESA and the APA, . . . the APA by its terms independently authorizes review only when 'there is no other adequate remedy in a court.'") (quoting 5 U.S.C. § 704). The Court, consequently, need not separately address the APA.

### A.  Statutory Framework

#### 1. *Endangered Species Act*

Congress enacted the ESA in 1973 "to halt and reverse the trend toward species extinction, whatever the cost.'" Nat'l Ass'n of Home Builders v. U.S. Fish and Wildlife Serv., 786 F.3d 1050, 1052 (D.C. Cir. 2015) (quoting Tenn. Valley Auth. v. Hill, 437 U.S. 153, 184 (1978)). Section 7(a)(2) of the Act requires that "[e]ach Federal agency . . . insure that any

action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species."  16 U.S.C. § 1536(a)(2).  The accompanying regulations specify:

> Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat.  If such determination is made, formal consultation is required, except . . . if, as a result of informal consultation with the Service under § 402.13, the Federal agency determines . . . that the proposed action is not likely to adversely affect any listed species or critical habitat.

50 C.F.R. § 402.14(a)–(b).  (As an aside, there are other, limited escape hatches from formal consultation not relevant to this case.  Id. § 402.14(b)(1)–(2).)

In other words, the first step is for the "action agency" — in this case, the Sustainable Fisheries Division (SFD) of NMFS — to determine whether its action "may affect" a listed species (or critical habitat).  If the answer to that question is yes, the action agency must engage in either informal or formal consultation with the "expert agency" — in this case, the Protected Resources Division (PRD) of NMFS — as to the effects of the proposed action on the listed species.  If, through informal consultation, the expert agency can determine "that the action is not likely to adversely affect listed species," it may issue a "written concurrence" to that effect, thus ending the action agency's ESA-consultation duties.  Id. § 402.13.  If, however, the expert agency does not so find, formal consultation is required.  Id. § 402.14(c).

The end product of formal consultation is a "biological opinion" by the expert agency, which offers its determination as to "whether the action is likely to jeopardize the continued existence of a listed species . . . (a 'jeopardy' biological opinion); or, the action is not likely to jeopardize the continued existence of a listed species . . . (a 'no jeopardy' biological opinion)."  Id. § 402.14(h)(3).  If the opinion is a "jeopardy" one, it must either set out "reasonable and

3

prudent alternatives" to the agency action or otherwise "indicate that to the best of [the agency's] knowledge there are no reasonable and prudent alternatives." Id. If the opinion is a "no jeopardy" one, the agency action may proceed.

The ESA also contains a citizen-suit provision "of remarkable breadth." Bennett, 520 U.S. at 164. It authorizes "any person . . . to enjoin any person, including the United States and any other governmental instrumentality or agency[,] . . . who is alleged to be in violation of any provision of [the ESA] or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A).

### 2. *Magnuson-Stevens Act*

Plaintiff's second cause of action falls under the Magnuson-Stevens Act. The MSA was passed in 1976 to "balance[] the twin goals of conserving our nation's aquatic resources and allowing U.S. fisheries to thrive." Oceana, Inc. v. Pritzker, 26 F. Supp. 3d 33, 36 (D.D.C. 2014). In service of those ends, the Act delegates to the Secretary of Commerce, who has delegated to NMFS, the responsibility of managing the eight regional Fishery Management Councils created by the MSA and charged with creating Fishery Management Plans (FMPs). Id. at 36–37. As explained in more detail below, it was the promulgation by SFD of a final rule implementing changes recommended by the New England Fishery Management Council that constitutes the "agency action" in this case. See 83 Fed. Reg. 15,240, 15,240 (Apr. 9, 2018).

As relevant here, Section 304(a)(1)(A) of the MSA requires the Secretary to "immediately commence a review" of any "fishery management plan or plan amendment" in order to "determine whether it is consistent with . . . any . . . applicable law." 16 U.S.C. § 1854(a)(1)(A) (emphasis added). So if, in promulgating an FMP amendment, NMFS fails to determine whether the amendment is consistent with Section 7(a)(2) of the ESA — *i.e.*, by

4

failing to consult as to the effects of the amendment on an endangered species — then NMFS necessarily violates Section 304(a)(1)(A) of the MSA.

B.  Factual History

Although the Court will provide more detail as to NMFS's consultation process in the Analysis Section, *infra*, it briefly offers some general background here.  In 2004, the New England Fishery Management Council announced its intent to begin work on an amendment affecting all seven FMPs within its region.  See 69 Fed. Reg. 8,367, 8,367 (Feb. 24, 2004).  One of these FMPs governs the Northeast multispecies fishery, id., which is also known as the groundfish fishery.  Conservation Law Found. v. Ross, 374 F. Supp. 3d 77, 87 (D.D.C. 2019). The groundfish fishery employs a type of gear known as gillnets, which are "wall[s] of netting that hang[] in the water column," each between two vertical lines.  Fishing Gear: Gillnets, NOAA Fisheries, https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-gillnets (last visited Oct. 28, 2019).  At the time, several areas in New England waters were designated as groundfish-closure areas, meaning that "fishing gear capable of catching groundfish," like gillnets, was prohibited.  Conservation Law Found., 374 F. Supp. 3d at 87.  As described in more detail below, gillnet fishing creates a serious risk of entanglement for North Atlantic right whales.

While the final Habitat Amendment, promulgated by final rule in April 2018, made many changes to the New England FMPs, see 83 Fed. Reg. 15,240 (Apr. 9, 2018), most relevant to this proceeding is that it opened two areas — the Nantucket Lightship Groundfish Closure Area and the Closed Area 1 Groundfish Closure Area — that had been closed to groundfish fishing gear for over 20 years.  Id.; ESA 5035.  (The Court cites to the administrative record, which is filed in three volumes under ECF No. 48, using the parties' convention of "ESA ####," referring to the

Bates numbers). This means that gillnet fishing is now permitted in those waters. NMFS

approved this measure despite (1) a finding in SFD's December 2016 Environmental Impact

Statement (EIS) for the Habitat Amendment that the Amendment "may affect" North Atlantic

right whales, see ESA 27763 tbl.61; and (2) public comments suggesting that, by failing to

complete formal or informal consultation with PRD as to the effects of the Habitat Amendment

on these whales, SFD had violated Section 7(a)(2) of the ESA. See ESA 4997, 5029.

　　　CLF filed its Complaint in this case just a month after the Habitat Amendment was

promulgated, alleging that SFD's failure to consult constituted a violation of the ESA and the

MSA. See Compl., ¶ 1. The agency, for its part, responded that it had "determin[ed] that it was

not required to consult or reinitiate consultation," but it nonetheless requested a remand in order

to provide "additional explanation of [that] determination." ECF No. 34 (NMFS Reply re:

Remand) at 2. The Court granted NMFS its requested 30-day remand, see ECF No. 35

(Memorandum Opinion and Order re: Remand), and it permitted CLF to file a renewed

summary-judgment motion, which has now been submitted.

　　　In its Renewed Motion, Plaintiff maintains that judgment in its favor is appropriate on its

ESA and MSA claims. NMFS counters, first, that CLF lacks standing and, as to the merits, that

SFD was not required to consult under the ESA. The Court will begin its analysis with the

former issue. Because it finds that CLF has standing in spades, it will then lay out the legal

standard governing the merits, analyze the central question presented — whether SFD violated

its consultation obligations under Section 7(a)(2) of the ESA — and consider the appropriate

remedy for such a violation.

　　　The Court notes briefly that, because Plaintiff's summary-judgment motion does not

contest the Habitat Amendment's changes to the Scallop FMP, Defendant-Intervenor Fisheries

Survival Fund's arguments, which relate only to that fishery, are rendered moot. <u>See</u> ECF No. 42 (FSF Cross-Motion for Summary Judgment & Opposition) at 1–2.

## II.     Standing

The Court begins, as it must, by considering its own jurisdiction to hear this case. <u>See</u> <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 94–95 (1998). NMFS argues that the matter is nonjusticiable because CLF lacks standing. Plaintiff counters that it has both associational (or representational) and organizational standing on behalf of its members. As the Court finds the former to be true, it need not address the latter.

Standing is "a doctrine rooted in the traditional understanding of a case or controversy" in Article III of the Federal Constitution. <u>Spokeo, Inc. v. Robins</u>, 136 S. Ct. 1540, 1547 (2016). It requires, at a minimum, that a plaintiff show by a "substantial probability," <u>Sierra Club v. EPA</u>, 292 F.3d 895, 899 (D.C. Cir. 2002), that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." <u>Spokeo</u>, 136 S. Ct. at 1547. The "injury in fact" must be both "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 180 (2000). An injury is "particularized" when it "affect[s] the plaintiff in a personal and individual way," and it is "concrete" when it is "real, and not abstract," <u>Spokeo</u>, 136 S. Ct. at 1548 (internal quotation marks omitted), although "intangible injuries can nevertheless be concrete." <u>Id.</u> at 1549.

When a plaintiff claims a <u>procedural</u> injury, courts in this circuit perform a modified standing analysis. The first element of standing — injury in fact — remains an irreducible requirement of Article III, but the "imminence" component of that requirement is "relax[ed]." <u>Sierra Club v. FERC</u>, 827 F.3d 59, 65 (D.C. Cir. 2016). As to the second element —

causation — a plaintiff must establish "two causal links: 'one connecting the omitted [procedural step] to some substantive government decision that may have been wrongly decided because of the lack of [that procedural requirement] and one connecting that substantive decision to the plaintiff's particularized injury.'" Ctr. for Biological Diversity v. EPA, 861 F.3d 174, 184 (D.C. Cir. 2017) (alterations in original) (quoting Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 668 (D.C. Cir. 1996)). The third and final element — redressability — is also relaxed: "[T]he case law relieves the plaintiff of the need to demonstrate that (1) the agency action would have been different but for the procedural violation, and (2) that court-ordered compliance with the procedure would alter the final result." Nat'l Parks Conservation Ass'n v. Manson, 414 F.3d 1, 5 (D.C. Cir. 2005) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 572 n.7 (1992)).

An organization claiming associational standing on behalf of its members must show that "(1) at least one of its members would have standing to sue in his or her own right [*i.e.*, by satisfying the standing inquiry described above]; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" Sierra Club v. FERC, 827 F.3d at 65 (quoting WildEarth Guardians v. Jewell, 738 F.3d 298, 305 (D.C. Cir. 2013)).

The Court addresses each element of associational standing in turn.

A. CLF Member Standing

As just described, CLF must first demonstrate that at least one of its members would have standing to sue in her own right. Because an action agency's failure to consult under Section 7(a)(2) of the ESA constitutes an "archetypal procedural injury," Ctr. for Biological Diversity, 861 F.3d at 182 (quoting WildEarth Guardians, 738 F.3d at 305), the Court assesses CLF's members' standing using the modified inquiry described above. Plaintiff supplements its

briefing here with declarations from four of its individual members.  See ECF No. 38 (Pl.

Renewed MSJ), Exhs. A (Declaration of Nigella M.K. Hillgarth); B (Declaration of Viola P.

Patek); C (Declaration of Peter Shelley); D (Declaration of Robbin E. Peach).  Only three need

be discussed.

### 1.  *Injury in Fact*

The Court begins with injury in fact.  While "the desire to use or observe an animal

species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of

standing," Lujan, 504 U.S. at 562–63, CLF must nonetheless "show[], through specific facts, not

only that listed species were in fact being threatened by [the agency action], but also that one or

more of [CLF's] members would thereby be 'directly' affected apart from their '"special

interest" in th[e] subject.'"  Id. at 563 (third alteration in original) (quoting Sierra Club v.

Morton, 405 U.S. 727, 735 (1972); then quoting id. at 739).  In other words, CLF must show

both that opening these closure areas to gillnet fishing would threaten North Atlantic right

whales and that at least one CLF member will suffer a concrete and particularized — that is,

individualized — harm if the future of the species was even more threatened than it already is.

See also Friends of the Earth, 528 U.S. at 180.  The injury to that CLF member must also be

"actual or imminent," id., although, as explained above, this imminence requirement is relaxed in

a procedural-injury case such as this one.

Because the subsequent discussion of remedy articulates in great detail the threat posed to

the North Atlantic right whale by NMFS's opening the closed areas to gillnet fishing, see *infra*

Section VI.A, the Court will not repeat the same analysis at this point.  It will, instead,

concentrate on whether the threat to the whales causes any of the three declarant members a real,

individualized harm.

a. Nigella Hillgarth

Nigella Hillgarth, the first of the CLF declarants, describes a strong and personalized recreational, professional, and emotional interest in the North Atlantic right whale, one that would be injured by a further threat to the species. See Ctr. for Biological Diversity, 861 F.3d at 183 (finding sufficient, for standing purposes, an organization member's "recreational, scientific, aesthetic, educational, moral, spiritual and conservation interests" in an endangered species).

Hillgarth served as the CEO and President of the New England Aquarium from 2014 to 2017, during which time her interest in North Atlantic right whales grew into a "deep personal attachment" to the species, whose "preservation is of great importance to [her] happiness and wellbeing." Hillgarth Decl., ¶ 8. She "routinely go[es] on whale watching expeditions in hopes of seeing" a North Atlantic right whale, id., ¶ 10, and has one such trip planned for April or May 2020, when she hopes to see a seasonal gathering of the whales in Cape Cod Bay. See ECF No. 44, Exh. A (Supplemental Declaration of Nigella M.K. Hillgarth), ¶ 2. Hillgarth has never yet seen a right whale and is concerned by "[a]nything that reduces the probability" of her seeing one. See Hillgarth Decl., ¶ 10.

She also states that she "frequently consult[s] news and social media resources for updates on the status of" the whales and that her professional background "gives [her] a heightened subjective investment in these activities that other consumers of such information might not share. Id., ¶ 9. She describes the "dread and despair" she feels at learning that "conservation efforts [for the species] have plateaued or worsened," id., in addition to the "heartbr[eak]" she experienced last year when she learned the story of a North Atlantic right whale that had "died in agony" from entanglement. Id., ¶ 12. Hillgarth notes that her experience

in the field makes her "acutely aware . . . that each death is a major setback for the survival of these severely endangered animals." Id., ¶ 11.

NMFS argues that Hillgarth's declaration is insufficient because it "does not describe any plans to view right whales in the action area." ECF No. 42 (NMFS Opposition and Cross-Motion for Summary Judgment) at 23 (emphasis added); see also ECF No. 46 (NMFS Reply) at 3. Even so, it cautions, any such plans averred by Hillgarth are not adequately "concrete . . . 'to satisfy the requirement of imminent injury.'" NMFS Cross-Mot. at 23 (quoting Summers v. Earth Island Inst., 555 U.S. 488, 496 (2009)).

As to NMFS's first point: Hillgarth plans to go to Cape Cod, the closest land mass to Closed Area I, in order to go out on the water searching for North Atlantic right whales. See Hillgarth Supp. Decl., ¶ 2; ECF No. 38, Exh. F (Declaration of Michael Moore), ¶¶ 21 fig.6, 25 fig.7. Short of a vacation to Closed Area I itself, which the Court suspects NMFS might find hard to credit, Hillgarth's plans get as close to the action area as can reasonably be expected. See Animal Legal Def. Fund, Inc. v. Glickman, 154 F.3d 426, 433 (D.C. Cir. 1998) (en banc) (citing Didrickson v. U.S. Dep't of Interior, 982 F.2d 1332, 1340–41 (9th Cir. 1992)). CLF is not making the claim here that "anyone who has an interest in studying or seeing the endangered animals anywhere on the globe has standing," but rather is presenting the more "plausible' scenario of "a person who observes . . . a particular species in the very area of the world where that species is threatened by a federal decision." Lujan, 504 U.S. at 566 (citing Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 231 n.4 (1986)). What's more, Hillgarth plans to look for North Atlantic right whales "in the particular area[] that they frequent." Animal Legal Def. Fund, 154 F.3d at 433 (quoting Didrickson, 982 F.2d at 1340–41); see also Moore Decl., ¶ 20 (noting that "as much as half the population" of North Atlantic right whales now uses "Cape

Cod Bay and the area south of Nantucket and Martha's Vineyard" as feeding grounds). The facts of this case are, quite literally, miles within the boundaries provided by the caselaw. Indeed, one would expect geographic-specificity demands to be more relaxed in a case such as this one, given that it involves a highly migratory species whose entire population is sharply affected by even one human-caused death — anywhere — per year. See ESA 25075, 25677.

Neither does NMFS's other contention — that Hillgarth's plans to go searching for these whales are insufficiently definite to give rise to an actual or imminent injury — find support in precedent. As Hillgarth not only "routinely go[es] on whale watching expeditions in hopes of seeing" a North Atlantic right whale, see Hillgarth Decl., ¶ 10, but also has plans, formed before the initiation of this lawsuit, to go to Cape Cod Bay to try to see the whales during their seasonal feeding time there in April or May 2020, see Hillgarth Suppl. Decl., ¶ 2, her case is a far cry from the "'some day' intentions — without any description of concrete plans, or indeed even any specification of when the some day will be" that Lujan found insufficient. See 504 U.S. at 564. Nor does Hillgarth claim merely a "special interest" in the whales. Id. at 563 (quoting Sierra Club v. Morton, 405 U.S. at 735). She explains that she became deeply invested in the survival of the species through her responsibilities as president and CEO of the New England Aquarium, which included "oversight of the institution's right whale research," through which she "came to know their individual stories — including their names, their family trees, whether they calved, where they migrated, and, tragically, when, where, and how they died." Hillgarth Decl., ¶ 6. This interest, born of a unique professional role, cannot be described as anything but personal — that is, particularized — to Hillgarth. And even though the imminence requirement is relaxed in this procedural-injury case, Sierra Club v. FERC, 827 F.3d at 65, the remedy discussion below makes clear how real the threat from increased gillnet fishing is to North Atlantic right whales

12

and, thus, to those with a particularized interest in them.  See *infra* Section VI.A.  Hillgarth has

sufficiently shown her injury in fact.

b.  Viola Patek

Viola Patek has been a member of CLF since 2014 and states that its information "helps

[her] understand the facts about the plight of" North Atlantic right whales, facts that she in turn

shares with her town of Nahant, Massachusetts, using the environmental non-profit organization

Nahant Safer Waters in Massachusetts Inc. (SWIM), of which she has been president since 2012.

See Patek Decl., ¶¶ 2–4.  SWIM "advocates for [the] conservation of North Atlantic right

whales," which Patek facilitates by creating educational and outreach initiatives in the local

community.  Id., ¶ 4.  She states that SWIM is "absolutely determined to educate the public

about the plight of the whales," id., ¶ 5, and "has twice spread sighting information on social

media that was used by the public to locate and view North Atlantic right whales in person."  Id.,

¶ 6.  Patek further states that "[t]he survival of North Atlantic right whales is of great importance

to [her] work as president of the organization, to which she is "very committed" and which she

"intend[s] to continue . . . into the future."  Id., ¶ 7.

Along with some of her children and grandchildren, she "had the rare privilege of seeing

a North Atlantic right whale" when one appeared in "the waters off the coast of Nahant . . . ,

visible from the shore, for two days."  Id., ¶ 8.  She describes the experience as "highly

emotional and personal."  Id.  Patek and her family "spent hours observing this whale" and

"could actually hear [its] breathing."  Id.  Because of this personal experience, Patek researched

the whale and discovered that it was #2415; the news that it was seen "in very poor condition"

over a year later, therefore, "deeply saddened" her.  Id.  Patek writes that she "often return[s] to

the spot" where she saw whale #2415 and "regularly scan[s] the ocean especially when it is

calm," looking for North Atlantic right whales. Id., ¶ 9. She hopes to see more of these whales as well as the specific whale they saw that day. Id. She states that "[a]ny action that further endangers the existence of the North Atlantic right whale is an injury to [her] enjoyment of whale watching and seeking this individual whale." Id. Patek further elaborates that threats to the North Atlantic right whale affect her professionally (by "negatively impacting" SWIM's efforts), recreationally (by decreasing her chances of seeing the species), and emotionally (because the "increased endangerment or extinction of North Atlantic right whales causes [her] tremendous dread and heartache," particularly because of her experience with #2415). Id., ¶ 10.

Like Hillgarth, Patek's declaration demonstrates a strong professional, recreational, and emotional interest in the survival of North Atlantic right whales that is much more individualized than that of a member of the general population interested in conservation or in marine mammals. And there is no suggestion that Patek lacks concrete future plans to look for North Atlantic right whales: she lives in a town where such a whale has been spotted, often searches the shoreline for the species, and is the president of an organization that works to inform the local community of these whale sightings. Indeed, NMFS does not question the future plans of any declarant but Hillgarth. See NMFS Cross-Mot. at 23–24. Patek's declaration has demonstrated her injury.

c. Peter Shelley

Peter Shelley, Senior Counsel and a Vice President for CLF, lives in Marblehead, Massachusetts, which is "situated on a peninsula in the center of the North Atlantic right whale's habitat during the winter and spring months." Shelley Decl., ¶ 2; id., ¶ 3. Shelley describes his "strong professional interest," id., ¶ 5, as well as his "strong personal and recreational interests," id., ¶ 6, in protecting North Atlantic right whales. He "founded CLF's Ocean Program,"

"participated in CLF's first federal lawsuit" regarding "impacts on North Atlantic right whales," and "give[s] public talks on the plight of the species and work[s] closely with local North Atlantic right whale researchers, whom [he] count[s] among [his] most important professional colleagues." Id., ¶ 5. Shelley has also "gone on numerous chartered whale watching trips from Boston and Provincetown to observe North Atlantic right whales in Massachusetts Bay, including one trip . . . with professional colleagues." Id., ¶ 6. In addition to these chartered trips, he "spend[s] an extensive amount of time . . . watching for these whales from [his] own boat, both for leisure and work, when they are migrating through Massachusetts and Maine waters." Id. Shelley describes the experience of watching the whales as "a deeply spiritual experience for [him] that soothes [his] soul and connects [him] directly to the ecological workings of the planet." Id. He also tracks sightings of the whales using his professional network as well as technology, and he "plan[s] to continue [these] efforts." Id., ¶ 7.

As noted above, NMFS does not contest Shelley's future plans, and rightly so. There is no doubt that he has a very real and individualized interest in the North Atlantic right whale that would be directly harmed by a further threat to the species.

2. *Causation*

The second element of standing that must be shown for at least one CLF member is causation — namely, that the injury "is fairly traceable to the challenged conduct of the defendant." Spokeo, 136 S. Ct. at 1547. As explained above, in a procedural-injury case, this means that CLF must establish "two causal links: 'one connecting the omitted procedural step to some substantive government decision that may have been wrongly decided because of the lack of that procedural requirement and one connecting that substantive decision to the plaintiff's particularized injury.'" Ctr. for Biological Diversity, 861 F.3d at 184 (alterations omitted)

(quoting <u>Fla. Audubon Soc'y</u>, 94 F.3d at 668).  Here, this means that CLF must show: (1) a connection between NMFS's failure to consult under the ESA and its removal of gillnet closures in the two areas; and (2) a connection between the removal of gillnet closures and a CLF member's particularized interest.  The latter step can be further divided into two smaller causal connections: (a) one connecting the removal of the gillnet closures to harm <u>to the whales</u>; and (b) one connecting harm to the whales to harm to a CLF member's interest.  For each causal step, CLF must show that it is "substantially probable 'that the substantive agency action that disregarded a procedural requirement created a demonstrable risk, or caused a demonstrable increase in an existing risk, of injury to the particularized interests of the plaintiff." <u>Sierra Club v. FERC</u>, 827 F.3d at 65 (quoting <u>Fla. Audubon Soc'y</u>, 94 F.3d at 669).

On the first central question, NMFS's decision not to consult under Section 7(a)(2) of the ESA, discussed below, is directly connected to its decision to remove gillnet closures in the two areas at issue.  Because the Service promulgated the Habitat Amendment without going through the prescribed process under Section 7(a)(2), <u>see</u> *infra* Section IV, it made the decision to open the area to gillnet fishing without considering that action's effect on the species.  <u>See</u> <u>Ctr. for Biological Diversity</u>, 861 F.3d at 184 (finding agency's failure to consult under ESA "unquestionably" connected to its decision to use certain kind of pesticide without consideration of its effect on listed species).  This connection far surpasses the substantial probability required.

On the second step, CLF has also easily shown both that the removal of gillnet closures is substantially likely to cause harm to the North Atlantic right whale and that such harm to the whale is substantially likely to directly harm its members' individual interests discussed above.  The first of these two sub-connections is shown at length in the Remedy Section below.  <u>See</u>

*infra* Section V.A.  The Court, therefore, will proceed to discuss the connection between (further) harm to the whales and harm to CLF's members' individual interests.

The declarations of each of the three aforementioned CLF members show the ways in which further harm to the whales would injure their personal, professional, and recreational interests.  Hillgarth states that "[a]nything that reduces the probability that [she] will see a North Atlantic right whale reduces [her] enjoyment" of her recreational whale watching.  See Hillgarth Decl., ¶ 10.  She states, too, that learning of "[t]he death of even a single individual of this species grieves [her], as [she is] acutely aware through [her] professional and academic background that each death is a major setback for the[ir] survival."  Id., ¶ 11.  Patek and Shelley, who live in coastal Massachusetts towns where North Atlantic right whales are spotted, both frequently search for the whales.  See Patek Decl., ¶¶ 8–10; Shelley Decl., ¶¶ 6–7.  Patek asserts that "[a]ny action that further endangers the existence of the existence of the North Atlantic right whale is an injury to [her] enjoyment of whale watching and seeking [the] individual whale [#2415]."  Patek Decl., ¶ 9.  Shelley states that whale watching and staying updated on the whales' migratory and conservation status "all bring [him] less joy and meaning as the survival of this species is being further imperiled by continued entanglement in commercial fishing gear, particularly gillnets."  Shelley Decl., ¶ 11.  He also notes the harm to his professional interest, since the increased risk from gillnets in these areas "stands to undo the conservation achievements" to which he "ha[s] committed a great portion of [his] life" through his work at CLF.  Id., ¶ 12.  The declarations of these members show that they are certain to be harmed in myriad ways by the further endangerment of the North Atlantic right whale.  This more than satisfies the "substantially probable" standard.

NMFS rebuts this strong showing of causation with the argument that the Patek and Shelley declarations "rely on speculation as to the future actions of third parties and resulting effects on right whales." NMFS Cross-Mot. at 24. It argues that CLF needed to, and did not, prove three additional causal links: first, that fishing efforts will shift into the formerly closed areas as a result of the Habitat Amendment; second, that there will be increased entanglements "even though the number of fishing vessels remains the same"; and third, that "entanglements [will] affect the ability of [CLF] members to observe the species in the wild." Id. at 25. The Court addresses each in turn.

NMFS's first contention — that CLF has not shown that fishing is likely to shift as a result of the Habitat Amendment — strains credulity. Opening formerly restricted areas to gillnet fishing is, of course, designed to benefit gillnet fishing by allowing it to occur in these two new areas. NMFS itself states plainly: "The opening of these areas is expected to have significant economic benefits for the fishing industry." NMFS Cross-Mot. at 7. NMFS, moreover, offers no evidence to support its statement that fishing effort will not shift. The Court is hard pressed to see why assuming that fishermen will do what the Habitat Amendment was passed to enable them to do is a "very speculative inference[]" or "assumption[]." Id. at 25 (quoting San Juan Audubon Soc'y v. Wildlife Servs., 257 F. Supp. 2d 133, 137 (D.D.C. 2003)).

The Service's second point — that CLF has not shown that there will be increased entanglements "even though the number of fishing vessels remains the same," id. at 25 — is similarly unconvincing. Even assuming that NMFS means that the number of gillnets will remain the same, the question is whether there may be increased entanglements from allowing gillnets in two specific areas that may house up to half the entire population of North Atlantic right whales in a given feeding season. As established in the previous paragraph, NMFS has

failed to plausibly establish that fishing efforts will not shift into those areas. CLF's expert, whose report is discussed in more detail below, see *infra* Section VI.A, confirms that this shift could "increase effort" and thus increase the "likel[ihood] an individual whale will encounter and become entangled in this gear." Moore Decl., ¶¶ 30–32.

NMFS's third position — that CLF has not shown that entanglements will affect its members' abilities to view North Atlantic right whales in the wild — has already been addressed in part by the causation analysis above, see *supra* Section II.A.2, and will be further discussed in the remedy discussion below. See *infra* Section V.A. Briefly, however, the causal steps proceed like this: entanglements cause death, shortened lifespans, and lower reproductivity in North Atlantic right whales — in short, they result in fewer whales in the water. Id. Fewer whales in the water means a lower chance of CLF's members seeing the whales. See Hillgarth Decl., ¶¶ 10–11; Patek Decl., ¶¶ 8–10; Shelley Decl., ¶¶ 6–7.

CLF has thus shown the substantial probability required to prove this second element of standing, and it has done so for all three declarant members.

### 3. *Redressability*

The last of the three elements of individual standing is redressability — that is, that the injury in fact of its members is "likely to be redressed by a favorable judicial decision." Spokeo, 136 S. Ct. at 1547. As noted above, this third element of standing is relaxed when the injury alleged is procedural: "[T]he case law relieves the plaintiff of the need to demonstrate that (1) the agency action would have been different but for the procedural violation, and (2) that court-ordered compliance with the procedure would alter the final result." Nat'l Parks Conservation Ass'n, 414 F.3d at 5 (citing Lujan, 504 U.S. at 572 n.7). CLF need only show "that a revisitation of the [agency action] that includes an effects determination and any required consultation would

redress [its] members' injury because the [agency] <u>could</u> reach a different conclusion." <u>Ctr. for Biological Diversity</u>, 861 F.3d at 185.

Here, there is certainly a possibility that NMFS will change its mind as to the two closures in question once it follows the prescribed procedures under the ESA and its regulations. Indeed, Congress — through the ESA — created this system of "institutionalized caution" precisely so that agencies would reconsider actions that threaten endangered species. <u>Hill</u>, 437 U.S. at 194. NMFS has made no statements to the contrary, and, even if it had, those would not be dispositive. <u>Ctr. for Biological Diversity</u>, 861 F.3d at 185 (finding plaintiffs had met relaxed redressability requirement even when agency "assert[ed] that a 'serious possibility' exist[ed]" that its final action would not change after ESA effects determination and consultation). Because this possibility exists, CLF has shown that the injury to its members' interests is redressable by a favorable outcome in this litigation.

To recap: because the Court finds that all three CLF member declarants have shown injury in fact, causation, and redressability, Plaintiff has now met the first element of associational standing — <i>viz.</i>, at least one of its members would have standing to sue individually. Two other elements remain.

### B. Interests Germane to CLF's Purpose

As noted above, the second requirement of associational standing is that "the interests [the organization] seeks to protect are germane to [its] purpose." <u>Sierra Club v. FERC</u>, 827 F.3d at 65 (quoting <u>WildEarth Guardians</u>, 738 F.3d at 305). The D.C. Circuit recently stated that it had "no difficulty finding that . . . an organization dedicated to the protection and enjoyment of the environment" had an interest in an agency's fulfilling its consultation obligations under the ESA. <u>Ctr. for Biological Diversity</u>, 861 F.3d at 182 (internal quotation marks omitted). CLF,

whose purpose is "to protect New England's environment for the benefit of all people," Pl. Renewed MSJ, Exh. E (Declaration of Sean Mahoney), ¶ 3, has an "obvious interest" in challenging NMFS's compliance with ESA consultation procedures as to the effect of the Habitat Amendment on an endangered species that frequents New England waters. See Ctr. for Biological Diversity, 861 F.3d at 182 (quoting Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin., 724 F.3d 243, 247 (D.C. Cir. 2013)). But CLF has a specific purpose even more germane than that: North Atlantic right whales have been a "focus" of CLF's work "[f]or over 40 years" in myriad ways, including suits, *amicus* briefs, advisory consultation, and various direct-conservation efforts. See Mahoney Decl., ¶¶ 5–11. Given that an organization with conservationism writ large as its purpose has been found to fulfill this requirement, see Ctr. for Biological Diversity, 861 F.3d at 182, there can be no question that this is so for an organization that focuses on whales specifically. CLF easily meets this requirement.

C. No Member Participation Required

The third and final hurdle CLF must overcome in order to prove its associational standing is that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Sierra Club v. FERC, 827 F.3d at 65 (quoting WildEarth Guardians, 738 F.3d at 305). Here, the claim asserted is NMFS's violation of its consultation obligation under ESA, and the relief requested is an injunction requiring the Service to restore gillnet closures to the two areas. Neither requires CLF member participation, accord Ctr. for Biological Diversity, 861 F.3d at 182, and NMFS makes no argument to the contrary.

As CLF thus meets all three requirements of associational standing, the Court may move on to the merits.

### III.    Legal Standard

As noted above, Plaintiff's ESA (and thus MSA) claims preclude a separate cause of
action under the APA.  But, ironically, the legal standard used to evaluate cases brought under
the ESA is the judicial-review provision of the APA.  See Nat'l Ass'n of Home Builders v.
Norton, 415 F.3d 8, 13 (D.C. Cir. 2005).  While the subject of review is whether NMFS has
violated the ESA, the standard of review is thus found in APA precedent.

Because of the limited role federal courts play in reviewing such administrative
decisions, the typical Federal Rule 56 summary-judgment standard does not apply to the parties'
dueling Motions.  See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89–90 (D.D.C. 2006).
Instead, "the function of the district court is to determine whether or not . . . the evidence in the
administrative record permitted the agency to make the decision it did."  Id. at 90 (quoting
Occidental Eng'g Co. v. INS, 753 F.2d 766, 769 (9th Cir. 1985)).  Summary judgment thus
serves as the mechanism for deciding, as a matter of law, whether an agency action is supported
by the administrative record and is otherwise consistent with the APA standard of review.  See
Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002) (citing Richards v. INS, 554 F.2d 1173,
1177 (D.C. Cir. 1977)).

The Administrative Procedure Act "sets forth the full extent of judicial authority to
review executive agency action for procedural correctness."  FCC v. Fox Television Stations,
Inc., 556 U.S. 502, 513 (2009).  It requires courts to "hold unlawful and set aside agency action,
findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not
in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is arbitrary and capricious if, for
example, the agency "entirely failed to consider an important aspect of the problem, offered an
explanation for its decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Under this "narrow" standard of review, an agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Id. (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). Courts "have held it an abuse of discretion for [an agency] to act if there is no evidence to support the decision or if the decision was based on an improper understanding of the law." Kazarian v. U.S. Citizenship and Immigration Servs., 596 F.3d 1115, 1118 (9th Cir. 2010). Put another way, the court's role is only to "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Am. Oceans Campaign v. Daley, 183 F. Supp. 2d 1, 4 (D.D.C. 2000) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)).

It is not enough, then, that the court would have come to a different conclusion from the agency. See Oceana, 24 F. Supp. 3d at 58 (citing Steel Mfrs. Ass'n v. EPA, 27 F.3d 642, 646 (D.C. Cir. 1994). The reviewing court "does not substitute its own judgment for that of the agency." Id. A decision that is not fully explained, moreover, may be upheld "if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974). It is only these "certain minimal standards of rationality" to which a reviewing court holds an agency. See Nat'l Envtl. Dev. Ass'ns Clean Air Project v. EPA, 686 F.3d 803, 810 (D.C. Cir. 2012) (quoting Ethyl Corp. v. EPA, 541 F.2d 1, 36–37 (D.C. Cir. 1976) (*en banc*)).

NMFS also claims that SFD's choices are entitled to the even more deferential standard used to review agency decisions involving technical expertise. See NMFS Cross-Mot. at 29.

But it is not the <u>action</u> agency that is the expert as to its duties under the ESA and its regulations. <u>Nat'l Wildlife Fed'n v. Brownlee</u>, 402 F. Supp. 2d 1, 10–11 (D.D.C. 2005) (citing <u>Office of Pers. Mgmt. v. FLRA</u>, 864 F.2d 165, 171 (D.C. Cir. 1988)). The Court, therefore, will not afford this further level of deference.

## IV.    Analysis

Now that the ship has been fully rigged, the Court steers to the crux of the matter: whether the Sustainable Fisheries Division of NMFS violated Section 7(a)(2) of the ESA by failing to engage in consultation with the Protected Resources Division of NMFS as to the effects of the Habitat Amendment on North Atlantic right whales. As previously explained, a failure to consult under the ESA also constitutes a violation of Section 304(a)(1)(A) of the MSA.

To recap, SFD began work on the Habitat Amendment, which covers all seven FMPs overseen by the New England Fishery Management Council, in 2004. <u>See</u> 69 Fed. Reg. 8,367 (Feb. 24, 2004). Once the measures to be implemented by the Amendment had been determined, and pursuant to its duties under a separate environmental statute, SFD issued a final Environmental Impact Statement (EIS) for the Habitat Amendment in December 2016. <u>See</u> ESA 27319–29266. That EIS considered not only the environmental impacts of the individual proposed changes to the FMPs but also the cumulative effects of the entire Amendment. <u>Id.</u> Most relevant to this case, the EIS found that the Habitat Amendment <u>may affect</u> the North Atlantic right whale. <u>See</u> ESA 27763 tbl.61 (listing whether various species were "[p]otentially affected" by the Habitat Amendment and answering this question in affirmative for North Atlantic right whale).

Despite this clear finding, SFD did not then engage in either informal or formal consultation with PRD as to the effects of the Habitat Amendment on the whale. <u>See</u> NMFS

Cross-Mot. at 29–30.  Instead, SFD undertook its <u>own</u> "internal review process" to "determin[e] that consultation was not required prior to approving the Habitat Amendment."  <u>Id.</u> at 32.  While SFD "did not contemporaneously document the details of" this process at the time NMFS avers the review was undertaken — <i>i.e.</i>, before promulgation of the Amendment — "it did so during the limited remand granted by the Court."  <u>Id.</u>  This internal-review process consisted of filling out several "checklist[s]," each applying to 1–3 FMPs within the New England region.  <u>Id.</u>  Those checklists were "created for th[e] purpose" of analyzing whether consultation was required as to the effects of the changes made to that FMP on the North Atlantic right whale.  <u>Id.</u>; <u>see</u> ESA 30989–94 (Atlantic Sea Scallop FMP); ESA 30999–31004 (Atlantic Herring FMP); ESA 31015–16 (Red Crab FMP); ESA 31017 (Northeast Multispecies, Monkfish, and Skate FMPs combined).  In each case, the completed checklist found that no consultation was required.  As to the seventh FMP — the Atlantic Salmon FMP — SFD did not complete a checklist because the Amendment's only changes to the Salmon FMP were to increase protections for the salmon, and thus "consultation on the Salmon FMP is not required at this time."  ESA 30988.

CLF's core contention is simple: notwithstanding the various steps SFD took on its own, it never completed the required consultation with PRD as to the effects of the Habitat Amendment on the whale.  <u>See</u> Pl. Renewed MSJ at 20–23.  In CLF's view, once SFD had determined in its December 2016 EIS that the Amendment "may affect" the whale, it was no longer empowered to make any sort of interim determination that consultation was not required.  In other words, the "may affect" trigger <u>necessitated</u> either informal or formal consultation.  <u>Id.</u>; <u>see also</u> 50 C.F.R. § 402.14(a)–(b).  No amount of "internal review" — and especially not a review process that segmented the Amendment into its effects on the separate FMPs — fulfills this consultation duty.  <u>See</u> Pl. Renewed MSJ at 20–23.

CLF's position is unequivocally supported by the ESA, its regulations, and the caselaw. Once an action agency makes the determination that its action "may affect" a listed species, it is without discretion to avoid consultation with the expert agency as to the effects of the action on the listed species.  See 50 C.F.R. § 402.14(a)–(b); Ctr. for Biological Diversity v. U.S. Dep't of Interior, 563 F.3d 466, 474–75 (D.C. Cir. 2009) ("If an agency concludes that its action 'may affect' a listed species or critical habitat, then the agency must pursue either formal or informal consultation with the [expert agency]."); Nat'l Parks Conservation Ass'n v. Jewell, 62 F. Supp. 3d 7, 12 (D.D.C. 2014) ("[A]n agency avoids the consultation requirement for a proposed discretionary action only if it determines that its action will have 'no effect' on threatened or endangered species or critical habitat.") (emphasis added) (quoting Ctr. for Biological Diversity, 563 F.3d at 475).  At a minimum, SFD had to engage in informal consultation with PRD as to the combined effects of the entire Habitat Amendment and obtain a "written concurrence" from it confirming "that the action is not likely to adversely affect listed species."  50 C.F.R. § 402.13(a).   If PRD could not so find, SFD was required to participate in formal consultation with it.  Id. § 402.14(a)–(b).  Ultimately, in such a situation, only a biological opinion by PRD finding that the combined effects of the entire Habitat Amendment are "not likely to jeopardize the continued existence of any endangered species," 16 U.S.C. § 1536(a)(2), will relieve SFD of its ESA duties and permit the action to carry forward. 50 C.F.R. § 402.14(h)(3); see also 16 U.S.C. § 1536(a)(2).  NMFS concedes that it has not traveled down either of these avenues.  It therefore stands in clear violation of the ESA and, as a result, of the MSA.  See 16 U.S.C. § 1854(a)(1)(A).

In an effort to escape the wide net cast by Section 7(a)(2), NMFS argues that it had discretion to determine, "on a fishery-by-fishery basis," whether consultation was needed.  See

NMFS Cross-Mot. at 29. Even if such segmented analysis were permitted, this argument suffers from the same problem just discussed: SFD had no discretion to make <u>any</u> sort of interim determinations after its finding that the Habitat Amendment "may affect" the North Atlantic right whale. Once SFD made this "may affect" determination, it had to proceed directly to consultation — it could not pass Go, it could not collect $200, and it could not make any more independent determinations as to its ESA duties, "fishery-by-fishery" or otherwise. <u>See</u> <u>Ctr. for Biological Diversity</u>, 563 F.3d at 474–75; <u>Nat'l Parks Conservation Ass'n</u>, 62 F. Supp. 3d at 12.

In any event, the "fishery-by-fishery" approach is not permitted by ESA regulations or the caselaw, even when consultation does occur. ESA regulations permit grouping individual actions for purposes of consultation, but expressly caution that any such groupings "do[] not relieve the Federal agency of the requirements for considering the effects of the action as a whole." 50 C.F.R. § 402.14(c). The reason for this is intuitive: "[S]uch impermissible segmentation would allow agencies to engage in a series of limited consultations without ever undertaking a comprehensive assessment of the impacts of their overall activity on protected species." <u>Am. Rivers v. U.S. Army Corps of Eng'rs</u>, 271 F. Supp. 2d 230, 255 (D.D.C. 2003). For this reason, the memorandum offered by NMFS and written from PRD to SFD during remand does not cure its Section 7(a)(2) defects. The memo states that, by reviewing the fishery-by-fishery checklists described above, PRD had "completed an intra-agency consultation under section 7 of the Endangered Species Act" and "concur[red] with [SFD's] determination that the proposed action [did] not trigger the need to reinitiate consultation" as to various individual FMPs. <u>See</u> ESA 30986. Putting aside the expert agency's apparent lack of independent investigation of the individual FMPs' effects on the whales, this "consultation" is insufficient merely by nature of its "impermissible segmentation." <u>Am. Rivers</u>, 271 F. Supp. 2d at 255.

Indeed, this case is a perfect example of why the rule against such a piecemeal analysis exists. Segmenting the Amendment for purposes of both its own *ultra vires* interim ESA determination and PRD's concurrence with that determination led not only to a failure to consider the combined and cumulative effects of the various measures of the Habitat Amendment but also to SFD's reliance on individual, outdated biological opinions for individual FMPs. For example, one of the biological opinions on which NMFS relies was completed in 2002 — before the Habitat Amendment was even initiated. See NMFS Cross-Mot. at 15–16, 19. Another, completed in 2013, appears to assume the continued existence of the two groundfish closure areas at issue in this case. Id. at 18–19; see ESA 5507, 5523–28.

More broadly, however, having treated the Habitat Amendment as one action from its initiation, see 69 Fed. Reg. 8,367, through its EIS, see ESA 27319–29266, to its promulgation, see 83 Fed. Reg. 15,240, NMFS cannot now maintain that segmenting the Amendment for ESA purposes will allow it to obtain a "comprehensive assessment of the impacts of their overall activity on protected species." Am. Rivers, 271 F. Supp. 2d at 255; see 50 C.F.R. § 402.14(c) (stressing the obligation to "consider[] the effects of the action as a whole"). Only an assessment of the Amendment as a whole would be able to consider, for example, the overall shifts and resulting density of fishing effort as a result of the multiple changes proposed by the various parts of the Amendment. (As should be clear by now, PRD's 2017 reinitiation of formal consultation on the 2002 and 2013 biological opinions, undertaken for reasons unrelated to the Habitat Amendment, see ESA 6048, cannot produce any end product that will satisfy SFD's consultation duties as to the entire Habitat Amendment.)

In sum, NMFS's duty was clear, and the Court cannot excuse this breach, even under the deferential APA standard of review. Having determined that the Amendment may affect North

Atlantic right whales, SFD was required to undergo consultation with PRD as to the effects of the <u>entire</u> Habitat Amendment on the species. By failing to do so, it violated Section 7(a)(2) of the ESA and, consequently, Section 304(a)(1)(A) of the MSA. These manifest statutory violations are, of course, "not in accordance with law." 5 U.S.C. § 706(2)(A). Judgment in Plaintiff's favor is thus warranted, and the contours of an appropriate remedy are discussed next.

## V. Remedy

CLF seeks "a narrowly tailored injunction" that would "restore the prior prohibition on gillnet fishing" in Closed Area I and the Nantucket Lightship Area. <u>See</u> Pl. Renewed MSJ at 37–38. In other words, Plaintiff seeks to return to the status quo that existed for 20 years prior to the promulgation of the Habitat Amendment. <u>See</u> ECF No. 45 (Plaintiff Reply) at 43–44.

The standard for a permanent injunction is a familiar one. CLF must convince the Court of four things:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

<u>Monsanto Co. v. Geerston Seed Farms</u>, 561 U.S. 139, 156–57 (2010) (quoting <u>eBay Inc v. MercExchange, L.L.C.</u>, 547 U.S. 338, 391 (2006)). While the first element is recited in the past tense, the Supreme Court has recognized that it may include future harm. <u>See</u> <u>Monsanto</u>, 561 U.S. at 162 (finding respondents did not adequately show "that they <u>will suffer</u> irreparable injury" if the agency were "allowed to proceed" (emphasis added)). And when an injunction is being considered as a remedy for a violation of Section 7 of the ESA, "the third and fourth factors . . . are generally considered to tip in favor of the species." NMFS Cross-Mot. at 40 (citing <u>Hill</u>, 437 U.S. at 194). In passing the ESA, "Congress has spoken in the plainest of

words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." Hill, 437 U.S. at 194 (enjoining construction of dam that was nearly completed).

Upon consideration of these four factors, discussed in turn below, the Court is convinced that an injunction should issue. See Monsanto, 561 U.S. at 158 ("It is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should not issue; rather, a court must determine that an injunction should issue."). NMFS raises arguments as to only the first factor — irreparable injury — and does not appear to contest the last three. See NMFS Cross-Mot. at 40–42.

A. Irreparable Injury

To meet this first prong, CLF must show that it "will suffer irreparable injury if [the agency] is allowed to proceed." Monsanto, 561 U.S. at 162. The injury that will result to CLF through its members if North Atlantic right whales are harmed has already been discussed at length. See supra Sections II.A.1–2. The Court here thus focuses on why opening Closed Area I and the Nantucket Lightship Area to gillnet fishing will cause irreparable harm to the whale.

The parties each submit expert declarations on this issue. As previously discussed, CLF offers one from Dr. Michael Moore, senior scientist at the Woods Hole Oceanographic Institute and director of its Marine Mammal Center, who holds a master's degree and a Vet MB from the University of Cambridge as well as a PhD in Biological Oceanography from the Massachusetts Institute of Technology's joint program with the Woods Hole Institute, where he has been employed since 1986. See Moore Decl., ¶¶ 2, 4. Dozens of Moore's 137 peer-reviewed publications have studied the entanglement of North Atlantic right whales, id. at 24–36, and he has served as the Chair of two of NMFS's scientific bodies: the Unusual Marine Mammal

Mortality Events review panel and the Atlantic Scientific Review Group.  Id., ¶ 5.  NMFS

counters with the declaration of Michael Asaro, who has been the Marine Mammal and Sea

Turtle Branch Chief in the Greater Atlantic Region at NMFS since June 2017, before which he

worked as a Policy Analyst at NMFS since September 2010.  See NMFS Cross-Mot., Exh. B at

7–8.  Asaro holds a Masters in Environmental Management concentrating in Policy, Economics,

and Law from the Yale University School of Forestry and Environmental Studies as well as a

PhD in Law and Public Policy from Boston University.  Id. at 7.  Two of his three peer-reviewed

publications have studied the entanglement of North Atlantic right whales.  Id. at 8–9.  In his

current position at NMFS, Asaro "manage[s] the implementation of conservation programs to

protect North Atlantic right whales under . . . the Endangered Species Act."  Id., ¶ 1.

Moore presents powerful evidence, supported by extensive citation to peer-reviewed

research, that opening these two areas to gillnet fishing will irreparably harm North Atlantic right

whales.  Gear entanglement, which has been increasing since 2003, and the incidence of which is

almost certainly underestimated, is "the most important diagnosed cause of death in this

species."  Moore Decl., ¶ 12; see also id., ¶ 13 (listing reasons for underestimation).   When the

global population of a species is as low as 400, id., ¶ 9, "every mortality is of huge significance

to the potential for the species to avoid extinction."  Id., ¶ 15 (citing a 2018 study finding that

without the increase in entanglement over the last 3 decades, North Atlantic right whales "could

have been much more resilient to a disaster year like 2017").

Death is not the only harmful consequence of entanglement and fishing-gear drag for the

whales; the energy needed to recover from these incidents has drastically delayed how frequently

reproductively viable females now give birth.  Id., ¶ 17.  Given that there are fewer than 100

breeding females left alive on the planet, id., ¶ 11, and given that studies (from before

31

entanglements increased dramatically starting in 2010) estimate that as many as 83% of the whales have been entangled at least once, id., ¶ 16, this "sub-lethal" effect of gear drag and entanglement may be equally harmful to the whale population.

Gillnet fishing, the type that the Habitat Amendment permits in Closed Area I and the Nantucket Lightship Area, presents a "disproportionate risk" of entanglement to these whales as compared to other types of fishing gear. Id., ¶ 18. This is because gillnets are "a wall of netting that hangs in the water column." Fishing Gear: Gillnets, NOAA Fisheries, https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-gillnets (last visited Oct. 5, 2019). This "much larger target area" — up to 300 feet wide — makes gillnets harder for a whale to avoid. See Moore Decl., ¶ 18.

In the last several years, North Atlantic right whales "ha[ve] increasingly used the Cape Cod Bay (as much as half the population) and the area south of Nantucket and Martha's Vineyard." Id., ¶ 20. This is true "especially during the winter and spring," but some of the species now "stay in these waters . . . year round." Id. These areas "overlap the former gear restricted areas eliminated when the Habitat Amendment was implemented." Id., ¶ 21; compare id., ¶ 20 fig.5 (map showing increase in North Atlantic whale sightings), with id., ¶ 21 fig.6 (map showing the two formerly closed areas). Unsurprisingly, opening these two protected areas to gillnet fishing is likely to shift gillnet fishing there, increase the distribution of gillnets through these waters that host vast concentrations of North Atlantic right whales, and thus increase the risk of those whales' becoming entangled in the gillnet gear. Id., ¶¶ 31–32. Given the lethal and sub-lethal effects of entanglement, removing gillnet closures is likely to cause irreparable injury to these whales and thus to CLF and its members. See also supra Sections II.A.1–2.

NMFS attempts to rebut this conclusion with two arguments. First, it claims that Asaro has shown that "gillnets do not pose a greater entanglement risk within the former closed areas than other vertical lines." NMFS Cross-Mot. at 41 (citing Asaro Decl., ¶ 8). Second, NMFS points to Asaro's conclusion that gear-closure areas are not as effective as two alternate methods of whale protection because whale "hotspots" are not static. Id. (citing Asaro Decl., ¶¶ 10–12).

The fundamental problem with both of these arguments is that, even if true, they do not refute the conclusion that opening these two areas to gillnet fishing will irreparably injure North Atlantic right whales. The question is not whether there are more harmful actions the agency could take or more effective ways of protecting the whales than keeping the two areas closed. It matters only that gillnet fishing seriously harms the whales and that opening these areas to gillnet fishing would cause such injury. Both of these propositions have just been shown above.

For the sake of completeness, however, the Court will note other reasons why Asaro's assertions do not carry the day. His first claim, made without citation, is that "gillnet gear is a minor contributor to the overall right whale entanglement risk . . . because lobster fishing accounts for over 97% of the vertical lines on the east coast." Asaro Decl., ¶ 7. But, of course, this only helps to strengthen CLF's position. Gillnet gear, which NMFS points out can be at most 3% of vertical line fishing on the east coast, accounted for 10% of fishery-related right-whale deaths in the last twenty years. See Moore Decl., ¶ 18. Moore explains in a supplemental declaration — and with reference to peer-reviewed research — that it is the net panels strung between the vertical lines in gillnet fisheries, more so than the vertical lines themselves, that pose the outsized risk to these whales, whose feeding behavior takes them frequently between the ocean's floor and its surface. See Pl. Reply, Exh. B (Supplemental Decl. of Michael Moore), ¶ 8.

So NMFS's reliance on the relatively low presence of gillnets only emphasizes the "disproportionate risk" they pose to the whales.  <u>See</u> Moore Decl., ¶ 18.

Asaro's second position is that area closures are not the most effective method of preventing entanglement because whale "hotspots" are not static.  While the areas where North Atlantic right whales have concentrated has indeed shifted over time, their current concentration for the last five years has been where the two closed areas are.  <u>Id.</u>, ¶¶ 20–21.  The Court is disinclined to speculate that the species might immediately and completely abandon these areas, such that opening gillnet closures would have a much smaller impact on their survival.  In any case, Moore also points out several concerning "scientific shortcomings" with the model Asaro used as the basis for his conclusions.  <u>See</u> Moore Supp. Decl., ¶ 6.  Moore states that, when presented with the recent modeling at their latest meeting, several members of NMFS's Atlantic Large Whale Take Reduction team "expressed significant concerns" with the modeling tool, which "was not designed to evaluate gillnet risk to [North Atlantic right whales]."  <u>Id.</u>, ¶ 6.  Moore further explains that, among other issues, the model "was heavily biased by survey data prior to 2010 (1998-2016) even though the distribution of right whales shifted significantly after that time frame."  <u>Id.</u>  Suffice it to say, Asaro's statement that there are other, more effective methods of preventing entanglement does not convince the Court that opening the two closed areas to gillnet fishing will not cause irreparable injury to North Atlantic right whales.

B.  <u>Inadequacy of Legal Remedies</u>

The second element needed for a permanent injunction, uncontested by NMFS, is that "remedies available at law, such as monetary damages, are inadequate to compensate for that injury."  <u>Monsanto</u>, 561 U.S. at 156.  It hardly merits recitation that the harm inflicted upon the whales by entanglement, and the resulting harms to the professional, aesthetic, and recreational

interests of CLF's members, are noncompensable by legal remedies. Both lethal and sublethal effects of entanglement bring the species ever closer to extinction, from which there is, of course, no return. Even short of extinction, each death causes the declarant CLF members individualized personal and professional anguish that money damages would not redress. See Hillgarth Decl., ¶ 10; Patek Decl., ¶ 9; Shelley Decl., ¶¶ 5–6. Significantly, NMFS makes no argument that the irreparable injury caused by opening these two closed areas to gillnet fishing could be remedied by any relief available at law. See NMFS Cross-Mot. at 40–42. The Court finds this element easily met.

    C. <u>Balance of Hardships / Public Interest</u>

The final two elements CLF must show in order to convince the Court that an injunction should issue are "(3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." <u>Monsanto</u>, 561 U.S. at 157. As noted above, the Supreme Court has recognized that, in an ESA case, these two inquiries are influenced heavily by Congress's plain meaning in enacting the ESA. It being "the exclusive province of the Congress" to "establish the[] relative priority for the Nation" of legislative policies and projects, it is not "our function" as courts to question the priorities set by Congress when it passed the ESA. <u>Hill</u>, 437 U.S. at 194. The plain text of the ESA "mak[es] it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." <u>Id.</u> As NMFS concedes, <u>see</u> NMFS Cross-Mot. at 40, Congress has thus instructed both the executive and the judicial branches as to whose hardships are to be prioritized and as to what will serve the public interest. Between the hardship to the North Atlantic right whale of its fast-approaching extinction and the hardship to NMFS of completing its legislatively mandated

consultation to ensure that Congress's priorities as to endangered species are carried out, there can be no confusion. And the public interest in preventing the extinction of the whale, which has been listed as endangered since the passage of the ESA, is beyond dispute. It is not the place of this Court to question these legislative priorities nor to allow NMFS to escape their strictures.

Upon consideration of the four elements above, the Court finds not only that each element is met but also "that an injunction should issue." <u>Monsanto</u>, 561 U.S. at 158.

## VI.    Conclusion

For the foregoing reasons, the Court will grant CLF's Motion for Summary Judgment, grant CLF's request for injunctive relief, and deny NMFS's and FSF's corresponding Cross-Motions for Summary Judgment. A contemporaneous Order so stating will issue this day.


<u>/s/</u> James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  October 28, 2019